**14-1856, -1857**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

ROMAG FASTENERS, INC.,
*Plaintiff - Appellant,*

v.

FOSSIL, INC., FOSSIL STORES I, INC., MACY'S, INC.,
MACY'S RETAIL HOLDINGS, INC., BELK, INC.,
THE BON-TON STORES, INC.,
THE BON-TON DEPARTMENT STORES, INC., DILLARD'S, INC.,
NORDSTROM, INC., ZAPPOS.COM, INC., ZAPPOS RETAIL, INC.,
*Defendants - Cross-Appellants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF CONNECTICUT

10-cv-01827-JBA and 11-cv-00929-CFD

Janet Bond Arterton, United States District Judge

### BRIEF OF PLAINTIFF-APPELLANT
### ROMAG FASTENERS, INC

Norman H. Zivin
Tonia A. Sayour
COOPER & DUNHAM, LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 278-0400
(212) 391-0525 (fax)
nzivin@cooperdunham.com
tsayour@cooperdunham.com

Jonathan Freiman
WIGGIN AND DANA LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
(203) 498-4400
(203) 782-2889 (fax)
jfreiman@wiggin.com

*Attorneys for Plaintiff-Appellant*
*Romag Fasteners, Inc.*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellant Romag Fasteners, Inc. certifies the following:

1. The full name of every party represented by us is: Romag Fasteners, Inc.

2. The name of the real party in interest represented by us is: not applicable.

3. All parent corporations and any publicly held companies that own ten percent or more of the stock of the party represented by us are: none.

4. The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this court are: <u>Law firms</u>: Brenner, Saltzman & Wallman LLP; Cooper & Dunham, LLP-NY; Wiggin and Dana LLP; <u>Attorneys</u>:  David R. Schaefer, Brian P. Daniels, Sean M. Fisher, Norman H. Zivin, Tonia A Sayour, Adam Farbiarz, Tahlia Townsend, Jonathan M. Freiman.


Dated: January 29, 2015


By:    <u>/s/ Jonathan M. Freiman</u>
Jonathan M. Freiman
WIGGIN AND DANA LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
(203) 498-4400
(203) 782-2889 (fax)
jfreiman@wiggin.com

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................ i

TABLE OF AUTHORITIES.................................................................. v

STATEMENT OF RELATED CASES ................................................. 1

JURISDICTIONAL STATEMENT......................................................... 2

STATEMENT OF THE ISSUES ............................................................. 3

STATEMENT OF THE CASE ............................................................... 4

STATEMENT OF FACTS...................................................................... 7

I.     Fossil Directs Its Factories To Use Romag Snaps And Buy Them From
       Wing Yip........................................................................................ 9

II.    Romag Guards Its Good Name, Learns That Superior Is Counterfeiting,
       And Ties It To Fossil.................................................................... 11

III.   The Jury Finds That Fossil Acted With "Callous Disregard," Infringing
       Romag's Patent And Trademark By Using Counterfeit Snaps In Its Bags.. 15

IV.    After A One-Day Bench Trial, The District Court Reduces The Patent
       Damages And Sets Aside The Jury's Entire Award Of Profits For
       Trademark Infringement .............................................................. 21

SUMMARY OF THE ARGUMENT...................................................... 22

ARGUMENT ........................................................................................ 26

I.     A Counterfeiting Victim Can Recover Profits From The Sale Of
       Counterfeit Goods Without Proving That The Infringer Acted Willfully.... 26

       A.     Standard Of Review And Choice Of Law ........................... 27

B.    Congress Intended To Establish A Remedial System That Would Discourage Trademark Infringement And Fully Compensate Victims ...................................................................................... 27

C.    Section 1117(a) Vests Trial Courts With Broad Equitable Discretion, Which May Be Limited Only By A "Clear Legislative Command" ....................................................................... 33

D.    Amendments After *Basch* Make Clear There Is No "Clear Legislative Command" Limiting Equitable Discretion Only To Cases Where The Victim Proves The Infringer's Willfulness ..................... 36

    1.    Congress Made Willfulness A Prerequisite For Recovery Of Monetary Relief For Trademark Dilution, But Not For Other Types Of Trademark Infringement .......................................... 36

    2.    Congress Allowed Counterfeiting Victims To Elect Statutory Damages Instead Of "Actual Damages And Profits" In Cases Of Both Willful And Non-Willful Infringement ........................................................................... 39

    3.    The Post-*Basch* Amendments Rejected – Not Ratified – A Willfulness Prerequisite .................................................... 41

E.    Congress Specified Constraints On Courts' Equitable Discretion – But A Willfulness Prerequisite Is Not Among Them ....................... 45

    1.    Congress Expressly Limited The Recovery Of Attorneys' Fees To "Exceptional Cases" But Imposed No Such Restriction On Profits, Damages, And Costs ............................ 46

    2.    Congress Rejected A General Good-Faith Defense To Damages And Profits, Instead Creating Targeted Exemptions For Specific Categories Of "Innocent" Infringer ............................................................................... 49

II.    A Patent Infringer Cannot Invoke Laches When The Victim Has Filed Suit Within The Applicable Within The Limitations Period ................................ 53

CONCLUSION AND RELIEF SOUGHT ............................................................. 59

ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*,
  960 F.2d 1020 (Fed. Cir. 1992) ................................................................ *passim*

*ALPO Petfoods, Inc. v. Ralston Purina Co.*,
  913 F.2d 958 (D.C. Cir.1990) ........................................................... 45

*Am. Seating Co. v. USSC Grp., Inc.*,
  514 F.3d 1262 (Fed. Cir. 2008) ........................................................ 27

*Axiom Worldwide, Inc. v. Excite Med. Corp.*,
  No. 13-13900, 2014 WL 6234006 (11th Cir. Nov. 17, 2014) ........................... 43

*Baden Sports, Inc. v. Molten USA, Inc.*,
  556 F.3d 1300 (Fed. Cir. 2009) ........................................................ 27

*Banjo Buddies, Inc. v. Renosky*,
  399 F.3d 168 (3d Cir. 2005) ...................................................... 38, 45

*BMW of North Am., LLC v. Cudahar*,
  No. 6:14-cv-40, 2014 WL 5420133 (M.D. Fla. June 20, 2014) ........................ 49

*Burger King Corp. v. Mason*,
  855 F.2d 779 (11th Cir. 1988) .................................................. 33, 35, 43

*Cartier v. Aaron Faber, Inc.*,
  512 F.Supp.2d 165 (S.D.N.Y. 2007) .................................................... 38

*Chanel, Inc. v. Veronique Idea Corp.*,
  795 F. Supp. 2d 262 (S.D.N.Y. 2011) .................................................. 38

*Chavis v. Chappius*,
  618 F.3d 162 (2d Cir. 2010) .......................................................... 27

*Conopco, Inc. v. Campbell Soup Co.*,
  95 F.3d 187 (2d Cir. 1996) ........................................................... 54

*Duncan v. Walker*,
  533 U.S. 167 (2001) .................................................................. 37

*Fair Wind Sailing, Inc. v. Dempster,*
 764 F.3d 303 (3d Cir. 2014) ................................................................. 49

*Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.,*
 507 Fed. App'x 26 (2d Cir. 2013) ......................................................... 42

*Fishman Transducers Inc. v. Paul,*
 684 F.3d 187 (1st Cir. 2012) ................................................................. 44

*Fleischmann Distilling Corp. v. Maier Brewing Co.,*
 386 U.S. 714 (1967) ............................................................................... 51

*George Basch Co., Inc. v. Blue Coral, Inc.,*
 968 F.2d 1532 (2d Cir. 1992) ....................................................... *passim*

*Greene v. United States,*
 79 F.3d 1348 (2d Cir. 1996) ........................................................... 46, 51

*Hebert v. Lisle Corp.,*
 99 F.3d 1109 (Fed. Cir. 1996) ................................................................. 7

*Hecht Co. v. Bowles,*
 321 U.S. 321 (1944) ............................................................................... 35

*Immigration & Naturalization Service v. Cardoza-Fonseca,*
 480 US 421 (1987) ................................................................................. 52

*Louis Vuitton Malletier S.A. v. LY USA, Inc.,*
 676 F.3d 83 (2d Cir. 2012) ........................................... 33, 41, 45, 47

*M2 Software, Inc. v. Viacom, Inc.,*
 223 Fed. App'x 653 (9th Cir. 2007) ...................................................... 44

*Markman v. Westview Instruments, Inc.,*
 517 U.S. 370 (1996) ............................................................................... 55

*Masters v UHS of Delaware, Inc.,*
 631 F.3d 464 (8th Cir. 2011) ................................................................. 44

*Meloff v. New York Life Ins. Co.,*
 240 F.3d 138 (2d Cir. 2001) ................................................................. 27

*Merck Eprova AG v. Gnosis S.P.A.,*
   760 F.3d 247 (2d Cir. 2014) ................................................................. 42

*Monessen Sw. Ry. Co. v. Morgan,*
   486 U.S. 330 (1988) ............................................................................. 42

*Nike, Inc. v. Top Brand Co. Ltd.,*
   No. 00 Civ.8179, 2005 WL 1654859 (S.D.N.Y. July 13, 2005) ....................... 38

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.,*
   134 S. Ct. 1749 (2014) ................................................................... 48, 49

*Pebble Beach Co. v. Tour 18 I Ltd.,*
   155 F.3d 526 (5th Cir. 1998) ................................................................. 44

*Petrella v. Metro-Goldwyn-Mayer, Inc.,*
   134 S. Ct. 1962 (2014) ................................................................. *passim*

*Porter v. Warner Holding Co.,*
   328 U.S. 395 (1946) ............................................................................. 35

*Quick Technologies Inc. v. Sage Group PLC,*
   313 F.3d 338 (5th Cir. 2003) ........................................................... 38, 45

*Robinson v. Shell Oil Co.,*
   519 U.S. 337 (1997) ............................................................................. 33

*Romag Fasteners, Inc. v. Fossil, Inc.,*
   29 F.Supp.3d 85 (D. Conn. 2014) ............................................................. 4

*Romag Fasteners, Inc. v. Fossil, Inc.,*
   979 F. Supp.2d 264 (D. Conn. 2013) .......................................................... 4

*Roulo v. Russ Berrie & Co., Inc.,*
   886 F.2d 931 (7th Cir. 1989) ................................................................. 43

*Russello v. United States,*
   464 U.S. 16 (1983) ............................................................................... 52

*SCA Hygeine Products Aktiebolag v. First Quality Baby Products,*
   *LLC,*
   No. 2013-1564 (Fed. Cir.) ......................................................... 17, 23, 56

*Synergistic Internat'l, LLC v. Korman,*
      470 F.3d 162 (4th Cir. 2006)......................................................... 38, 45

*Taco Cabana Int'l, Inc. v. Two Pesos, Inc.,*
      932 F.2d 1113 (5th Cir. 1991)............................................................ 35

*United States v. Ionia Mgmt. S.A.,*
      555 F.3d 303 (2d Cir. 2009).................................................................. 7

*United States v. Peterson,*
      394 F.3d 98 (2d Cir. 2005)....................................................... 38, 39, 46

*Western Diversified Servs., Inc. v. Hyundai Motor America, Inc.,*
      427 F.3d 1269 (10th Cir. 2005)......................................................... 44

*Wynn Oil Co. v. Am. Way Serv. Corp.,*
      943 F.2d 595 (6th Cir. 1991)............................................................ 44

**Statutes and Acts**

15 U.S.C. § 507 .................................................................... 55, 57

15 U.S.C. § 1111 ....................................................................... *passim*

15 U.S.C. § 1114 ....................................................................... *passim*

15 U.S.C. § 1117 ....................................................................... *passim*

15 U.S.C. § 1121 ............................................................................... 2

15 U.S.C. § 1125 ....................................................................... *passim*

28 U.S.C. § 1295 ............................................................................... 2

28 U.S.C. § 1331 ............................................................................... 2

28 U.S.C. § 1332 ............................................................................... 2

28 U.S.C. § 1338 ............................................................................... 2

28 U.S.C. § 1367 ............................................................................... 2

35 U.S.C. § 285 .............................................................................. 48

35 U.S.C. § 286 ........................................................................ 55, 56, 57

Federal Trademark Dilution Act, Pub. L. 104–98, 109 Stat. 985
(1996) .............................................................................................*passim*

Anticounterfeiting Consumer Protection Act of 1996, Pub. L. 104-
153, 110 Stat. 1386 (1996) .................................................................. 39

Pub. L. 93-600, 88 Stat. 1955, (1975) .................................................... 47

Trademark Amendments Act of 1999, Pub. L. No. 106–43, 113 Stat.
219 (1999) .......................................................................................*passim*

## Other Authorities

Federal Rule of Civil Procedure 8(c) ...................................................... 58

HR 2828, 71st Cong, 1st Sess. (1929) .................................................... 52

HR 6248, 69th Cong, 1st Sess (1925) ..................................................... 52

HR 6683, 70th Cong, 1st Sess (1927) ..................................................... 52

HR 11988, 70th Cong, 1st Sess. (1928) .................................................. 52

HR 13109, 70th Cong, 1st Sess (1928) ................................................... 52

HR 13486, 69th Cong, 2d Sess. (1926) ................................................... 52

Hearings on HR102, HR5461 and S895, 77th Cong, 1st Sess (1941) .............. 34, 35

S. Rep. No. 177, 104th Cong. (1995) ...................................................... 29

S. Rep. No. 1333, 79th Cong., 2d Sess. (1946) ........................................ 29

S. Rep. No. 2679, 68th Cong, 1st Sess. (1924) ........................................ 52

Danielle Conway-Jones, *Remedying Trademark Infringement: The
Role of Bad Faith in Awarding An Accounting of Defendant's
Profits*, 42 Santa Clara L. Rev. 863 (2002) ............................................. 38

Keith M. Stolte, *Remedying Judicial Limitations on Trademark
Remedies: An Accounting of Profits Should Not Require A Finding
of Bad Faith,* 87 Trademark Rep. 271, 293-99 & n. 127 (1997) ...................... 38

## <u>STATEMENT OF RELATED CASES</u>

Other than the associated cross-appeal pending in this Court, *Romag Fasteners, Inc. v. Fossil, Inc.*, 14-1857 (Fed. Cir.), there have been no other appeals from this action in this Court or in any other circuit; and there are no cases known to counsel pending in this or any other court that will directly affect or be directly affected by this Court's decision here.  The attorney's fees issue remains before the District Court.

## **JURISDICTIONAL STATEMENT**

Romag Fasteners, Inc. ("Romag") appeals from a final judgment of the District of Connecticut entered on August 8, 2014, set out as a seperate document on September 19, 2014, amended on September 22, 2014. The District Court had subject matter jurisidiction under 15 U.S.C. § 1121(a), 28 U.S.C. §§ 1331, 1332(a), 1338(a) and 1367. Romag filed a timely notice of appeal on September 8, 2014. This Court has exclusive jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.    Did the District Court err in ruling that a counterfeiting victim cannot recover profits from a trademark infringer unless the victim can prove that the infringer's use of the counterfeits was"willful," even though the Lanham Act does not establish willfulness as a prerequisite to the recovery of an infringer's profits? (Yes.)

2.    Did the District Court err in ruling that a patent infringer can invoke laches as a defense even though the victim of the patent infringement filed suit within the statutory limitations period? (Yes.)

## STATEMENT OF THE CASE

This appeal asks whether a trademark owner must prove that a seller of counterfeits acted willfully in order to recover the infringer's profits. Romag Fasteners, Inc. is a family business that creates magnetic snaps used as closures on handbags and other leather goods. Although it is a small business, Romag has an outsized reputation in the accessories industry for quality and dependability, and it protects its good name with trademarks. When Romag discovered that its customer Fossil, a major retailer and designer of fashion accessories, was selling hundreds of thousands of fashion handbags with counterfeit Romag snaps bearing the Romag trademark prominently on their faces, it sued under the Lanham Act, the Patent Act and state law.

The jury returned a verdict for Romag, finding that Fossil had infringed Romag's patent, engaged in unfair trade practices, and acted "with callous disregard" when infringing Romag's trademark. Expressly noting the need to prevent unjust enrichment and to deter further infringement, the jury found that $6.7 million of Fossil's profits should be disgorged to Romag.

The District Court nevertheless concluded that Romag could not recover any of the profits, and it wiped out the $6.7 million award.[1] It did so because it

---

[1] The District Court decision, *Romag Fasteners, Inc. v. Fossil, Inc.*, 29 F.Supp.3d 85 (D. Conn. 2014), is at JA3-44. Its summary judgment ruling is *Romag Fasteners, Inc. v. Fossil, Inc.*, 979 F. Supp.2d 264 (D. Conn. 2013).

believed that a victim of trademark infringement cannot recover the infringer's profits unless it can prove that the infringer acted "willfully," which Romag had not proven. Contrary to the District Court's ruling, the Lanham Act does not make willfulness a prerequisite to the recovery of profits for trademark infringement. As the Lanham Act's text makes clear, a trademark owner's right to recover profits is not subject to a bright-line willfulness requirement, but to "the principles of equity" and to the court's discretion to adjust the award "according to the circumstances of the case."

No fewer than seven early versions of the legislation that would become the Lanham Act contained bright-line safe harbors for non-willful infringers, but Congress rejected those versions. In the years since, Congress has inserted a willfulness prerequisite in other settings – such as actions for trademark dilution – but it has never made willfulness a prerequisite to the recovery of profits for infringement.

The flexible approach to recovery of profits in infringement cases makes sense. Congress intended the Lanham Act not just to protect the good will of trademark holders and to protect the public against fakes, but also to take the incentive out of counterfeiting. Those goals apply equally whether a defendant intentionally hawks fakes, or – with callous disregard – allows his products to be made with falsely branded components. Here, Fossil deliberately chose to

manufacture its bags in China, a country known for rampant counterfeiting, and it did nothing to stop one of its Chinese factories – a factory that it knew to be untrustworthy – from shipping bags with counterfeit components. Fossil made millions of dollars from the counterfeit-component bags. If it can keep profits made from counterfeits whenever a victim of infringement cannot make the difficult showing of willfulness, then there is little incentive for it to avoid counterfeit components.

This Court should reverse the District Court, holding that the Lanham Act permits victims of counterfeiting to recover profits from infringers in accordance with the Act's text: subject to the flexible "principles of equity" and "the circumstances of the case," not to an unwritten rigid prerequisite that would skew the incentives Congress intended and create an exemption that Congress rejected.

## STATEMENT OF FACTS

Romag Fasteners, Inc. is a small, family company that makes a single type of product—magnetic snaps used as closures on handbags and other leather goods. The snaps' inventor, Howard Reiter, runs the company. (JA538.) He is the fourth generation of hardware and fastener maker in his family. (JA534.)[2]

Over the years, Romag has sold over fifty million magnetic snaps (JA576), and the family business owes that success to the quality and reputation of the Romag brand – and the goodwill that reputation engenders. (JA561; JA783-84.) As explained by the designer at Coach (a leading handbag manufacturer) responsible for selecting hardware components, Romag snaps are known to be dependable, providing the promised level of magnetic strength and proven to resist corrosion over time. (JA1095-96, JA1103.) To ensure that authentic Romag snaps are readily recognizable, Romag stamps onto each snap a federally registered trademark, "ROMAG," and, where applicable, a patent number. (JA2437-55; JA552-53; JA561.)

Romag brought this lawsuit to prevent its reputation and goodwill from being squandered by a former customer that designed handbags, specified the sourcing of many of their components, and directed that the handbags be made at a

---

[2] This Court views "the facts and evidence in the light most favorable to the verdict." *U.S. v. Ionia Mgmt. S.A.*, 555 F.3d 303, 305 n.1 (2d Cir. 2009); *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1114 (Fed. Cir. 1996) ("it is assumed that the jury resolved the evidentiary facts as appropriate to support the verdict").

Chinese factory that it knew was untrustworthy. The customer then purchased, imported, distributed and sold nearly 700,000 of these handbags, which contained counterfeit snaps. That customer is Fossil (a collective term referring here to Fossil, Inc. and Fossil Stores I, Inc.), a major, publicly-traded designer and retailer of handbags and other fashion accessories. (JA1856; JA1356.) Romag also brought suit against several retailers selling Fossil handbags with counterfeit snaps, including Macy's.[3]

Factories outside the United States, primarily in China, make Fossil bags to Fossil's specifications. (JA805-06; JA852-55; JA969.) Fossil knows that by having Chinese factories make its bags, it runs the risk that it could end up buying, importing and selling counterfeit products. As a member of Fossil's Board of Directors acknowledges, it is "universal" and "everyone knows" that counterfeiting is a problem in China. (JA1180.) Indeed, Fossil's own Director of Product Development for Men's and Women's Leathers – a category that includes handbags – admitted that he knew that counterfeiting *of handbags components* is a problem in China. (JA850-51.) Despite Fossil's knowledge that counterfeiting was prevalent in China, Fossil failed to take appropriate steps to monitor the production of its handbags and to prevent counterfeiting of Romag's snaps.

---

[3] "Macy's" refers collectively to Macy's, Inc. and Macy's Retail Holdings, Inc.

## I.    Fossil Directs Its Factories To Use Romag Snaps And Buy Them From Wing Yip.

Romag's relationship with Fossil began in 2002, when Fossil representative Douglas Dyment called Romag founder and president Howard Reiter. Fossil wanted a catalogue and samples, and asked about Romag's patent. (JA596-98.) Reiter sent the catalogue and samples, as requested, and told Fossil that Romag snaps were protected by a patent and that "ROMAG" was a registered trademark. (JA826; JA2477.) Fossil told Romag it was interested in buying Romag snaps if Romag agreed to indemnify Fossil, so that Romag would assume the legal battle for Fossil if it were sued for using genuine Romag snaps. (JA601; JA2477.)

Fossil liked the samples and the promise of indemnification, and it decided to buy Romag snaps. (JA602-04; JA2478-79.) Fossil directed the factories making Fossil handbags to use only Romag snaps. (JA833-34; JA2478.) As Dyment acknowledged, Fossil's factories could not use any other magnetic snaps in Fossil bags; they were *required* to use Romag magnetic snaps. (JA834; JA910.)[4]

The factories making Fossil bags would buy the Romag snaps from a Hong Kong company, Wing Yip Accessory Manufactory Ltd. ("Wing Yip"). (JA604;

---

[4] From 1994 to 2001, Fossil paid royalties to Randolph-Rand Corporation for each product with a magnetic snap that Fossil imported. (JA811-12; JA820.) Fossil knew Randolph-Rand was litigious (JA812; JA979), making the indemnification from Romag important to Fossil. To avoid litigation with Randolph-Rand, Fossil wanted to ensure *all* Fossil bags contained Romag snaps –protected by their own patent and trademark.

JA981-82; JA993; JA2481-82)  Fossil knew that Wing Yip was the *only* authorized source for Romag snaps in China, and that Romag had a patent and a trademark. (JA826-29; JA847-48; JA939.)

During the entire time relevant to this dispute, Wing Yip made only products designed by Reiter. (JA851.) Wing Yip was founded by Timmy Cheung, the son of a factory owner that Reiter's father – also in the fastener business – had long worked with.  The senior Reiter had first met a young Cheung in the 1980's, when Cheung was working in his own father's factory.  (JA579-80.) Years later, the junior Reiter elected to "partner" with the junior Cheung to produce Romag snaps because he was looking for a "very deep relationship, somebody [he] knew and trusted with [his] new patented device." (JA580.)  Mr. Cheung fit the description, in light of "the multigenerational relationships between [the Reiter and Cheung] families." (JA580.)

Early in the Romag-Fossil relationship, one of Fossil's manufacturers, a company named Simone, contacted Reiter about the finishes on Romag snaps. (JA640; JA775; JA285-86; JA2480-81.)  Reiter thus understood Fossil's manufacturer to be Simone. (JA640; JA776.)   After the discussions with Simone, Reiter reminded Fossil that its manufacturers should deal directly with Wing Yip, the authorized Romag manufacturer in China, contacting Romag only for new custom requests.  (JA750; JA843; JA2485.)

In the years that followed, Romag and Fossil had little contact, as Reiter trusted the relationship. (JA614-16; JA987-88; JA 2480.)

## II. Romag Guards Its Good Name, Learns That Superior Is Counterfeiting, And Ties It To Fossil.

Several years later, Romag began to discover counterfeiters profiting from its good name. Each time, Romag took action to stop the counterfeiting. In 2007, it sought an injunction against J.C. Penney after discovering counterfeits Romag snaps on handbags sold there. (JA7-8; JA689-90; JA758.) Two years later, a Romag employee brought into the office a gift bought at DSW (Designer Shoe Warehouse), and Reiter saw that the "Romag" snap on it was counterfeit; the parties settled before suit was filed. (JA8; JA691; JA758.) Romag had no reason to think that Fossil was involved in the counterfeiting, and so did not contact Fossil about it. (JA689-693.)

The next year, on May 12, 2010, Reiter got an email from "Joe," who identified himself as a former Wing Yip factory employee and wrote:

> [I] know your "ROMAG" magnetic button is a patent product, the company has been licensed to WINGYIP production and processing! . . . I found [another] factory is producing your company's patent product . . . but they do not receive your company's authorization.

(JA2468.)

Neither Reiter nor Wing Yip founder Cheung knew a "Joe" from Wing Yip. (JA616-19.) Reiter wrote back the next day:

11

So what do you want from romag in order for us to learn the factory name? . . . What is more important to us is what handbag maker and what brands in usa are getting these on their handbags. It is hard for the law to work in china . . . easier in usa.

(JA2467.)

On May 20, 2010, Joe replied with the factory name: Hechuang. He also attached apparent evidence: two purchase orders for Romag snaps sent to Hechuang, one from Dong Guan Red Lion Leather Products Ltd ("Red Lion"), dated March or May 2009; the other from Superior Leather Limited ("Superior"), dated March or December 2008. (JA623-24; JA2467) Red Lion and Superior had the same address in Hong Kong. (JA625; JA2470-71.)

The purchase orders to the unauthorized Hechuang factory did not say what the Romag snaps would be used for, i.e., what handbag designer's product they would be attached to. (JA623-24; JA626.) That was not surprising. When factories buy standard Romag snaps from Wing Yip, neither Wing Yip nor Romag knows what the snaps will be used for. It is only when a designer orders custom-made snaps – e.g., a snap with a special finish or different dimensions – that Wing Yip and Romag learn the brand of the handbag that the snap will go into. (JA604-05.)

Reiter had never heard of Red Lion, but he had heard of Superior, and suspected that Superior had placed the unauthorized snap order for another of its customers, Abercrombie & Fitch ("Abercrombie"). (JA624-26.) Reiter knew that

Superior manufactured products for Abercrombie from previous sales to Superior by another Reiter family fastener business, Rome Fasteners. (JA536; JA625-28.) But by the time of Joe's email, the division at Abercrombie that had worked with Rome Fasteners had shut down, and Superior, which had owed Rome Fasteners a lot of money for rings and belt buckles, had repeatedly rebuffed Reiter's efforts to collect. (JA627-28.) Reiter knew that confronting Superior would be fruitless. (JA628.)

A few days after Joe's email, on May 24, 2010, Reiter's wife, Jody Ellant, the general counsel of Romag, received a phone call from her sister in Florida, telling her that she saw Romag-branded snaps on Fossil bags at a Macy's store. (JA612-14; JA2215-16.) Ellant didn't know that Fossil was a Romag customer, so suspected that the snaps weren't authentic, and told her sister to buy the bags. (JA613.) Later that day, Ellant visited a Macy's store in Connecticut where she bought Fossil bags. (JA613; JA2216.) She then shared her suspicions with her husband, Reiter, who told her that Fossil was in fact a Romag customer. (JA615.) Because Fossil was a customer, Reiter had no reason to suspect Fossil of using counterfeits, and he set aside the bags from Ellant and her sister. (JA615-16.)

After trips to China and India, including a trip that kept him abroad for most of July 2010 (JA628-30), Reiter began to wonder about whether there was a connection between what "Joe" had emailed about Superior's counterfeiting and

13

the Fossil bags that Ellant and her sister had bought at Macy's. (JA632-33.) In mid-October 2010, Reiter emailed Wing Yip asking about its sales of Romag snaps to Superior. (JA632-34; JA2895.) Reiter then disassembled the Fossil bags and its snaps, and thinking that the snaps didn't look quite right, sent them on November 1 to Wing Yip's engineers for further examination. (JA638.) On November 8, 2010, Wing Yip's Cheung wrote back to Reiter: "the magnetic snap are counterfeit, we check the whole dimensions and logos . . . you can go ahead and fight this company." (JA637-38; JA2613.) Around this time, Reiter went to a Macy's store and bought additional Fossil handbags incorporating counterfeit snaps. (JA660.)

On November 8, 2010, the day Reiter got the email from Cheung confirming that the snaps were counterfeit, he emailed Dyment asking for the names of the factories that manufactured certain Fossil bags. (JA638; JA2472.) Dyment replied a week later, saying that the information was confidential. (JA2472.) Reiter then called Dyment, but Dyment still refused to provide the names of the factories – and directed Reiter to Fossil's legal department. (JA641-42.) Given Fossil's defensive response, Reiter's attorney sent Fossil a cease-and-desist letter two days later, advising Fossil of the infringement. (JA642; JA2473-76.) Fossil's lawyer responded, saying that Fossil's supplier was Superior. But it did not agree to cease and desist. (JA644; JA2893-94.)

14

On November 22, 2010, Romag sued Fossil and Macy's, asserting patent infringement, trademark infringement, false designation of origin and related state law claims. (JA210-237.) On November 23, 2010, Romag moved for a TRO and preliminary injunction enjoining Macy's and Fossil from using of Romag's patent and trademark. (*See* JA150.)[5]

### III. The Jury Finds That Fossil Acted With "Callous Disregard," Infringing Romag's Patent And Trademark By Using Counterfeit Snaps In Its Bags.

The District Court bifurcated the trial. (*See* JA185.) After a six-day jury trial, the court held a one-day bench trial on the equitable defenses. At trial, the evidence showed what Wing Yip – the only authorized manufacturer of Romag snaps in China – had found: the snaps on Fossil's bags were counterfeit. Indeed, Superior admitted that in a letter to Fossil on December 2, 2010:

> We refer to your inquiry regarding the fasteners made by Romag which were used by our factory in China in your products. Our investigation reveals that the purchasing department in our factory made the mistakes of sourcing them from a manufacturer which is not the authorized licensee of Romag.

(JA942-44; JA2499.) The evidence also included an email from Superior's finance department noting that Fossil received from Superior 694,273 bags containing snaps originating in "purchases from the supplier other than Wing Yip." (JA2500.) Purchase orders and invoices demonstrated that from 2008 to 2010, Superior

---

[5] On June 9, 2011, Romag sued the remaining Retailers that sold Fossil handbags with counterfeit snaps. The District Court consolidated the actions. (*See* JA156.)

bought hundreds of thousands of snaps designated in those documents as "Romag," but the snaps didn't come from Wing Yip and weren't authorized by Romag.  (JA784-86; JA2614-2837.)

Fossil admitted how many bags it bought from Superior, broken down by individual SKU (stock keeping unit) number. (JA2607-08.)  The evidence showed that the snaps on Fossil bags were not manufactured by Wing Yip (JA644-60; JA2457-66) and that they infringed Romag's patent.  (JA1142-44; JA1154-56; JA2600-04.)[6]

The presence of counterfeit snaps on bags manufactured for Fossil by Superior should have come as no surprise. Fossil is a consumer fashion brand, and the company aggressively protects its own intellectual property (JA1182-85; JA1296-99).  To be sure, it knew that its own bags could be counterfeited.  And given the "universal" knowledge of the counterfeiting problem in China (JA1180), Fossil also knew that the components that it put into its bags could be counterfeited if unscrupulous Chinese factories looked to cut corners.  (JA850-51.)

Fossil bags had only two components containing trademarks: Romag snaps, and zippers made by YKK, the world's largest zipper manufacturer.  (JA890-92;

---

[6] Even though Superior admitted it had bought counterfeit snaps, and even though Superior's purchase orders confirmed that, Fossil refused to acknowledge at trial that the snaps were counterfeit. Instead it concocted an elaborate story, asserting that Wing Yip—the sole authorized source of authentic Romag snaps—had sold legitimate Romag snaps to Superior on the sly. (JA2058-59.) In finding for Romag, the jury necessarily rejected Fossil's concoction.

JA1000.)  Fossil took careful steps to make sure that counterfeit YKK zippers weren't put in its bags.  Kelly Terwege, Fossil's Senior Director of Production and Sourcing, was the key contact between Fossil and its factories producing Fossil leather projects.  Fossil maintained a group of quality-control inspectors in China, called Fossil East.  (JA1325-27.)  Fossil East reported to Terwege.  (JA1315.)  She testified that Fossil East inspectors *were trained to monitor the authenticity of the YKK zippers* and to ensure that Fossil's factories got the zippers from a legitimate source designated by Fossil.  (JA1342-46; JA891.)

While it took careful steps to monitor the authenticity of zippers made by YKK, a major international manufacturer, it took no steps to monitor whether the snaps were authorized by Romag, a small, family-owned business.  Fossil East inspected the *quality* of the snaps (JA887-88; JA2590.), but Fossil did not make sure that the snaps bought by Superior came from Wing Yip (*see* JA894-96), which Fossil knew to be the sole authorized source (JA828-29) for Romag snaps. Fossil failed to ensure the authenticity of the snaps used by Superior, even though Fossil had an entire staff in China devoted to protecting Fossil from poor quality and counterfeit components, and *even though Fossil had the contractual authority* to inspect Superior's books and invoices.  (JA902-07; JA913; JA2493.)

Moreover, Fossil knew from previous experience that Superior could not be trusted in its sourcing of materials.  Fossil had previously canceled an order to

Superior for some handbags that coincidentally used Romag snaps. Because Superior had already bought the snaps, Fossil had to pay Superior the cost of the materials. When presented with the costs, Fossil balked at paying the cost of Romag snaps. (JA929-32; JA2577.) That was because *Fossil doubted that Superior had really spent the extra money on Romag snaps*, rather than on cheaper generic snaps. (JA2577.) Fossil thus directed Fossil East to verify that Superior had bought Romag snaps, as claimed. (JA929-30; JA2577) Other than this one time—when Fossil's own money was on the line—the record shows no other occasion when Fossil made any effort to ensure that Superior used genuine Romag snaps.

But the record shows other occasions when Fossil did not trust Superior. On one such occasion, Superior quoted Fossil a price for handbags that Superior was to manufacture. Fossil thought the price was too high and asked Superior to justify the components of the cost. (JA914-18; JA2594.) Superior said that the use of a brand-name YKK zipper increased the cost. Angus Cheung, [7] Fossil East's lead inspector and its "eyes and ears in China," (JA879; JA969-70) doubted that Superior was using YKK:

> RK [Richard Kwan of Superior] excused that they h[a]v[e] use . . . ykk japan cost 2.60? Per our memory of zipper in sample [provided to Fossil] were not YKK. But I didn't challenge him lie at this p[oin]t

---

[7] Angus Cheung (Fossil East) and Tommy Cheung (Wing Yip) are not related.

and purposely let him make up some story to support his 52.00 for quote.

. . .

I have asked him why they use ykk japan zipper in this bag.

. . .

Again, I didn't challenge him lie at this point.

(JA2594.)

Terwege, the Fossil director to whom Fossil East reported, was straightforward in her assessment of Superior's trustworthiness: Superior lied, repeatedly, and didn't care that it lied.  As she testified:

Q. Had [Superior] misled Fossil about materials they were using in any handbags?
A. Yes, I believe they have.
. . .
Q. And when you said they misled you, do you believe they knew they were incorrect?
A. Yes.
. . .
Q. Did you raise that issue with people at Superior?
A. Yes.
Q. And what was the response?
A. Not much.
Q. Did that impact on the decision to stop using Superior?
A. Over years, yes.
Q. When you say "over years," had this been a situation that'd happened more than once over the years?
A. Yes.

(JA1332-33.)

In short, Fossil had known since April 2002 that to determine whether a Romag snap was genuine, all it needed to do was see where it was purchased.  If it was bought from Wing Yip, it was genuine, if it wasn't, then it was counterfeit.

Yet even though Fossil knew that it could protect against counterfeits just by checking to see where the components came from, and even though it had the right to check Superior's component invoices whenever it wanted, and even though it distrusted Superior, Fossil never bothered to see if the snaps were counterfeit.

The jury found Fossil liable for trademark infringement, false designation of origin and state statutory and common-law unfair competition. It awarded $90,759.36 of Fossil's profits to prevent Fossil's unjust enrichment. (JA2409.) The jury also awarded $6,704,046 of Fossil's profits to deter future trademark infringement, having been instructed that such an award would be appropriate only if Romag proved that Fossil had demonstrated a "callous disregard of the known rights of Romag as a mark holder." (JA2385; JA2409.) The jury found that Fossil and Macy's had infringed Romag's patent, awarding damages of $51,052.14 and $15,320.61 against those defendants, respectively.[8] (JA2416.) While it found that Fossil had acted with "callous disregard" in infringing Romag's trademark, the jury did not find that the culpable conduct was "willful."[9]

---

[8] Noting that Macy's must have infringed the trademark if it infringed the patent, the Court later granted judgment against Macy's for trademark infringement.

[9] The District Court asked the jury about willfulness to isolate the "open issue" of whether a counterfeit victim must show the infringer's willfulness to recover profits. (JA381.)

**IV.   After A One-Day Bench Trial, The District Court Reduces The Patent Damages And Sets Aside The Jury's Entire Award Of Profits For Trademark Infringement.**

After the jury verdict, the District Court held a one-day bench trial on equitable issues, then issued a final memorandum of decision. (JA3-44.)  The court found that Romag should have brought suit shortly after Reiter received the anonymous May 20, 2010 email from "Joe" stating that a Chinese factory was making counterfeit snaps.  (JA2467-71.) The email did not mention Fossil, Macy's or any other defendant.  Nevertheless – and even though Fossil had been a good customer – the court thought that Reiter should have immediately sent Fossil bags bought by his wife and sister-in-law to China for inspection. (JA20.)  Moreover, the court thought that Reiter should have searched through his electronic documents for any reference to the word "superior;" and if he had, the court concluded, he would have found a single email, several years old, forwarded to Reiter, in which the word "superior" appeared among the domain names in the "cc" field.  (JA18-19; JA283-84.) Believing that Romag should have sued shortly after receiving the email in late May 2010, rather than in November 2010, it concluded that laches should reduce the patent recovery by 18%.  (JA23.)

The District Court also stated that laches would require it to reduce the trademark recovery when the court performed the "equitable adjustment" of recovery required under the Lanham Act.  (JA26; *see* 15 U.S.C. § 1117(a).)

However, the court never got to that. Instead, it concluded that because the jury had found that Fossil's trademark infringement was not "willful," Romag could not recover any profits as a matter of law. (JA41.) The District Court thus erased both parts of the jury's profits award: the $6,704,046 that the jury allocated to necessary deterrence, and the $90,759.36 that the jury concluded was necessary to remedy Fossil's unjust enrichment. (JA41; JA44.)

Romag timely brought this appeal.

## SUMMARY OF THE ARGUMENT

The jury found that Fossil and Macy's infringed Romag's patent, and that Fossil infringed Romag's trademark with callous disregard for Romag's rights. It awarded damages for patent infringement and found that Fossil should have to disgorge over $6 million in profits made from sales of Fossil bags containing the counterfeit snaps. In striking the profits award in its entirety, and in reducing the patent damages award, the District Court erred.

**Trademark Profits:** The District Court erred in holding that a counterfeiting victim cannot recover the infringer's profits unless it can prove that the infringer acted willfully. Contrary to the District Court's ruling, the Lanham Act does not establish any willfulness prerequisite to an award of profits for infringement.

*First,* 15 U.S.C. § 1117, the provision that permits a mark owner to recover profits, does not impose a willfulness prerequisite for infringement.  On the contrary, the plaint text of that provision makes a victim's right to recover profits subject to "the principles of equity" and the court's discretion to adjust the award up or down "according to the circumstances of the case."  Under well-established principles of statutory construction, where Congress has vested a court with equitable discretion, that discretion is not to be denied or limited absent a clear legislative command.  Section 1117 contains no such clear legislative command.

*Second,* although the Second Circuit in *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532 (2d Cir. 1992) held that willfulness is a requirement for a profits award, that decision dealt with older and now-superseded statutory text.  Lanham Act amendments after *Basch* make clear that Congress did not intend to impose a willfulness prerequisite in infringement cases. In 1999, Congress amended Section 1117, clarifying that a mark owner may recover for "*a violation* under section 43(a) [trademark infringement], *or a willful violation* under section 43(c) [trademark dilution]" (emphases added).  Congress clearly requires a showing of willfulness for a recovery of profits in a dilution action, but not in an infringement action.

Similarly, in a 1996 amendment, Congress created two tiers of statutory damages in counterfeiting cases – one for willful counterfeiting, and one for non-

willful counterfeiting. At the same time, Congress expressly affirmed that *both* tiers of statutory counterfeiting damages were alternatives to the traditional remedies of actual damages *and profits*. This means that Congress intended both profits and damages to be available to a mark owner in both circumstances: where infringement is willful, and where it is not.

These post-*Basch* Congressional enactments were made against a backdrop of conflicting decisions by the federal circuits as to whether willfulness was a necessary prerequisite to an award of profits. At the time, several federal circuits had clearly held that willfulness was *not* a prerequisite. As such, the post-*Basch* Congressional enactments cannot have ratified any one circuit's rule. To the contrary, the text of Section 1117 must be read to mean what it says: to require willfulness as a prerequisite to a trademark dilution claim, but not as a prerequisite to a trademark infringement claim.

*Third*, other aspects of the text and structure of the Lanham Act – never presented to the *Basch* court – also make clear that Congress never intended willfulness as a prerequisite to the recovery of an infringer's profits. Section 1117 makes attorney's fees available in "exceptional" cases but does not limit the recovery of profits to "exceptional" cases. In addition, Section 1117 incorporates by reference the limitations on recovery set forth in Sections 1111 and 1114. Those limitations bar recovery, in certain circumstances, where the defendant acted

with "innocence," lack of "knowledge," or without "bad faith." Those targeted exemptions would be superfluous if willfulness was in all cases an implicit prerequisite.

It should come as no surprise that the Lanham Act does not require a victim of counterfeiting to prove that the infringer acted willfully in order to recover the infringer's profits. Proponents of such a prerequisite sought – no fewer than seven times – to pass language in early versions of the Lanham Act that would have immunized trademark infringers from actions for profits unless they deliberately infringed. Congress rejected those efforts, stripping out that language from the legislation that became the Lanham Act. In inserting a requirement that Congress clearly chose to remove, the District Court erred.

**Laches Defense to Patent Infringement:** The District Court found that Romag should have known of Fossil's infringement shortly after May 20, 2010, and that it should not have waited until November 2010 to file suit. On that basis, the District Court found laches and reduced the patent infringement award. That finding was erroneous. As a matter of law, laches cannot bar or reduce a patent infringement claim properly brought within the six-year statutory limitations period. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962 (2014).

## **ARGUMENT**

**I.    A Counterfeiting Victim Can Recover Profits From The Sale Of Counterfeit Goods Without Proving That The Infringer Acted Willfully.**

The jury found that Fossil "callously disregarded" Romag's trademarks under the Lanham Act, 15 U.S.C. §1125(a).  (JA2385; JA2409.)  Finding that Fossil had been unjustly enriched, and that its callous disregard for Romag's intellectual property and good name needed to be deterred, the jury awarded $90,759.36 in profits to remedy unjust enrichment and $6,704,046 in profits to provide adequate deterrence.  (JA2409.)

Under the Lanham Act, the District Court should have then weighed the equities under the circumstances of the case in order to determine whether to adjust that jury award up or down.  15 U.S.C. § 1117(a).  The District Court declined to weigh the equities.  (JA41.)  Instead, it set aside the jury's determination of profits as a matter of law, ruling that under the Lanham Act, a victim of counterfeiting cannot recover the infringer's profits unless the victim proves that the infringer acted willfully.  (*Id.*)  While the Lanham Act permits a District Court to consider the relative culpability of a defendant as part of its weighing of the equities, it does not make willfulness a legal *prerequisite* to an award of profits.  In holding that it does, the District Court erred.

## A. Standard Of Review And Choice Of Law.

In construing the Lanham Act, this Court applies the law of the regional circuit, *Baden Sports, Inc. v. Molten USA, Inc.*, 556 F.3d 1300, 1304 (Fed. Cir. 2009), here the Second Circuit. Likewise, this Court reviews a district court's entry of judgment as a matter of law under the regional circuit's standard. *Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1266 (Fed. Cir. 2008). Like other circuits, the Second Circuit deems judgment as a matter of law appropriate only where there is no legally sufficient basis for the jury's decision, *Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001), and it reviews *de novo* a district court's purely legal conclusion. *See Chavis v. Chappius*, 618 F.3d 162, 169 (2d Cir. 2010) ("There are few principles of judicial review more well-established than the rule that appellate courts consider legal questions . . . *de novo*"). This Court thus reviews *de novo* the District Court's legal conclusion that a victim of counterfeiting may never recover the infringer's profits unless it can prove that the infringer acted willfully.

## B. Congress Intended To Establish A Remedial System That Would Discourage Trademark Infringement And Fully Compensate Victims.

The Lanham Act gives trademark holders several forms of available monetary remedy against those who have violated their rights:

(a) When a violation of any right of the registrant of a mark

27

registered in the Patent and Trademark Office, **a violation under section 1125(a) or (d) of this title,** *or a* ***willful*** **violation under section 1125(c)**, shall have been established in any civil action arising under this chapter, **the plaintiff shall be entitled**, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, **to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action**.

15 U.S.C. §1117(a) (emphasis added).  While Congress chose to give victims of trademark dilution – Section 1125(c) – those monetary remedies only when a "willful violation" has occurred, it chose to give victims of trademark infringement – Section 1125(a) – those monetary remedies without the precondition of willfulness.

That is not to say that willfulness is irrelevant.  Congress made plain that an ultimate award of profits, damages or costs must be "subject to the principles of equity," *id.*, and equity often treats a violator's state of mind as a relevant factor.  But Congress did not make willfulness – or any other single factor – a threshold requirement for any award of profits.  To the contrary, the Lanham Act gives courts the widest possible discretion in their equitable balancing: "If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." *Id.*

28

On its face, the statutory text makes plain that a victim of trademark infringement can seek both damages and profits, so long as the total recovery is consistent with the "principles of equity" and "the circumstances of the case." The text does not establish a willfulness precondition for either damages or profits in infringement cases.

The absence of such a requirement is not an accident. The legislative history of the Lanham Act shows that Congress expressly rejected efforts to shield non-willful defendants from an award of profits. *See infra* Part I.E.2. That makes perfect sense. Congress intended the Lanham Act not only to "secur[e] to the owner the good will of his business and protect[] the public against spurious and falsely marked goods," S.Rep. No. 1333, 79th Cong., 2d Sess., 3 (1946), but also to take the incentive out of counterfeiting "given the extent of damage done to business goodwill by infringement of trademarks."    S.Rep. No. 177, 104th Cong., 10 (1995).

These twin goals apply with equal force whether the defendant intentionally palms off counterfeits or, with callous disregard, negligently allows them into his supply chain by failing to police his suppliers. Whether it "meant to" or not, a defendant that sells counterfeit products dupes the public into buying in reliance on a false brand and lines its wallet with profits made on the back of the innocent victim of trademark infringement. If the counterfeits are inadequate or defective,

the defendant further lays waste to the trademark owner's hard-earned goodwill, exposing consumers to losses of personal property, physical injury, and frustration with the product. A defendant's lack of malicious intent is cold comfort to the victims of these harms, which hurt no less because the defendant caused them through neglect rather than malice. And it is cold comfort to the trademark holder, whose good name is linked to the harms.[10]

Congress recognized that prevention of these social ills requires a remedial scheme that gives potential infringers sufficient incentive not just to refrain from *deliberately* selling counterfeits, but also to take reasonable measures to prevent counterfeits from finding their way into products the defendant sells. Damages alone are inadequate to this task. The difficulty of proving lost sales and damage to intangible goodwill mean that awards capped at plaintiff's damages under-compensate the victim and provide inadequate disincentives to defendants. As this case demonstrates, manufacturers who choose to outsource production to countries where counterfeiting is rampant increase their profit margins by driving down labor costs, while rolling the dice on trademark infringement and quality. If their potential exposure is capped at the trademark victim's damages – often, the difference between what they paid for the counterfeits and what they would have

---

[10] This is especially true in a global marketplace, where U.S. manufacturers turn to foreign companies for production. If manufacturers were not accountable for their goods made abroad, the Lanham Act would fail to adequately protect American consumers and mark owners from counterfeit and fraudulent products.

paid for the real thing – then manufacturers can take their chances, paying the proper price for trademarked goods only when they get caught. That leaves them no real incentive to monitor suppliers for the use of counterfeits.

An award of *profits*, by contrast, means that defendants risk losing not just the difference between what they paid for counterfeits and what they should have paid for the real thing, but all of the profits earned from the use of the counterfeits. By increasing the cost of allowing suppliers to pollute the supply chain with counterfeits, the remedial mechanism creates disincentives for outsourcers to take appropriate measures to avoid trading in counterfeits. Congress explicitly allowed victims to recover the defendant's profits in order to provide adequate compensation to the victims and adequate disincentives for potential infringers.

Likewise, Congress did not require a victim of trademark infringement to prove that a defendant "willfully" sold counterfeits in order to recover profits. It is enough to show that the defendant acted with callous disregard. Whether a defendant acts willfully, recklessly, or negligently, the victim of trademark infringement can seek both damages and profits, serving Congress's twin goals of proper compensation and incentives that discourage trafficking in fakes. If, contrary to its text, the Lanham Act allowed trademark victims to recover profits from willful infringers but only damages from reckless or negligent infringers, then the law would fail to achieve either of its twin goals when victims could only

31

establish recklessness or negligence. Congress chose another path, directing courts to equitably tailor recovery to the facts of particular cases, carefully calibrating remedies so as to preclude trademark violators from keeping profits earned through infringement. That increases the likelihood that trademark victims are adequately compensated, and protects the public from both intentional hawkers of fakes and reckless or negligent sellers who fail to monitor their supply chains – in other words, from all those who exhibit at least callous disregard for another's good name and intellectual property.

Honoring both the plain text and the purpose of Section 1117, six of the federal Courts of Appeal permit plaintiffs to recover a defendant's profits, damages and costs for violations of Section 1125(a) based on a traditional equitable assessment of a range of factors that includes – but is in no way limited to – the defendant's level of intent. The Second Circuit has never analyzed the current text of the Lanham Act in order to determine whether it requires a counterfeiting victim to prove the infringer's willfulness as a prerequisite to an award of profits. The district court, however, relying on the Second Circuit's interpretation *of an older version of the statute* in *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1540 (2d Cir. 1992), denied Romag recovery of Fossil's profits, finding that "a plaintiff must establish willful infringement in order to recover an award of the defendant's profits in a trademark action." (JA34.)

*Basch* analyzed an older and now superseded version of the Lanham Act.

Lanham Act amendments that came after *Basch* make clear that the Act does not

require a counterfeiting victim to prove that the trademark infringer deliberately

sold fakes. Those post-*Basch* amendments, along with aspects of the statute not

presented to the *Basch* court and post-*Basch* interpretations adopted by other

circuits, together compel the conclusion that the Second Circuit would – and this

Court should – reject the rule of *Basch*, joining the Third, Fourth, Fifth, Sixth,

Seventh, and Eleventh Circuits in holding that because "[t]he Lanham Act ...

confers broad discretion upon the district court to fashion the assessment of

damages ... subject to the principles of equity ... no hard and fast rules dictate the

form or quantum of relief," "[n]or is an award of profits ... dependent upon a

higher showing of culpability on the part of defendant"). *Burger King Corp. v.*

*Mason*, 855 F.2d 779, 781-783 (11th Cir. 1988) (internal quotation marks omitted).

## C.    Section 1117(a) Vests Trial Courts With Broad Equitable Discretion, Which May Be Limited Only By A "Clear Legislative Command."

The "first step in interpreting a statute is to determine whether the language

at issue has a plain and unambiguous meaning with regard to the particular dispute

in the case. Our inquiry must cease if the statutory language is unambiguous and

the statutory scheme is coherent and consistent." *Robinson v. Shell Oil Co.*, 519

U.S. 337, 340 (1997) (internal quotation marks omitted); *Louis Vuitton Malletier*

33

*S.A. v. LY USA, Inc.*, 676 F.3d 83, 108 (2d Cir. 2012) ("If we can ascertain the plain meaning of the statutory text by examining it in the context of the statute as a whole, we need proceed no further.").

Here, the text and structure of the statute bar the insertion of an unwritten willfulness prerequisite for recovery of profits in Section 1125(a) cases.

Section 1117(a) instructs that for "a violation under section 1125(a)" – such as Fossil's sale of counterfeit goods – the plaintiff "*shall* be entitled" to three things: "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." The statutory text sets three – and only three – limitations on a victim's right to recover profits, damages, and costs: (i) "the provisions of sections 1111 and 1114;" (ii) "the principles of equity;" and (iii) the court's discretion to adjust the award up or down "according to the circumstances of the case." *Id.*

By invoking the principles of equity and vesting courts with the power to adjust the award according to the circumstances of the case, Section 1117(a) gives trial courts wide discretion to fashion an equitable remedy.[11] As the Supreme

---

[11] Edward S. Rogers, a main proponent and draftsman of the legislation that ultimately became the Lanham Act, explained during legislative hearings on the remedy provision that "the whole purpose of this section [1117]" is "to give a thing that is now inflexible, a certain flexibility and rely on the good judgment of the court to see that the recovery was not excessive but was at least adequate." Hearings on HR102, HR5461 and S895 Before the Subcommittee on Trade-Marks of the House Committee on Patents, 77th Cong, 1st Sess, 206 (1941).

Court has long made clear "[a]n appeal to the equity jurisdiction conferred on federal district courts is an appeal to the sound discretion which guides the determinations of courts of equity. ...The essence of equity jurisdiction has been the power ... to do equity and to mould each decree to the necessities of the particular case." *Hecht Co. v. Bowles*, 321 U.S. 321, 229-330 (1944). It thus follows, as the night the day, that where Congress vests courts with equitable discretion, that discretion "is not to be denied or limited in the absence of a clear and valid legislative command." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946). Reading a willfulness prerequisite into Section 1117(a) limits district courts' equitable discretion not only absent, but in *direct opposition* to, "a clear and valid legislative command.[12]

Two of the relevant legislative commands did not occur until after *Basch* was decided, and the others were never presented to the *Basch* court. The Second Circuit has explicitly acknowledged that one of the post-*Basch* amendments calls into question whether a trademark infringement victim must prove that the violator acted willfully in order to recover profits, and it has never considered – or even

---

Congressman Lanham concurred, stating "we have to rely upon the courts in their discretion to administer these things fairly." *Id.* at 205-06.

[12] *See, e.g., Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1127 (5th Cir. 1991) ("[Section 1117(a)] endows the district court with considerable discretion in fashioning an appropriate remedy for infringement"); *Burger King Corp. v. Mason*, 855 F.2d 779, 782-83 (11th Cir. 1988) ("[t]he Lanham Act ... confers broad discretion upon the district court to fashion the assessment of damages . . . subject to the principles of equity").

addressed – the others.  Moreover, in the years since *Basch*, three federal circuits have held that a post-*Basch* amendment makes clear that Congress did not intend willfulness to be a prerequisite to a trademark infringement victim's recovery of profits.  Presented with the textual, structural and historical evidence of Congress' intent, the Second Circuit would – and this Court should – reject the counter-textual willfulness prerequisite and permit district courts to do what Congress intended: weigh willfulness along with all other equitable factors in order to determine a just award on a case-by-case basis.

### D.    Amendments After *Basch* Make Clear There Is No "Clear Legislative Command" Limiting Equitable Discretion Only To Cases Where the Victim Proves The Infringer's Willfulness.

#### 1.    Congress Made Willfulness A Prerequisite For Recovery Of Monetary Relief For Trademark Dilution, But Not For Other Types Of Trademark Infringement.

At the time of *Basch*, the first sentence of section 1117(a) stated:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, or a violation under section 1125(a) of this title [Lanham Act section 43(a)], shall have been established … the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.

*Id.*  Congress amended Section 1117(a) seven years later, to take account of a new action for trademark dilution, created in the Federal Trademark Dilution Act, Pub. L. 104–98, 109 Stat. 985 (1996).  In particular, the Trademark Amendments Act of

1999, Pub. L. No. 106–43, 113 Stat. 219 (1999) (the "1999 Amendment") deleted the phrase "or a violation under section 43(a) [section 1125(a)]," and replaced it with a doubly-long phrase that clearly distinguished between violations where willfulness was required and violations where it was not. *Id.* at § 3(b). Instead of giving a victim the right to monetary relief when there is

a violation under section 43(a) [15 U.S.C. § 1125(a)]

the 1999 Amendment gives a victim the right to monetary relief when there is

*a violation* under section 43*(a)* [1125(a)],
or *a willful violation* under section 43*(c)* [1125(c)].

*Id.* (emphasis added).

By inserting "willful" before "violation under section 43(c) [1125(c)]," Congress chose to make willful infringement a prerequisite to recovery of monetary relief for trademark *dilution* (section 43*(c)*). But in the very same phrase, Congress chose *not* to insert "willful" before "violation under section 43*(a)* [1125(a)]," making plain that it did not intend willful infringement to be a prerequisite to recovery of monetary relief for the other types of infringement covered by that section, including the sale of counterfeits.

It is well-settled that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Duncan v. Walker*, 533 U.S. 167, 173 (2001) (citations omitted);

*accord U.S. v. Peterson*, 394 F.3d 98, 107 (2d Cir. 2005) ("When Congress uses

particular language in one section of a statute and different language in another, we

presume its word choice was intentional."). Accordingly, as the Third, Fourth, and

Fifth Circuits have explicitly recognized, "[t]he plain language of the [1999

Amendment] indicates that Congress intended to condition monetary awards for

§43(c) [§ 1125(c) dilution] violations, but not §43(a) [§ 1125(a) false designation]

violations, on a showing of willfulness." *Banjo Buddies, Inc. v. Renosky*, 399 F.3d

168, 174 (3d Cir. 2005); *accord Quick Technologies Inc. v. Sage Group PLC*, 313

F.3d 338, 349 (5th Cir. 2003) ("[I]n light of the plain language of § 1117(a),

however, we decline to adopt a bright-line rule in which a showing of willful

infringement is a prerequisite to an accounting of profits" for section 1125(a)

violations); *Synergistic Internat'l, LLC v. Korman*, 470 F.3d 162, 175 & n.13 (4th

Cir. 2006) ("[A]lthough willfulness is a proper and important factor in an

assessment of whether to make a damages award, it is not an essential predicate

thereto.").[13] The Second Circuit has not yet considered the construction of the

---

[13] *See also Chanel, Inc. v. Veronique Idea Corp.*, 795 F. Supp. 2d 262, 268-69
(S.D.N.Y. 2011) (finding no willfulness requirement under § 43(a)); *Cartier v.
Aaron Faber, Inc.*, 512 F.Supp.2d 165, 172-73 (S.D.N.Y. 2007) (same); *Nike, Inc.
v. Top Brand Co. Ltd.*, No. 00 Civ.8179 2005 WL 1654859, at *9-*11 (S.D.N.Y.
July 13, 2005) (same); *see generally* Danielle Conway-Jones, *Remedying
Trademark Infringement: The Role of Bad Faith in Awarding An Accounting of
Defendant's Profits*, 42 Santa Clara L. Rev. 863, 924 (2002) ("Congress did not
intend bad faith to be a requirement for an award of the remedy of an accounting of
profits"); Keith Stolte, *Remedying Judicial Limitations on Trademark Remedies:*

statutory language as it stands following the 1999 Amendment but, when it does, there is every reason to think that it will do so consistent with these three circuits and with the Second Circuit's own precedent in *Peterson*.

> ## 2. Congress Allowed Counterfeiting Victims To Elect Statutory Damages Instead Of "Actual Damages and Profits" In Cases Of Both Willful And Non-Willful Infringement.

The text of the 1999 Amendment by itself convinced the Third, Fourth, and Fifth Circuits that Congress did not intend to make willfulness an unwritten prerequisite to an award of profits in Section 1125(a) cases. But Congress also made the same intent plain in *another* statutory amendment enacted after *Basch*.

In the Anticounterfeiting Consumer Protection Act of 1996, Pub. L. 104-153, 110 Stat. 1386, § 7 (1996), Congress added a new subsection (c) to section 1117, which states that a counterfeiting victim "may elect … to recover, *instead of actual damages and profits* under subsection (a) … an award of statutory damages … (1) not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services … *or (2) if the court finds that the use of the counterfeit mark*

---

*An Accounting of Profits Should Not Require A Finding of Bad Faith*, 87 Trademark Rep. 271, 293-99 & n. 127 (1997) (noting that Lanham Act legislative history shows Congress did not intend to require a victim to prove willfulness as a prerequisite to profits).

*was willful*, not more than $2,000,000 per counterfeit mark per type of goods or services ..." 15 U.S.C. §1117(c) (emphasis added) ("1996 Amendment").[14]

The 1996 Amendment gives counterfeiting victims two choices. They can seek "actual damages *and profits* under subsection (a)" or they can seek "statutory damages" under subsection (c), which are higher if the use of the counterfeit mark was willful. This provision demonstrates that Congress intended victims of counterfeiting to be able to recover profits and damages, whether or not the infringement was willful. By creating separate tiers of statutory damages for cases of willful and non-willful counterfeiting, and specifying that statutory damages were an alternative to "actual damages *and* profits" in both kinds of cases, Congress indicated its understanding that damages *and* profits are the ordinary quantum of recovery in cases of both willful and non-willful infringement.[15] In other words, as the Second Circuit recently recognized, "section 1117(c) represents a special exception or carveout for part of *the remedy otherwise available* under

---

[14] Likewise, the Lanham Act authorizes an injunction against an internet domain name registry only if it "*willfully* failed to comply with any [prior] court order." 15 U.S.C. § 1114(2)(D)(i)(II)(cc).

[15] By contrast, Section 1117(d), which provides for statutory damages for domain name infringement under Section 1125(d), contemplates only a single tier of statutory damages. This makes sense, because Section 1125(d) – unlike section 1125(a) – expressly conditions liability on a showing of "bad faith." *See* 15 U.S.C. 1125(d) ("A person [using an infringing domain name] shall be liable in a civil action ... if ... that person ... has a bad faith intent to profit from [the] mark ...").

section 1117(a): 'actual damages *and profits*.'" *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 109 (2d Cir. 2012) (emphasis added).

Like the 1999 Amendment, the Second Circuit has not yet considered whether the 1996 Amendment manifests Congress's intent that victims of counterfeiting be able to seek monetary relief subject to longstanding equitable principles, without a requirement to prove that the seller of counterfeits acted willfully.  There is every reason to think that Congress so intended.  Otherwise, Congress would not have given counterfeiting victims the choice between recovering, on the one hand, "actual damages and profits under subsection (a)" or recovering statutory damages that are higher "*if the court finds that the use of the counterfeit mark was willful*."  Instead, it would have given counterfeiting victims the choice between recovering, on one hand, "actual damages or, *if the court finds that the use of the counterfeit mark was willful*, profits under subsection (a)," and recovering statutory damages that are higher "*if the court finds that the use of the counterfeit mark was willful*."

### 3.    The Post-*Basch* Amendments Rejected – Not Ratified – A Willfulness Prerequisite.

While the Second Circuit has not had occasion to analyze the effects of the 1996 or 1999 Amendments on *Basch*'s interpretation of the now-superseded statutory language, the Second Circuit acknowledged two years ago that the 1999 Amendment calls into question whether a victim must still prove the willfulness of

a defendant that has sold counterfeits. *See Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*, 507 Fed. App'x 26, 31 (2d Cir. 2013). However, the *Fendi* court declined to reach the issue because the plaintiff there had established willfulness.[16] As noted above, three appellate courts that have explicitly addressed the 1999 Amendment have concluded that willfulness, while relevant, is not required for an award of profits in Section 1125(a) cases. Nonetheless, the district court here interpreted the 1999 Amendment in precisely the opposite manner: as a *ratification* of judicial precedents adopting an unwritten willfulness prerequisite. (JA40-41.) This was error.

To be sure, "Congress' failure to disturb a consistent judicial interpretation of a statute may provide some indication that Congress at least acquiesces in, and apparently affirms, that [interpretation]." *Monessen Sw. Ry. Co. v. Morgan*, 486 U.S. 330, 338 (1988) (internal quotation marks omitted; brackets in original). But neither of the requirements for application of that rule – an undisturbed statute, and a consistent judicial interpretation – is present here.

First, far from "fail[ing] to disturb" the interpretation defended by the district court, Congress *removed* the phrase into which the Second Circuit had read

---

[16] After *Fendi*, the Second Circuit cited *Basch*'s willfulness prerequisite in passing in a case where willfulness had been established. *See Merck Eprova AG v. Gnosis S.P.A.*, 760 F.3d 247, 261 (2d Cir. 2014). Because willfulness had been established, *Merck* did not analyze the reasons for the *Basch* rule; its citation to *Basch* was dicta, and it did not disturb *Fendi's* recognition that the post-*Basch* changes to the statute may undermine the willfulness prerequisite.

a willfulness requirement and replaced it with a phrase in which willfulness is expressly enumerated as a prerequisite for dilution claims, but not for infringement claims in general, and certainly not for counterfeiting claims. Had Congress wished to ratify a willfulness prerequisite for recovery in Section 1125(a) cases, it would have inserted willfulness before the reference to Section 1125(a) as well as before the reference to Section 1125(c). At a bare minimum, it would have chosen not to insert willfulness in either place. It did neither. Instead, it inserted willfulness as a prerequisite to dilution claims under Section 1125(c), but *not* to infringement claims under Section 1125(a).

Second, the willfulness prerequisite came nowhere near being a *"consistent judicial interpretation"* before the Amendments. To the contrary, the Fifth, Sixth, Seventh, and Eleventh Circuits all treated willfulness as just one factor among other equitable considerations that a district court may weigh in determining a just award. *See Burger King,* 855 F.2d at 781-783 (11th Cir. 1988) ("[Because] all monetary awards under Section 1117 are 'subject to the principles of equity,' … no hard and fast rules dictate the form or quantum of relief," "[n]or is an award of profits … dependent upon a higher showing of culpability on the part of defendant"); *Axiom Worldwide, Inc. v. Excite Med. Corp.,* No. 13-13900, 2014 WL 6234006, at *9 (11th Cir. Nov. 17, 2014) (reaffirming *Burger King*); *Roulo v. Russ Berrie & Co., Inc.,* 886 F.2d 931, 941 (7th Cir. 1989) ("Other than general

equitable considerations, there is no express requirement . . . that the infringer willfully infringe the trade dress to justify an award of profits."); *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 607 (6th Cir. 1991) ("[T]here is no express requirement that the ... infringer willfully infringe the trade[mark] to justify an award of profits"); *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 554-55 (5th Cir. 1998) (An award of the defendant's profits is not automatic ... and is committed to the discretion of the district court ... [T]his court has not required a particular factor to be present, [but] relevant factors ... include ... (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off.").[17]

---

[17] The Eighth, Ninth and Tenth Circuits have come to different conclusions. *See Western Diversified Servs., Inc. v. Hyundai Motor America, Inc.*, 427 F.3d 1269, 1272 & n.1 (10th Cir. 2005) (acknowledging without analysis that willfulness requirement is not "universally applied"); *M2 Software, Inc. v. Viacom, Inc.*, 223 Fed. App'x 653, 655-56 (9th Cir. 2007) (acknowledging change to text of Section 1117(a) made by 1999 Amendment but declining to reach issue); *Masters v UHS of Delaware, Inc.*, 631 F.3d 464, 471 n.2 (8th Cir. 2011) (acknowledging other circuits' contrary opinions but "assum[ing], without deciding, that willful infringement is a prerequisite of monetary relief"); *see also Fishman Transducers Inc. v. Paul*, 684 F.3d 187, 191 (1st Cir. 2012) (noting that willfulness only appears in certain places in statute but stating, without analysis, that "our cases *usually* require willfulness ... to allow ... a recovery of the defendant's profits") (emphasis added). To the best of Romag's knowledge, none of these circuits have analyzed the arguments presented here. Note that the D.C. Circuit, like the Second Circuit in *Basch*, concluded *before* the 1996 and 1999 Amendments, under the now-

As noted above, the Third and Fourth Circuits have now joined the ranks of circuits rejecting a rigid prerequisite for award of profits in favor of multi-factor equitable evaluation, and the Fifth Circuit has reaffirmed its flexible approach in light of the 1999 Amendment. *See Banjo Buddies,* 399 F.3d at 174; *Synergistic,* 470 F.3d at 175 & n.13; *Quick Technologies,* 313 F.3d at 347-349.

In short, the Second Circuit would recognize that the 1996 and 1999 Amendments did not leave Section 1117 undisturbed, and that in any event there was no consistent judicial interpretation of the statute before the Amendments. Applying the construction of Section 1117 set forth in *Louis Vuitton, see infra* Part I.E.1., and considering the positions of the circuits that have squarely considered the effect of the Amendments, the Second Circuit would join the Third, Fourth, and Fifth Circuits and hold that the willfulness prerequisite did not survive the 1996 and 1999 Amendments.

### E. Congress Specified Constraints On Courts' Equitable Discretion – But A Willfulness Prerequisite Is Not Among Them.

For the reasons described above, a willfulness prerequisite is inconsistent with the post-*Basch* Amendments to the Lanham Act. Even in 1992, though, the willfulness prerequisite encroached on the text and structure of Section 1117. The

---

superseded statutory language, that "an award based on a defendant's profits requires proof that the defendant acted willfully or in bad faith." *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 968 (D.C. Cir.1990) (asserting conclusion without analyzing issue).

*Basch* court did not address those encroachments because the parties in that case did not bring them to the court's attention.

The District Court's willfulness requirement creates a broad exemption from awards of profits solely on the basis of a defendant's level of intent. The text of Section 1117(a) does not make willfulness a general prerequisite to recovery of profits for a Section 1125(a) violation. But it *does* make the defendant's intent or willfulness a prerequisite to recovery in certain targeted circumstances specifically described in Sections 1111 and 1117. The district court's willfulness requirement thus impermissibly reads into Section 1117(a) a broad exemption for defendants that far exceeds the limited exceptions that Congress chose to enact. *See Peterson*, 394 F.3d at 107 ("Where Congress uses particular language in one section of a statute and different language in another, we presume its word choice was intentional."). *Greene v. U.S.*, 79 F.3d 1348, 1355 (2d Cir. 1996) ("Where Congress explicitly enumerates certain exceptions ... additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.").

### 1.    Congress Expressly Limited The Recovery Of Attorneys' Fees To "Exceptional Cases" But Imposed No Such Restriction On Profits, Damages, And Costs.

Before 1975, Section 1117(a) only provided for the award of plaintiff's damages, defendant's profits, and costs; it said nothing about attorney's fees. In 1975, Congress amended the statute to provide for an award of attorney's fees to

the prevailing party, but only in "exceptional cases." *See* Pub. L. 93-600, 88 Stat. 1955, § 3 (1975) (amending Section 1117(a) to add a final sentence providing that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party").

Only attorney's fees are limited to "exceptional" cases. Congress created no such prerequisite for damages or profits, making plain that they are available in cases that are *not* "exceptional." *See Louis Vuitton*, 676 F.3d at 108-109 (acknowledging that Section 1117(a) clearly "distinguishes between actual profits and damages on the one hand, and an award of attorney's fees on the other," and that the "[r]ecovery of damages is … something to which a successful plaintiff 'shall be entitled' … in the form of (1) defendant's profits (2) any damages sustained by the plaintiff, and (3) the costs of the action," while "[t]he award of attorney's fees, by contrast, is reserved for 'exceptional cases.'") (internal quotation marks omitted).

The Second Circuit has held that a case is "exceptional" when "the infringement was 'willful' or in 'bad faith'." *Id.* That standard, together with the construction of Section 1117(a) adopted in *Louis Vuitton*, compels the conclusion that profits, unlike attorney's fees, must be available in infringement cases that do *not* involve willfulness or bad faith.

The Supreme Court's recent interpretation of an identical attorney's fees provision in the Patent Act, 35 U.S.C. §285, further demonstrates the error of imposing a blanket willfulness prerequisite on awards of profits for trademark infringement. In *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014), the Supreme Court rejected the view that a case is only "exceptional" for purposes of awarding attorney's fees under the Patent Act if it involves "material inappropriate conduct" or is both "objectively baseless" and "brought in subjective bad faith." *Id.* at 1755-56 (rejecting Federal Circuit test for exceptionality). The Supreme Court faulted that Federal Circuit test for exceptionality as "unduly rigid" and "impermissibly encumber[ing] the statutory grant of discretion to district courts," which, the Supreme Court emphasized, should determine whether a case is 'exceptional" "in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* at 1756. The Supreme Court then observed that, "[a]s in the comparable context of the Copyright Act, there is no precise rule or formula for making these determinations, but instead equitable discretion should be exercised in light of the [flexible] considerations we have identified [in prior cases]." *Id.* (internal brackets and quotations marks omitted).

The Supreme Court's rejection of a rigid prerequisite for attorney's fee awards in favor of equitable evaluation of the totality of the circumstances applies

with even greater force to the willfulness prerequisite for profits at issue in this case. For, while the Supreme Court disagreed with this Circuit's test for attorney's fees, that test was at least grounded in Congress' express limitation of such awards to "exceptional" cases. No such textual qualification justifies imposition of a threshold requirement for profits. Even more so than attorney's fees, then, awards of profits must be entirely remitted to the "case-by-case exercise of [the district court's] discretion, considering the totality of the circumstances." *Id.* at 1756.[18]

> ### 2. Congress Rejected A General Good-Faith Defense To Damages And Profits, Instead Creating Targeted Exemptions For Specific Categories Of "Innocent" Infringer.

Section 1117(a) instructs courts to make awards "subject to the provisions of sections 1111 and 1114." 15 U.S.C. §1117(a). Those sections exempt specific and

---

[18] While the Second Circuit has not yet considered the implications of *Octane Fitness* on attorney's fees under the Lanham Act, the Third Circuit has held that *Octane Fitness* applies to the identically-worded attorney's fees provision in Section 1117(a). *See Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 315 (3d Cir. 2014) ("[T]he Court was sending a clear message that it was defining 'exceptional' not just for the fee provision in the Patent Act, but for the fee provision in the Lanham Act as well. ... Whether litigation positions or litigation tactics are 'exceptional' enough to merit attorneys' fees must be determined by district courts in the case-by-case exercise of their discretion, considering the totality of the circumstances. ... Importantly, that discretion is not cabined by a threshold requirement that the losing party acted culpably."); *accord BMW of North Am., LLC v. Cudahar*, No. 6:14-cv-40, 2014 WL 5420133, *2-3 (M.D. Fla. June 20, 2014). The District Court here held that *Octane Fitness* does not apply to Lanham Act claims (JA2425-26), but granted some attorney's fees on other grounds. Because the District Court has not yet quantified the amount of attorney's fees, the attorney's fees ruling – including the holding regarding *Octane Fitness* – is not yet final, and is thus not part of this appeal.

limited categories of defendants from recovery of profits and damages based on "innocence", lack of "knowledge," or absence of "bad faith." Congress chose to exempt those specific and limited categories of defendants from liability for non-willful infringement. It did not, by contrast, broadly exempt all trademark infringers from liability for non-willful infringement.

Section 1111 states that when an infringement victim sues an infringer for infringement of a registered mark, "no profits and no damages shall be recovered … unless the defendant had actual notice of the registration." 15 U.S.C. §1111. Section 1114 bars recovery of profits or damages from: (i) defendants whose infringement consists of applying imitation marks to labels, signs, prints, packages, or advertisements and who act without "knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive"; (ii) printers and publishers who print or publish violating matter for others and who "establish[] that he or she was an innocent infringer;" [19] and (iii) domain name registration authorities "absent a showing of bad faith intent to profit from … registration or maintenance of the [infringing] domain name." *See* 15 U.S.C. §§ 1114(1), (2)(A) & (B), (2)(D)(iii), respectively.

---

[19] Even in this explicit exemption, Congress chose to put the burden of proof on the *defendant* to prove innocence, rather than requiring the victim to prove willfulness. The District Court's willfulness requirement not only improperly expands the limited exemptions – it also turns the statutory burden of proof for relief from fiscal penalties on its head.

In Section 1117(a), Congress invoked a *limited* set of exemptions from the award of damages and profits for specific categories of "innocent" infringers. It did not choose – as the district court's willfulness requirement would – to create a broad-based exemption from the disgorgement of profits for all defendants whose willfulness cannot be established by the victim. As the Supreme Court has recognized, "in the Lanham Act, Congress meticulously detailed the remedies available to a plaintiff." *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 719 (1967). Congress has been no less meticulous in detailing the exceptions to those remedies, and its choices must be respected by the courts. *See Greene v. U.S.*, 79 F.3d 1348, 1355 (2d Cir. 1996) ("Where Congress explicitly enumerates certain exceptions ... additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.").

Indeed, Congress plainly rejected efforts to shield non-willful defendants from the obligation to disgorge profits earned because of the infringement. *Seven* of the early bills that ultimately culminated in the Lanham Act explicitly provided that "there shall be *no recovery of profits* from any defendant whose adoption and use of an infringing trade-mark was in good faith and without knowledge of the

plaintiff's right thereto." S. 2679, 68th Cong, 1st Sess §18(c) at 21 (1924) (emphasis added).[20] Yet Congress chose to remove that language – not to enact it.

"Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded." *INS v. Cardoza-Fonseca*, 480 US 421, 442-43 (1987). "Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended," *Russello v. U.S.*, 464 U.S. 16, 23-24 (1983), and courts exceed their authority when they impose requirements that Congress rejected.

\*    \*    \*

By making an award of damages *and* profits the default remedy for infringement, while exempting narrow categories of defendants and vesting trial courts with wide latitude to adjust awards based on the circumstances of the case, Congress struck a careful balance between the risks of under-compensating plaintiffs and under-protecting the public on the one hand, and allowing unwarranted windfalls to plaintiffs on the other. Making willfulness a prerequisite to disgorgement of profits acquired from use of counterfeit marks upsets that balance and permits negligent or reckless infringers unjustly to retain profits made

---

[20] *See also* 69th Cong, 1st Sess §18(c) at 23 (1925); HR13486, 69th Cong, 2d Sess §18(c) at 23-24 (1926); HR6683, 70th Cong, 1st Sess §18(c) at 28 (1927); HR11988, 70th Cong, 1st Sess §17(c) at 30 (1928); HR13109, 70th Cong, 1st Sess §18(c) at 30 (1928); HR2828, 71st Cong, 1st Sess §18(c) at 30 (1929).

from another's labor, exposing the public to fraudulent, sub-standard and potentially dangerous counterfeits which, by simple measures, they (and only they) have the power to prevent from entering the steam of commerce.

Respecting Congress' determination of how best to strike that balance, six appellate courts have rejected a showing of willfulness as a prerequisite to an award of defendant's profits for violations of section 1125(a), in favor of a flexible, multi-factor approach. *See supra* Parts I.D.1 & D.3. In view of the post-*Basch* Amendments, aspects of the statute's text and structure not brought to the court's attention in 1992, and the Supreme Court's recent rejection of a similar threshold condition on awards of attorney's fees under the Patent Act, the Second Circuit would, and this Court should, join those six sister circuits.

## II.    A Patent Infringer Cannot Invoke Laches When The Victim Has Filed Suit Within The Applicable Within The Limitations Period.

The District Court found that Romag committed laches by bringing suit in November 2010, rather than five months earlier, in June. The Court ruled that this delay, although shorter than the applicable limitations period, was unreasonable under the circumstances and caused prejudice because, if Romag had sued faster, "Fossil could have switched the snaps on its handbags to generic snaps and still have been able to take its products to market for the profitable holiday selling season." (6-27 MOD, 20.) The Court ruled that the five-month delay, representing

about 18% of the 28-month period of patent infringement, should reduce the patent award by 18%. (JA23.)[21]

Laches is an unreasonable delay in bringing suit that prejudices the defendant. This Court reviews a District Court finding of laches for abuse of discretion, *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 193 (2d Cir. 1996) (trademark); *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1039 (Fed. Cir. 1992) (patent). Laches holdings must be overturned when they are based on a mistake of law, on clearly erroneous factual findings, or "an unreasonable judgment in weighing relevant factors." *Id.* Here, the District Court made a mistake of law by ruling that a patent infringer can invoke laches even when the victim of patent infringement has brought within the statutory limitations period.

The Supreme Court has recently noted that it continues to "adhere to the position that, in face of a statute of limitations enacted by Congress, laches cannot be invoked to bar legal relief." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1974 (2014). *Petrella* held that laches cannot be invoked as a defense to a copyright infringement claim, when the alleged infringement occurred within the

---

[21] The Court ruled similarly with respect to trademark profits, noting that it would "consider Plaintiff's laches as a factor" in adjusting the jury's award, but it never reached the issue because it found that the lack of willfulness precluded any award of profits. *See supra* 21-22. (JA26.)

three-year limitations period provided for in 15 U.S.C. § 507(b). *Id.* at 1973-74. That is because a laches defense applies in actions at law – as opposed to actions in equity – only when there is no statutorily prescribed limitations period. *Id.* The Supreme Court noted that it had *never* "approved the application of laches to bar a claim for damages brought within the time allowed by a federal statute of limitations." *Id.* at 1979.

Over twenty years ago, this Court held in *Aukerman* that defendants may invoke laches as a defense to a patent infringement action even when the patentee brought the action within the statutory limitations period. *A.C. Aukerman Co.*, 960 F.2d at 1039 (en banc). Under *Petrella, Aukerman* is no longer good law. Although *Petrella* involved copyright claims rather than patent claims, the Supreme Court explicitly left open the possibility that *Aukerman* no longer stands, *Petrella*, 134 S. Ct. at 1974 n. 15, and its reasoning requires that *Aukerman* be overruled. A patent infringement claim, like a copyright infringement claim, is an action at law, not an equitable claim. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 377, (1996) (noting "descent of today's patent infringement action from the infringement actions tried *at law* in the 18th century") (emphasis added). And like the limitations period in the Copyright Act, the Patent Act contains an express limitations period for damages actions. 35 U.S.C. §286. The reasoning of *Petrella* thus obliges this Court to hold that a defendant cannot invoke laches to bar or

reduce an award of damages in a patent infringement suit filed within the statutory limitations period.[22]

Where *Aukerman* held that a defendant can invoke laches within an express statutory limitation period, *Petrella* held the opposite: "To the extent that an infringement suit seeks relief solely for conduct occurring within the limitations period, however, courts are not at liberty to jettison Congress' judgment on the timeliness of suit. Laches, we hold, cannot be invoked to preclude adjudication of a claim for damages brought within the [statutory] window." *Petrella*, 134 S. Ct. at 1967. The Supreme Court's reasoning does not depend on the particular language of the limitations period in the Copyright Act; it applies to statutory limitation periods across the board, which by definition represent "Congress' judgment on the timeliness of suit" and therefore cannot be "jettison[ed]." *Id.*

Nor does it matter that the patent limitations statute (35 U.S.C. § 286) bars only claims for monetary damages, instead of barring all claims, as the copyright

---

[22] On December 30, 2014, this Court ordered rehearing *en banc* in *SCA Hygeine Products Aktiebolag v. First Quality Baby Products, LLC,* No. 2013-1564 (Dkt. #76 at 2), to consider "[i]n light of the Supreme Court's decision in *Petrella v. Metro-Goldwyn-Mayer*, 134 S. Ct. 1962 (2014) (and considering any relevant differences between copyright and patent law), should this court's en banc decision in *A.C. Aukerman* ... be overruled so that the defense of laches is not applicable to bar a claim for damages based on patent infringement occurring within the six-year damages limitations period established by 35 U.S.C. § 286?" The Order vacated the previous panel decision. *Id.*

limitations statute (17 U.S.C. § 507(b)) does. In the patent limitations statute, Congress has made its "judgment on the timeliness" of claims for monetary damages, and in the copyright limitations statute, Congress has made its "judgment on the timeliness" of monetary damages and all other claims, but in both statutes, Congress has set the time bar for infringement claims seeking monetary damages. Under *Petrella*, courts are not at liberty to override that congressional judgment by employing the equitable doctrine of laches.

To be sure, the fact that Congress chose to set the limitations period only for monetary damages in the patent infringement context – unlike the broader limitations period for all remedies that Congress chose in the copyright context – means that courts can continue to consider laches as a defense to patent infringement claims seeking *non*-monetary relief. But contrary to *Aukerman*, *Petrella* makes clear that when Congress has established a statutory limitation period, the *equitable* defense of laches can only bar or limit *equitable* claims:

> [L]aches is a defense developed by courts of equity; its principal application was, and remains, to claims of an equitable cast for which the Legislature has provided no fixed time limitation. See 1 D. Dobbs, Law of Remedies § 2.4(4), p. 104 (2d ed. 1993) (hereinafter Dobbs) ("laches … may have originated in equity because no statute of limitations applied, … suggest[ing] that laches should be limited to cases in which no statute of limitations applies"). Both before and after the merger of law and equity in 1938, this Court has cautioned against invoking laches to bar legal relief. See *Holmberg v. Armbrecht*, 327 U.S. 392, 395, 396, 66 S.Ct. 582, 90 L.Ed. 743 (1946)

> (in actions at law, "[i]f Congress explicitly puts a limit upon the time for enforcing a right which it created, there is an end of the matter," but "[t]raditionally …, statutes of limitation are not controlling measures of equitable relief"); *Merck & Co. v. Reynolds*, 559 U.S. 633, 652, 130 S.Ct. 1784, 176 L.Ed.2d 582 (2010) (quoting, for its current relevance, statement in *United States v. Mack*, 295 U.S. 480, 489, 55 S.Ct. 813, 79 L.Ed. 1559 (1935), that "[l]aches within the term of the statute of limitations is no defense [to an action] at law"); *County of Oneida v. Oneida Indian Nation of N. Y.*, 470 U.S. 226, 244, n. 16, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) ("[A]pplication of the equitable defense of laches in an action at law would be novel indeed.").

*Petrella*, 134 S. Ct. at 1973-74.[23]

Likewise, while *Aukerman* thought that the inclusion of laches as an affirmative defense under Federal Rule of Civil Procedure 8(c) meant that laches must be available to every sort of claim, whether law or equitable, *Petrella* rejected that argument:

> Laches is listed among affirmative defenses, along with, but discrete from, the statute of limitations, in Federal Rule of Civil Procedure 8(c). Accordingly, MGM maintains, the plea is "available … in every civil action" to bar all forms of relief. . . . The expansive role for laches MGM envisions careens away from understandings, past and present, of the essentially gap-filling, not legislation-overriding, office of laches. Nothing in this Court's precedent suggests a doctrine of such sweep. Quite the contrary, we have never applied laches to bar in their entirety claims for discrete wrongs occurring within a federally prescribed limitations period. Inviting individual judges to set a time limit other than the one Congress prescribed, we note, would tug against the uniformity Congress sought to achieve . . . .

---

[23] *See also id.* at 1967 (noting that laches remains relevant to equitable claims seeking injunctions or profits).

*Petrella*, 134 S. Ct. at 1974-75. *Petrella* requires reversal of the District Court's decision to use the equitable doctrine of laches to reduce the monetary damages due to Romag for the defendants' infringement of Romag's patent. Where, as here, the patent infringement suit were timely filed, and where there is no dispute that all of the damages awarded by the jury occurred during the six-year limitations period set by Congress, laches cannot be used to reduce the award.

## CONCLUSION AND RELIEF SOUGHT

This Court should hold that the Lanham Act does not require a victim of counterfeiting to prove that the infringer acted willfully in order to recover the infringer's profits. That aspect of the judgment should thus be reversed, and remanded to the District Court for further proceedings including the equitable balancing that Congress directed District Courts to conduct, conducted with appropriate regard for the jury's verdict.

On the patent infringement claim, this Court should hold that laches is not an available defense to patent infringement claims brought well within the statutory limitations period, reversing the District Court's judgment in that respect, with instructions to restore the amount of patent infringement damages awarded by the jury.

Respectfully submitted,

**PLAINTIFF-APPELLANT
ROMAG FASTENERS, INC.**

Dated: January 29, 2015

By:   /s/Jonathan M. Freiman
Jonathan Freiman
WIGGIN AND DANA LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
(203) 498-4400
(203) 782-2889 (fax)
jfreiman@wiggin.com

Norman H. Zivin
Tonia A. Sayour
COOPER & DUNHAM, LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 278-0400
(212) 391-0525 (fax)
nzivin@cooperdunham.com
tsayour@cooperdunham.com

*Its Attorneys*

# **ADDENDUM**

Jury Verdict (dkt 417).....................................................................Addendum 1

Memorandum of Decision (dkt 471) ...........................................Addendum 13

Amended Judgment (dkt 492) .....................................................Addendum 55

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROMAG FASTENERS, INC., | Civil No. 3:10cv1827 (JBA) |
| Plaintiff, | |
| v. | |
| FOSSIL, INC., et al., | |
| Defendants. | |

## JURY VERDICT

### A.    TRADEMARK LIABILITY

   1.    *Trademark Infringement*

Has Romag proved by a preponderance of the evidence that Defendants have infringed upon its federally registered mark ROMAG?

| | | |
|---|---|---|
| Fossil, Inc. and Fossil Stores I, Inc. | Yes ☒ | No ☐ |
| Belk, Inc. | Yes ☐ | No ☒ |
| The Bon-Ton Stores, Inc. and The Bon-Ton Department Stores, Inc. | Yes ☐ | No ☒ |
| Dillard's, Inc. | Yes ☐ | No ☒ |
| Macy's, Inc. and Macy's Retail, Inc. | Yes ☐ | No ☒ |
| Nordstrom, Inc. | Yes ☐ | No ☒ |
| Zappos.com, Inc. and Zappos Retail, Inc. | Yes ☐ | No ☒ |

   *Proceed to Question A.2.*

**Addendum  1**

2.    *False Designation of Origin*

Has Romag proved by a preponderance of the evidence that Defendants falsely represented that their goods come from the same source, or are affiliated with, or sponsored by Romag Fasteners, Inc.?

| | Yes | | No | |
|---|---|---|---|---|
| Fossil, Inc. and Fossil Stores I, Inc. | Yes | ☒ | No | ☐ |
| Belk, Inc. | Yes | ☐ | No | ☒ |
| The Bon-Ton Stores, Inc. and The Bon-Ton Department Stores, Inc. | Yes | ☐ | No | ☒ |
| Dillard's, Inc. | Yes | ☐ | No | ☒ |
| Macy's, Inc. and Macy's Retail, Inc. | Yes | ☐ | No | ☒ |
| Nordstrom, Inc. | Yes | ☐ | No | ☒ |
| Zappos.com, Inc. and Zappos Retail, Inc. | Yes | ☐ | No | ☒ |

If you answered "Yes" to Question A.1 or Question A.2 with respect to any Defendant, proceed to Question A.3. If you answered "No" to Question A.1 and Question A.2 with respect to all Defendants, proceed to Section C.

3.    Has Romag proved by a preponderance of the evidence that Defendants' trademark infringement was willful?

| | Yes | | No | |
|---|---|---|---|---|
| Fossil, Inc. and Fossil Stores I, Inc. | Yes | ☐ | No | ☒ |
| Belk, Inc. | Yes | ☐ | No | ☒ |
| The Bon-Ton Stores, Inc. and The Bon-Ton Department Stores, Inc. | Yes | ☐ | No | ☒ |
| Dillard's, Inc. | Yes | ☐ | No | ☒ |

2

| | | | |
|---|---|---|---|
| Macy's, Inc. and Macy's Retail, Inc. | Yes ☐ | No ☒ |
| Nordstrom, Inc. | Yes ☐ | No ☒ |
| Zappos.com, Inc. and Zappos Retail, Inc. | Yes ☐ | No ☒ |

If your answer to Question A.3 is "Yes" with respect to any Defendant, on what date do you find that Defendant's willful infringement began?

| | |
|---|---|
| Fossil, Inc. and Fossil Stores I, Inc. | _____ |
| Belk, Inc. | _____ |
| The Bon-Ton Stores, Inc. and The Bon-Ton Department Stores, Inc. | _____ |
| Dillard's, Inc. | _____ |
| Macy's, Inc. and Macy's Retail, Inc. | _____ |
| Nordstrom, Inc. | _____ |
| Zappos.com, Inc. and Zappos Retail, Inc. | _____ |

*Proceed to Section B.*

3

**Addendum 3**

**B.     TRADEMARK DAMAGES**

1.     What amount of profits do you find that Romag proved by a preponderance of the evidence that each Defendant made on the sale of the accused handbags which should be awarded to Plaintiff to prevent unjust enrichment to Defendants?

Fossil, Inc. and Fossil Stores I, Inc.                    $ *90,759.36*

Belk, Inc.                    $ *0*

The Bon-Ton Stores, Inc.
and The Bon-Ton Department Stores, Inc.                    $ *0*

Dillard's, Inc.                    $ *0*

Macy's, Inc. and Macy's Retail, Inc.                    $ *0*

Nordstrom, Inc.                    $ *0*

Zappos.com, Inc. and Zappos Retail, Inc.                    $ *0*

*Proceed to Question B.2.*

2.     What amount of profits do you find that Romag proved by a preponderance of the evidence that each Defendant made on the sale of the accused handbags which should be awarded to deter future trademark infringement?

Fossil, Inc. and Fossil Stores I, Inc.                    $ *6,704,046*

Belk, Inc.                    $ *0*

The Bon-Ton Stores, Inc.
and The Bon-Ton Department Stores, Inc.                    $ *0*

Dillard's, Inc.                    $ *0*

Macy's, Inc. and Macy's Retail, Inc.                    $ *0*

4

**Addendum 4**

Nordstrom, Inc.                                             $_____ 0 _____

Zappos.com, Inc. and Zappos Retail, Inc.                   $_____ 0 _____

*Proceed to Question B.3.*

3.      Have Defendants proved by a preponderance of the evidence that any portion of the profits earned from the sale of the accused handbags was attributable to factors other than the use of the ROMAG mark?

Yes   ☒                     No        ☐

If your answer to Question B.3 is "Yes," what percentage of Defendants' profits earned from the sale of the accused handbags was attributable to factors other than the use of the ROMAG mark?

99 %

5

**Addendum 5**

## C.    STATE LAW LIABILITY

1.    Has Romag proved by a preponderance of the evidence that Defendants have engaged in unfair competition under Connecticut common law?

| | | | |
|---|---|---|---|
| Fossil, Inc. and Fossil Stores I, Inc. | Yes | ☒ | No ☐ |
| Belk, Inc. | Yes ☐ | No ☒ |
| The Bon-Ton Stores, Inc. and The Bon-Ton Department Stores, Inc. | Yes ☐ | No ☒ |
| Dillard's, Inc. | Yes ☐ | No ☒ |
| Macy's, Inc. and Macy's Retail, Inc. | Yes ☐ | No ☒ |
| Nordstrom, Inc. | Yes ☐ | No ☒ |
| Zappos.com, Inc. and Zappos Retail, Inc. | Yes ☐ | No ☒ |

*Proceed to Question C.2.*

2.    Has Romag proved by a preponderance of the evidence that Defendants have engaged in a violation of the Connecticut Unfair Trade Practices Act ("CUTPA")?

| | | | |
|---|---|---|---|
| Fossil, Inc. and Fossil Stores I, Inc. | Yes | ☒ | No ☐ |
| Belk, Inc. | Yes ☐ | No ☒ |
| The Bon-Ton Stores, Inc. and The Bon-Ton Department Stores, Inc. | Yes ☐ | No ☒ |
| Dillard's, Inc. | Yes ☐ | No ☒ |
| Macy's, Inc. and Macy's Retail, Inc. | Yes ☐ | No ☒ |
| Nordstrom, Inc. | Yes ☐ | No ☒ |

6

Zappos.com, Inc. and Zappos Retail, Inc.          Yes ☐          No 

If you answered "Yes" to either Question C.1 or Question C.2 with respect to any Defendant, proceed to Section D.  If you answered "No" to both questions with respect to all Defendants, proceed to Section E.

7

**Addendum 7**

D.    STATE LAW DAMAGES

1.    If you find any Defendant liable with respect to Romag's state common law unfair competition claim, do you find that Romag is entitled to an award of punitive damages against that Defendant with respect to that claim?

| | | |
|---|---|---|
| Fossil, Inc. and Fossil Stores I, Inc. | Yes ☐ | No ☒ |
| Belk, Inc. | Yes ☐ | No ☒ |
| The Bon-Ton Stores, Inc. and The Bon-Ton Department Stores, Inc. | Yes ☐ | No ☒ |
| Dillard's, Inc. | Yes ☐ | No ☒ |
| Macy's, Inc. and Macy's Retail, Inc. | Yes ☐ | No ☒ |
| Nordstrom, Inc. | Yes ☐ | No ☒ |
| Zappos.com, Inc. and Zappos Retail, Inc. | Yes ☐ | No ☒ |

*Proceed to Question D.2.*

2.    If you find any Defendant liable with respect to Romag's CUTPA claim, do you find that Romag is entitled to an award of punitive damages against that Defendant with respect to that claim?

| | | |
|---|---|---|
| Fossil, Inc. and Fossil Stores I, Inc. | Yes ☐ | No ☒ |
| Belk, Inc. | Yes ☐ | No ☒ |
| The Bon-Ton Stores, Inc. and The Bon-Ton Department Stores, Inc. | Yes ☐ | No ☒ |
| Dillard's, Inc. | Yes ☐ | No ☒ |
| Macy's, Inc. and Macy's Retail, Inc. | Yes ☐ | No ☒ |
| Nordstrom, Inc. | Yes ☐ | No ☒ |

8

Zappos.com, Inc. and Zappos Retail, Inc.              Yes: ☐          No  

*Proceed to Section E.*

9

## E.    PATENT LIABILITY

1.    Has Romag proved by a preponderance of the evidence that Fossil and/or Macy's have infringed the asserted claims of the '126 patent?

Fossil, Inc. and Fossil Stores I, Inc.

| | | Yes | | No | |
|---|---|---|---|---|---|
| Claim 1 | | Yes | ☒ | No | ☐ |
| Claim 2 | | Yes | ☒ | No | ☐ |
| Claim 3 | | Yes | ☒ | No | ☐ |

Macy's, Inc. and Macy's Retail, Inc.

| | | Yes | | No | |
|---|---|---|---|---|---|
| Claim 1 | | Yes | ☒ | No | ☐ |
| Claim 2 | | Yes | ☒ | No | ☐ |
| Claim 3 | | Yes | ☒ | No | ☐ |

*If you answered "Yes" to Question E.1 with respect to either Fossil or Macy's, proceed to Question E.2. If you answered "No" to Question E.1 with respect to both Fossil and Macy's, your deliberations are complete. The foreperson should sign and date this verdict form.*

2.    Has Romag proved by clear and convincing evidence that Fossil's and Macy's patent infringement was willful?

| | Yes | | No | |
|---|---|---|---|---|
| Fossil, Inc. and Fossil Stores I, Inc. | Yes | ☐ | No | ☒ |
| Macy's, Inc. and Macy's Retail, Inc. | Yes | ☐ | No | ☒ |

*Proceed to Section F.*

10

Addendum 10

F.    PATENT DAMAGES

1.    If you find that Romag has proved that Fossil's and Macy's infringed any of the asserted claims of the '126 patent, what do you find to be the reasonable royalty rate that will fairly and reasonably compensate Romag for Defendants' patent infringement?

Fossil, Inc. and Fossil Stores I, Inc.    $ .09    price per unit

Macy's, Inc. and Macy's Retail, Inc.    $ .09    price per unit

Based on that reasonable royalty rate, what amount of patent damages do you award to Romag?

Fossil, Inc. and Fossil Stores I, Inc.    $ 51,052.4

Macy's, Inc. and Macy's Retail, Inc.    $ 15,320.61

Your deliberations are complete.  The foreperson should sign and date this verdict form.

_____
SIGNATURE OF FOREPERSON

_____
PRINTED NAME OF FOREPERSON

Dated at New Haven, Connecticut this 3 day of April, 2014
at 4:38 a.m./p.m.

11

**Addendum  11**

**Addendum 12**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROMAG FASTENERS, INC.,<br>*Plaintiff,*<br>*v.*<br>FOSSIL, INC., *et al.,*<br>*Defendants.* | Civil No. 3:10cv1827 (JBA)<br><br>June 27, 2014 |

## MEMORANDUM OF DECISION

On April 3, 2014, after a seven-day trial, a jury returned a verdict finding Defendants Fossil, Inc. and Fossil Stores I, Inc. ("Fossil") liable for trademark infringement, false designation of origin, state common law unfair competition, and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"). (*See* Jury Verdict [Doc. # 417].) The jury also found Fossil and Macy's, Inc. and Macy's Retail, Inc. ("Macy's") liable for patent infringement. (*Id.*) The jury returned a verdict of no liability for the remaining defendants, and found that neither Fossil nor Macy's had willfully infringed Plaintiff Romag Fasteners, Inc.'s ("Romag") patent or trademark. (*Id.*) The jury made an advisory award of $90,759.36 of Fossil's profits for trademark infringement under an unjust enrichment theory and $6,704,046.00 of Fossil's profits for trademark infringement under a deterrence theory and determined that one percent of Fossil's profits were attributable to its infringement of the ROMAG mark. (*Id.*) Finally, the jury awarded a reasonable royalty of $51,052.14 against Fossil and $15,320.61 against Macy's for patent infringement. (*Id.*)

The Court then held a two-day bench trial on April 8 and 9, 2014 to address "the equitable defenses of estoppel, acquiescence, unclean hands, and laches; the equitable adjustment of the amount of profits awarded by the jury; the calculation of punitive

damages; treble damages; attorneys' fees; and the amount of statutory damages to be awarded," (Ruling Granting Mot. to Bifurcate [Doc. # 360] ¶ 15), as well as Romag's claim for a permanent injunction.[1] Defendants also asserted that Romag failed to mitigate its damages and sought sanctions as a result of Romag's conduct in procuring a temporary restraining order ("TRO") at the outset of this case. (*See* Defs.' Prop. Findings of Fact and Conclusions of Law [Doc. # 419] at 42–45.)

For the following reasons, the Court concludes that Defendants have failed to establish that Romag is barred from relief by unclean hands or that Romag had a duty to mitigate its damages. However, the Court concludes that Defendants have established their laches defense and that the Court should impose sanctions. The Court further concludes as a matter of law that based on the jury's finding that the trademark infringement in this case was not willful, Romag is not entitled to recover an award of Fossil's profits associated with that infringement. Finally, a permanent injunction will enter against Fossil.

I.    **Findings of Fact**

Based on the evidence presented during the seven-day jury trial and the two-day bench trial, the Court makes the following findings of fact with respect to the affirmative defenses and the other equitable issues in this case.

---

[1] In their Proposed Findings of Fact and Conclusions of Law [Doc. # 419], Defendants address only the unclean hands and laches defenses, in addition to a newly asserted defense of failure to mitigate damages. Thus, this ruling will not address the defenses of acquiescence or estoppel. The issue of attorneys' fees, and any potential election of statutory damages by Romag will be addressed in separate rulings. This ruling also will not address the calculation of punitive damages, because the jury did not find such damages warranted in this case, nor will it address treble damages, because the jury found that Fossil's trademark infringement was not willful, and because Romag did not brief the issue in its Proposed Findings of Fact and Conclusions of Law [Doc. # 421] or its Trial Memorandum in Support of Damages [Doc. # 448].

2

## A.    The Parties

Romag is a corporation organized under the laws of the State of Connecticut having a place of business in Milford, Connecticut. (Trial. Tr. Vol. VI [Doc. # 438] at 1398.) Howard Reiter founded Romag in 1996 and has served as its President ever since. (Trial Tr. Vol. I [Doc. # 433] at 79–80.)  Romag manufactures magnetic snap fasteners that are protected by United States Patent No. 5,777,126 (the "'126 Patent") (*see* Pl.'s Ex. 1), which it owns by assignment (Trial Tr. Vol. VI at 1398–1401), and sells them under its registered trademark, "ROMAG," (*see* Pl.'s Ex. 2; Trial Tr. Vol. VI at 1398–1401).  These snaps are manufactured in factories in China by a company called Wing Yip Metal Manufactory Accessories Limited ("Wing Yip"). (Defs.' Ex. 548; Trial Tr. Vol. I at 82–85, 121–25.)  When Mr. Reiter decided to manufacture ROMAG snaps in Hong Kong, he was looking for "a very deep relationship," and so in 1997 he started Wing Yip with Timmy Cheung, whose family had previously worked with Mr. Reiter's family. (Trial Tr. Vol. I at 122.)  Although the companies are distinct legal entities, Mr. Reiter considers Mr. Cheung to be his business partner.  (*Id.* at 122–23.)  Wing Yip employs inspectors in its Chinese factories to monitor its production, but Romag also has its own inspectors in China, who work directly for Romag and are Mr. Reiter's "eyes and ears on the ground in China." (*Id.* at 111.)

All of the goods that Wing Yip manufacturers are made for Romag. (*Id.* at 123.) Pursuant to the License Agreement between these two companies, Wing Yip pays Romag a $0.05 royalty for every snap it sells. (Defs.' Ex. 548.)  Wing Yip's first factory—Kong Yip—was located in mainland China. (Trial Tr. Vol. I at 124.)  In 2004, Mr. Reiter and Mr. Cheung decided to open an additional factory, called Timake. (*Id.* at 125.)  Mr. Reiter financed the construction of this factory, and purchased new equipment for

3

production there. (*Id.* at 126–27.) The machinery used to make ROMAG snaps at Kong Yip was also transferred to Timake, which began producing ROMAG snaps in December 2007. (*Id.* at 127–28.) In early 2008, the workers at Kong Yip went on strike, the factory was shut down, and some of the manufacturing equipment there was seized. (*Id.* at 222.) Several former Wing Yip employees left the company at that time, and started a new manufacturing company known as Hechuang Metal Manufactory ("Hechuang"), which was not an authorized manufacturer of ROMAG snaps. (Pl.'s Ex. 27.)

Fossil is a corporation organized under the laws of the State of Delaware, having a place of business in Richardson, Texas (Trial Tr. Vol. VI at 1398), which designs, markets, and distributes fashion accessories, including jewelry, handbags, and small leather goods, (Trial Tr. Vol. IV [Doc. # 436] at 899), and sells its products through its own retail stores and website, and through other retailers, including the Retailer Defendants: Macy's, Belk, Inc., The Bon-Ton Stores, Inc., The Bon-Ton Department Stores, Inc., Dillard's, Inc., Nordstrom, Inc., Zappos.com, Inc., and Zappos Retail, Inc., (Trial Tr. Vol. VI at 1400). Like Romag, Fossil does not manufacture its products itself, but rather, contracts with independent business entities to do so. (Pl.'s Ex. 47.)    One of Fossil's independent authorized manufacturers is Superior Leather Limited a/k/a Dong Guan Red Lion Leather Products, Limited ("Superior"), which operates a factory in China. (*Id.*; Trial Tr. Vol. VI at 1401.)    Superior manufactured the handbags at issue in this case on behalf of Fossil. (*Id.*)    As Fossil's designated manufacturer, Superior, not Fossil, purchases the component parts for handbags, including the magnetic snaps used in the handbags at issue in this case. (Trial Tr. Vol. III [Doc. # 435] at 527–28.)

In 2002, Romag and Fossil entered into an agreement for the use of ROMAG magnetic snap fasteners in Fossil products. (Pl.'s Exs. 37–39; Trial Tr. Vol. I at 144–45.)

4

Pursuant to the agreement, Fossil instructed its factories, where necessary, to purchase ROMAG snaps from Wing Yip. (Pl.'s Ex. 38; Trial Tr. Vol. I at 144.) Via Wing Yip, Romag has sold magnetic snaps to Superior for use by multiple designers and retailers since 2001. (Trial Tr. Vol. I at 138, 168.) Although Mr. Reiter was forwarded an email in July 2002 identifying Superior as a Fossil manufacturer (*see* Pl.'s Ex. 42), the invoices between Wing Yip and Superior would not typically have identified the orders as being specifically for Fossil (Trial Tr. Vol. I at 146–47.) From 2002 through 2008, Superior purchased tens of thousands of ROMAG snaps from Wing Yip for use in Fossil products. (Pl.'s Ex. 35.) However, between August 2008 and the commencement of this action, Superior purchased only a few thousand ROMAG snaps from Wing Yip. (*Id.*; *see also* Pl.'s Ex. 54.) On December 2, 2010, in response to Fossil's inquiries after this action commenced, Superior informed Fossil that it had purchased ROMAG snaps from a manufacturer that was "not the authorized licensee of Romag." (Pl.'s Ex. 53A.)

**B.    Prior Instances of Counterfeiting**

Three years before the events at issue here, in November 2007, shortly before Thanksgiving, Mr. Reiter testified that he discovered that counterfeit ROMAG snaps were being used in handbags for sale at J.C. Penney. (Trial Tr. Vol. I at 231–32.) Mr. Reiter stated that he discovered these bags during a routine shopping trip to the J.C. Penney store near his office. (J.C. Penney Reiter Decl. [Doc. # 5] ¶¶ 8–9, *Romag Fasteners, Inc. v. J.C. Penney Co. ("Romag I")*, Civil No. 07cv1667 (JBA) (D. Conn. 2007).) On November 12, 2007, Romag's counsel in this action, Attorney Norman Zivin sent a cease and desist letter to J.C. Penney detailing the alleged counterfeiting. (Defs.' Ex. 557.) The next day, Romag filed suit against J.C. Penney, and on November 15, 2007, moved for a TRO and preliminary injunction enjoining J.C. Penney from selling the accused products. (*See*

5

Compl. [Doc. # 1], Mot. for TRO [Doc. # 3], and Mot. for Prelim. Inj. [Doc. # 6], *Romag I*.) On November 28, 2007, after a hearing, this Court granted Romag's motion for a TRO and a Preliminary Injunction. (TRO Order [Doc. # 22], *Romag I*.) A few weeks later, the parties reached a settlement in the suit and the TRO was dissolved. (Stip. Of Dismissal [Doc. # 30], *Romag I*.)

In November 2009, Romag again discovered the presence of counterfeit ROMAG snaps in the market, this time, on handbags being sold by DSW, Inc. ("DSW"). (*Id.* at 233). One of Mr. Reiter's employees received a bag with purchase at DSW and discovered that the bag contained a snap with the ROMAG mark. (*Id.*) On November 17, 2009, almost two years to the day from the last counterfeiting incident, Attorney Zivin sent a cease and desist letter to DSW demanding that it immediately discontinue the sale of the accused products. (Defs.' Ex. 560.) The two companies were able to reach a settlement agreement regarding the handbags before a civil action was initiated. (Defs.' Ex. 564.) Romag never informed Fossil about either incident, nor warned Fossil about the presence of counterfeit ROMAG snaps in the United States market. (Trial Tr. Vol. I at 232–34.)

### C.    Romag's Discovery of Counterfeiting by Fossil

On May 12, 2010, Mr. Reiter received an email from an unidentified former employee of Wing Yip who went by the name "Joe." (Pl.'s Ex. 27.) In the email "Joe" stated that another factory in China had been producing magnetic snap fasteners bearing the ROMAG mark without authorization. (*Id.*) On May 19, 2010, Mr. Reiter replied to the email, inquiring as to the identity of the factory and asking whether it was "the factory that many former workers from [W]ing [Y]ip went to." (*Id.*) Mr. Reiter further stated that the identity of the handbag maker using the snaps was the most important information for him because "it is hard for the law to work in [C]hina . . . easier in [the]

6

USA." (*Id.*) On May 20, 2010, "Joe" responded to Mr. Reiter's queries, identifying Hechuang as the factory in question and attaching two Superior invoices to the email to indicate which manufacturer was purchasing the unauthorized snaps. (*Id.*) Mr. Reiter testified that the only brand that he knew to be associated with Superior at that time was the defunct Ruehl division of Abercrombie & Fitch, and that because Ruehl had ceased operations, he felt that contacting Abercrombie & Fitch about the email would be futile. (Trial Tr. Vol. I at 169–70.)    Mr. Reiter testified that he did not search his email correspondence for any references to Superior when he received the email from "Joe" in May, but he did perform such a search in October or November, and found an email identifying Superior as a Fossil manufacturer. (Trial Tr. Vol. IX [Doc. # 442] at 1685–86.)

The next day, on May 21, 2010, Mr. Reiter contacted Attorney Zivin on four separate occasions. (Trial Tr. Vol. II [Doc. # 434] at 294–95; Defs.' Ex. 584.) Then, on May 24, 2010, Mr. Reiter's sister-in-law, Elissa Ellant Katz, contacted his wife—Jody Ellant, who is Romag's General Counsel, (Trial Tr. Vol. II at 295)—to report to Ms. Ellant that she had discovered ROMAG snaps on Fossil handbags at a Macy's store in Boca Raton, Florida, where she and her daughter had been shopping, (Trial Tr. Vol. I at 155; Trial Tr. Vol. IX at 1689). Ms. Ellant was concerned by this discovery because she did not believe that Fossil was a Romag customer, so she asked her sister to purchase several bags and send them to her in Connecticut. (Trial. Tr. Vol. I at 155, 157.) Ms. Ellant also went to the Macy's in Milford Connecticut and purchased additional Fossil bags containing ROMAG snaps. (*Id.* at 155; Trial Tr. Vol. IX at 1689–90.) Ms. Ellant told Mr. Reiter about her discovery and her suspicion that these were counterfeit snaps, but he assured her that Fossil was a customer. (Trial Tr. Vol. I at 155–57.) Mr. Reiter testified that he did not suspect that the snaps were counterfeit because he knew Fossil was a customer.

7

(*Id.* at 157–58.) Mr. Reiter testified that he put the bags that Ms. Katz and Ms. Ellant had purchased aside for several months. (Trial. Tr. Vol. II at 299.)

In July 2010, Mr. Reiter traveled to the Timake factory in China, but did not investigate the information he had received regarding counterfeit manufacturing at Hechuang at that time. (Trial Tr. Vol. I at 171–72.) Then, at the end of October, Mr. Reiter claims he suddenly had an epiphany that he should investigate the bags his wife and sister-in-law had purchased in connection with the alleged purchase of counterfeit snaps by Superior. (*Id.* at 174; Trial Tr. Vol. II at 299–300.) Mr. Reiter testified that he does not know what prompted him to make the connection between the alleged counterfeiting and the Fossil bags so suddenly at that time. (Trial Tr. Vol. I at 174–75.) He did not contact anyone at Fossil to report his initial suspicions. (Trial. Tr. Vol. II at 298.)   Rather, Mr. Reiter contacted Wing Yip and asked for computer reports on Superior's purchases. (Trial Tr. Vol. I at 175.) Mr. Reiter had not investigated Wing Yip's sales records prior to this request, but gave no indication they were not previously available to him. (*Id.* at 240.) Mr. Reiter found that Superior's purchases of ROMAG snaps had dropped off precipitously in 2008 and decided to investigate further. (*Id.* at 177.) He personally inspected the snaps from the Fossil bags purchased by Ms. Katz and Ms. Ellant, and sent them to Wing Yip for testing. (*Id.* at 177–78.) After performing some testing on the snaps, Wing Yip reported that the snaps could not have been made with Wing Yip's tooling. (*Id.* at 178; Pl.'s Ex. 149.)

On November 8, 2010, Mr. Reiter emailed Doug Dyment at Fossil and requested information about which of Fossil's factories manufactured the types of handbags his wife and sister-in-law had purchased in May. (Pl.'s Ex. 28.) The email made no mention of Mr. Reiter's suspicions of counterfeiting. (*Id.*) Mr. Dyment replied via email that the

8

information Mr. Reiter had requested was proprietary (*id.*), and in a subsequent phone conversation with Mr. Reiter that day, directed Mr. Reiter to the legal department if he had further questions. (Trial Tr. Vol. I at 183–84.) After this conversation, Mr. Reiter testified that he went to Macy's specifically to confirm his suspicions regarding counterfeiting by Fossil, and purchased several additional bags from Macy's and from a Fossil outlet store. (*Id.* at 202.) On November 17, 2010, exactly one year after he sent a cease and desist letter to DSW, Attorney Zivin sent a cease and desist letter to Fossil, demanding that Fossil suspend all sales of products containing the counterfeit snaps. (Ex. 32.) Fossil began an investigation of the allegations and confirmed that Superior had manufactured the bags in question. (Pl.'s Exs. 48–49, 665; Trial Tr. Vol. IX at 1697–1705.)

### D.    The Commencement of this Action

On November 22, 2010, Romag commenced this action against Defendants Fossil and Macy's (Compl. [Doc. # 1]),[2] and the next day, moved [Doc. # 10] for a TRO and preliminary injunction. This motion was filed on the eve of "Black Friday,"[3] which is the highest volume shopping day in the United States and kicks off the holiday shopping season. (Trial. Tr. Vol. IV at 956; *see also* Reiter Decl. [Doc. # 12] ¶ 19 (noting that "it is, of course, a well-known fact that the holiday selling season is the busiest time of year for retailers.").) Mr. Reiter submitted a sworn declaration [Doc. # 12] in connection with that motion. Portions of this declaration bear a striking resemblance to the declaration Mr. Reiter filed in connection with the J.C. Penney TRO application. (*Compare* Reiter

---

[2] The other Retailer Defendants were later sued in a separate action, filed on June 9, 2011, that was combined with this case.

[3] "Black Friday"—the Friday after Thanksgiving—fell on November 26th in 2010, a mere three days after Plaintiff's TRO application was filed.

Decl. ¶¶ 8–9 *with* J.C. Penney Reiter Decl. ¶¶ 8–9.)  The declaration makes no mention of the May 19, 2010 email, Ms. Katz's and Ms. Ellant's May 2010 purchases of Fossil bags, or Mr. Reiter's investigation into the connection between the two in late October and early November.  Rather, the declaration implies that the November shopping trip was the result of "habit and custom." (Reiter Decl. ¶ 8.)  In it, Mr. Reiter stated that he "was somewhat surprised that so many of the handbags . . . had [ROMAG] magnetic snap fasteners," (*id.*), and that he was "shocked to find that the magnetic snap fasteners on the Fossil handbags were counterfeits," (*id.* ¶ 9).  These statements are inconsistent with Mr. Reiter's testimony at trial that he went to Macy's in November 2010 with the specific purpose of confirming his suspicions that Fossil was using counterfeit ROMAG snaps. (*See* Trial Tr. Vol. I at 202 ("Well, after we contacted Fossil, I wanted to be sure before we went to the next step that they were still in the stores and verify the existence of these Fossil bags with counterfeits being on the floor of some stores.  So I went to Macy's and I went to Fossil's outlet in Clinton, Connecticut, to check bags.").)

On November 30, 2010, Judge Droney,[4] granted Romag's motion for a temporary restraining order, and enjoined Fossil and Macy's from "selling or offering for sale Fossil Handbags bearing counterfeit [ROMAG] fasteners." (TRO Ruling [Doc. # 20] at 9.) Fossil worked with its employees and retailers to put a hold on all of the affected products and to prevent any items that had already been delivered to retailers from being sold to customers. (Trial Tr. Vol. IX at 1697–1705.) Because of the timing of the suit, this all had to be done during the busy holiday season, diverting workers from their other holiday

---

[4] This case was assigned to several judges, including Judge Christopher Droney, Judge Mark Kravitz, Judge Stefan Underhill, and Judge William Young, before it was transferred to the undersigned for trial.

10

sales tasks. (*Id.*) The inventory that Fossil ultimately had to remove from its sales channels was worth $4,148,093.39. (*Id.* at 1712; Defs.' Ex. 736.) If the TRO had been entered in May, when Mr. Reiter first received evidence of counterfeit sales to Superior, Fossil's tainted inventory would have been much smaller—Fossil estimates that its inventory in May would have been about half as valuable. (Trial Tr. Vol. IX at 1712–14.) Fossil also believes that it could have replaced its holiday inventory with non-infringing products if it had been notified of the counterfeiting by September 2010. (*Id.* at 1724–26.)

## II.    Conclusions of Law

Defendants have asserted the equitable defenses of unclean hands and laches as a bar to Plaintiff's recovery in this action, and argue that Plaintiff failed to mitigate its damages once it discovered the infringing conduct. Defendants also ask the Court to impose sanctions as a result of Plaintiff's deceptive conduct in procuring a TRO in this case. Finally, Defendants assert that the Court should vacate the jury's award of profits based on its finding that Fossil's trademark infringement was not willful, and argue that even if the Court concludes that Plaintiff may seek an accounting of profits absent a finding of willfulness, the equitable considerations in this case warrant a drastic reduction or elimination of the jury's award. Plaintiff counters that it is legally entitled to an accounting of profits absent a finding of willfulness and that the Court should increase the jury's award of profits based on a consideration of the equitable factors. Plaintiff further seeks a permanent injunction enjoining Fossil from further infringement and ordering it to destroy all counterfeit ROMAG snaps in its possession.

11

### A.    Unclean Hands

Defendants argue that Romag's unclean hands with respect to its delay in commencing suit and its submission of a false declaration to obtain a TRO "bars the equitable remedy of recovery of Defendants' Profits." (Defs.' Prop. Findings of Fact and Conclusions of Law at 37.)    Plaintiff counters that in the context of a trademark action, the unclean hands doctrine applies only to a plaintiff's acquisition or use of a trademark, and not to litigation conduct.    Plaintiff further denies that it acted inequitably with respect to the commencement of this action and the procurement of the TRO, and argues that even if its conduct could be the basis for an unclean hands argument, the balance of the equities weighs in favor of permitting recovery in this action.

"He who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814 (1945).    "The 'clean hands' doctrine is 'far more than a mere banality.    It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.'" *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 129 (2d Cir. 2009) (quoting *Precision Instrument Mfg. Co.*, 324 U.S. at 814).    The Second Circuit has recognized that "the defense of unclean hands applies only with respect to the right in suit." *Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 334 (2d Cir. 1983).    "[T]he doctrine of unclean hands requires a balancing of the equities and the relative extent of each party's wrong upon the other and upon the public should be taken into account, and an equitable balance struck." *Patsy's Italian Rest., Inc. v. Banas*, 575 F. Supp. 2d 427, 461 (S.D.N.Y. 2008) *aff'd*, 658 F.3d 254 (2d Cir. 2011) (internal citations and quotation marks omitted).    "Further, because trademark law also involves protecting the public's interest,

12

courts typically only bar recovery under a theory of unclean hands when a plaintiff's conduct was egregious or clear, unequivocal and convincing." *Id.* (internal citations and quotation marks omitted).

Defendants rely on a case from the Tenth Circuit for the proposition that litigation conduct in a trademark action may be the basis for an unclean hands defense. In *Worthington v. Anderson*, 386 F.3d 1314, 1321 (10th Cir. 2004), the Tenth Circuit recognized that historically, two types of inequitable conduct are covered by the unclean hands doctrine: (1) "inequitable conduct toward the public, such as deception in or misuse of the trademark itself, resulting in harm to the public such that it would be wrong for a court of equity to reward the plaintiff's conduct by granting relief," and (2) "when the plaintiff has acted inequitably toward the defendant in relation to the trademark." *Id.* In *Worthington*, the plaintiffs had failed to pay off a loan on which the defendants were guarantors, making it difficult for the defendants to fully comply with an arbitral award granting ownership of the trademark in suit to the plaintiffs. *Id.* at 1320. The Tenth Circuit held that the plaintiffs' interference with the defendants' ability to comply with their legal obligations was a proper ground for an unclean hands defense. *Id.* at 1321–22. In so holding, the Tenth Circuit cited with favor *Federal Folding Wall Corp. v. Nat'l Folding Wall Corp.*, 340 F. Supp. 141, 146 (S.D.N.Y. 1971), in which the court held that where the plaintiff induced the trademark owner to cancel its license agreement with the defendant and to award a license to the plaintiff instead, unclean hands would operate to bar the plaintiff's recovery. *Id.*

However, neither of the cases cited by Defendants specifically held that a plaintiff's conduct in the course of the trademark litigation itself could be a proper basis for an unclean hands defense in such a suit. Rather, the weight of the authority in this

13

Circuit holds that the inequitable conduct at issue must relate to the use or procurement of the trademark, rather than a position taken in the lawsuit. *See Jackson v. Odenat*, -- F. Supp. 2d ---, 2014 WL 1202745, at *17 (S.D.N.Y. Mar. 24, 2014) ("In the trademark context, the fraud or deceit must relate to plaintiff's 'acquisition or use' of the trademark." (quoting *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 126, 131 (S.D.N.Y. 1999)); *Coach, Inc. v. Kmart Corporations*, 756 F. Supp. 2d 421, 429 (S.D.N.Y. 2010) ("[I]t is well settled in trademark law that the defense of unclean hands applies only with respect to the right in suit. Filing a trademark or trade dress infringement lawsuit, therefore, cannot be a basis for an unclean hands defense to that lawsuit because any bad faith or inequitable conduct in filing the lawsuit is unrelated to the plaintiff's acquisition or use of the trademark or trade dress." (internal citations and quotation marks omitted)). Here, Defendants do not allege that Romag engaged in any fraudulent or misleading conduct with respect to its registration or use of the ROMAG mark, or that Romag in any way acted inequitably with respect to Defendants' use of that mark. The sole basis for Defendants' unclean hands defense is that Plaintiff delayed filing suit to obtain a tactical advantage and then filed a misleading declaration with the Court once the suit had commenced in order to obtain specifically-timed emergency injunctive relief. Because these allegations are unrelated to Romag's use or acquisition of the ROMAG mark, Defendants' unclean hands defense to bar Plaintiff's recovery of Defendants' profits on the trademark infringement claim must fail.

    **B.**    **Laches**

Defendants also assert the equitable defense of laches, arguing that Plaintiff's delay in filing suit after receiving the May 19, 2010 email resulted in economic prejudice to Defendants and that Plaintiff should therefore be barred from recovery with respect to its

14

trademark and patent claims. Romag counters that Defendants have failed to establish either unreasonable delay or economic prejudice, and that their claim for laches therefore fails.

### 1.    Laches—Patent Claim

In the context of patent litigation the Federal Circuit has held that, "laches may be defined as the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 128–29 (Fed. Cir. 1992) (en banc). "Laches bars relief on a patentee's claim only with respect to damages accrued prior to suit." *Id.* at 1041. "The application of the defense of laches is committed to the sound discretion of the district court." *Id.* at 1032. "With its origins in equity, a determination of laches is not made upon the application of 'mechanical rules.'" *Id.* "The defense, being personal to the particular party and equitable in nature, must have flexibility in its application. A court must look at all of the particular facts and circumstances of each case and weigh the equities of the parties." *Id.* (internal citations omitted).

To succeed on a laches defense a defendant bears the burden of establishing the following two factors by a preponderance of the evidence: "(1) the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and (2) the delay operated to the prejudice or injury of the defendant." *Id.* at 1032, 1045. "A court must also consider and weigh any justification offered by the plaintiff for its delay." *Id.* at 1033. "A patentee may also defeat a laches defense if the infringer has engaged in particularly egregious conduct which would change the equities significantly in plaintiff's favor." *Id.*

15

(internal citations and quotation marks omitted). "Thus, for laches, the length of delay, the seriousness of prejudice, the reasonableness of excuses, and the defendant's conduct or culpability must be weighed to determine whether the patentee dealt unfairly with the alleged infringer by not promptly bringing suit. In sum, a district court must weigh all pertinent facts and equities in making a decision on the laches defense." *Id.* at 1034.

Plaintiff argues that Defendants have failed to establish unreasonable delay. Specifically, Plaintiff claims that because its alleged delay is shorter than the six-year statute of limitations, Defendants are categorically barred from asserting the laches defense. However, in the patent context, the Federal Circuit has held that laches may be applied within the limitations period. *Id.* at 1030 ("First, *Aukerman* is in error in its position that, where an express statute of limitations applies against a claim, laches cannot apply *within* the limitation period."). Rather, the statute of limitations functions to create a presumption of laches where the delay is alleged to have lasted longer than the six-year limitation period. *Id.* at 1035. Therefore, although the alleged delay in this case lasted only for a period of months, the length of the delay does not operate as a per se bar to Defendants' laches defense.

"The length of time which may be deemed unreasonable has no fixed boundaries but rather depends on the circumstances. The period of delay is measured from the time the plaintiff knew or reasonably should have known of the defendant's alleged infringing activities to the date of suit." *Id.* at 1032. Despite Romag's assertion that it did not know of the alleged counterfeiting until late fall of 2010, the Court concludes that Romag knew or should have known of the use of counterfeit snaps in Fossil bags prior to that date. Mr. Reiter received an email communication from China informing him that Superior was selling counterfeit ROMAG snaps on May 21, 2010. (Pl.'s Ex. 27.) Although Mr. Reiter

16

claims he did not immediately make the connection between Fossil and Superior, a prompt search of his email archive would have identified Superior as a Fossil manufacturer. (Trial Tr. Vol. IX at 1685–86.) Although Mr. Reiter testified that he did not know the bona fides of "Joe," he also contacted his longtime intellectual property counsel, Attorney Zivin, several times the day after he received the email about the counterfeiting at Superior. (Trial Tr. Vol. II at 294–95; Defs.' Ex. 584.) In recognition of Romag's attorney-client privilege, the Court declines Defendants' invitation to draw inferences regarding the content of those communications from their timing. However, the contact between Mr. Reiter and his attorney does establish that Romag had access to intellectual property counsel at that time to help thoroughly investigate and develop its legal claims of counterfeiting. Furthermore, three days after receiving the email, Ms. Ellant and Ms. Katz purchased multiple Fossil bags containing ROMAG snaps and Romag's General Counsel, Ms. Ellant, brought this news and the handbags to Mr. Reiter, expressing her suspicion that the snaps used could be counterfeits. (Trial Tr. Vol. I at 155–57; Trial Tr. Vol. IX at 1689.)

Despite having notice of possible sales of counterfeit snaps by Hechuang to Superior, having access to information tying Fossil, through Superior, to that counterfeiting, having actual possession of the infringing products, as well as having access to specialized legal counsel, all within one week, Mr. Reiter testified, inexplicably, that he drew no connection between his wife's concerns regarding the Fossil bags and the email alleging that Superior was purchasing counterfeit snaps. He offered no explanation for why he did not contact Romag's inspectors in China to investigate Hechuang, the counterfeiting allegations, or his wife's suspicions, or for why he failed to investigate these matters himself when he was in China at the Timake factory two months later in July

17

2010, where sales records would have disabused him of his belief that Fossil remained a purchaser of ROMAG snaps through authorized channels. Rather, Mr. Reiter claims to have had an epiphany in late October, the trigger for which he could not recall,[5] that led him to finally make the connection between the Fossil bags and the Superior invoices. Mr. Reiter's testimony does not ring true, especially in light of his prior track record of issuing cease and desist letters and seeking emergency relief on the eve of Black Friday, a time that is an obvious pressure point for retailer defendants. Although Mr. Reiter claimed not to know what Black Friday was, he made note of the holiday selling season in his own declaration in support of the TRO in this case. (*See* Reiter Decl. ¶ 19.)

Even if the Court were to credit Mr. Reiter's testimony that he actually made no connection between Fossil and Superior until late October 2010, the record is clear that he had all the information he needed to make that connection by the end of May 2010: Superior invoices from Hechuang, an email in his archives linking Superior to Fossil, and several Fossil handbags with likely counterfeit snaps. With this information, by Mr. Reiter's estimation, it took him no more than three or four weeks to confirm his post-epiphany suspicions by requesting Superior invoices from Wing Yip, examining the snaps on the bags, requesting information about Fossil's factories, and purchasing additional handbags containing ROMAG snaps. Therefore, Romag knew or should have known by June 2010 of its good faith basis for believing that Fossil was infringing. The Court thus concludes that the period of delay with respect to Defendants' laches claim should be

---

[5] *The Meriam-Webster Dictionary* defines an epiphany as "an intuitive grasp of reality through something (as an event) usually simple and striking." (*Available at* http://www.merriam-webster.com/dictionary/epiphany.) However, Mr. Reiter was unable to identify any event in late October, as opposed to late May, that would have led him to the sudden understanding that the Fossil handbags were connected to Superior's counterfeit purchases.

18

measured from June 2010 to the commencement of this suit in November 2010—a period of five months. Although a delay of several months might not typically sound like unreasonable delay, based on the circumstances of this case, Romag's delay was unreasonable. The inescapable conclusion is that Plaintiff carefully timed this suit to take advantage of the imminent holiday shopping season to be able to exercise the most leverage over Defendants in an attempt to extract a quick and profitable settlement, as it had done twice before in the past three years. Furthermore, Plaintiff, in filing for emergency relief, relied on misleading representations that obfuscated the months of delay, where full disclosure would have undermined its claim of irreparable harm. The Court thus finds that Defendants have met their burden with respect to the first factor of their laches defense.

Plaintiff also argues that Defendants have not established that they suffered material economic prejudice as a result of the delay. "Economic prejudice may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." *A.C. Aukerman Co.*, 960 F.2d at 1020. "Such damages or monetary losses are not merely those attributable to a finding of liability for infringement. . . . The courts must look for a *change* in the economic position of the alleged infringer during the period of delay. On the other hand, this does not mean that a patentee may intentionally lie silently in wait watching damages escalate, particularly where an infringer, if he had had notice, could have switched to a noninfringing product." *Id.* (internal citations omitted) (emphasis in original).

Defendants presented testimony that the value of the accused inventory that Fossil had to remove from its sales channels was worth $4,148,093.39. (Trial Tr. Vol. IX at 1712;

19

Defs.' Ex. 736.) If the TRO had been sought and entered in May or June, when Romag first had a basis for asserting its infringement claims, Fossil's inventory would have been much smaller and half as valuable as its November inventory. (Trial Tr. Vol. IX at 1712–14.) Fossil's corporate representative also testified that Fossil could have replaced its holiday inventory with non-infringing products if it had been notified of the counterfeiting by September 2010. (*Id.* at 1724-26.) Plaintiff, citing mostly trademark cases, argues that this financial impact is insufficient to establish material prejudice because Defendants are "required to show that they had taken affirmative steps to increase their reliance on [the patent] during Plaintiff['s] alleged delay." *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 361 (S.D.N.Y. 1998). However, the nature of Defendants' claimed loss goes beyond just showing that they conducted business as usual during the period of delay. Defendants were ramping up production of their products in preparation for the holidays while Plaintiff sat on its rights. As a result of the American retail cycle, the timing of Plaintiff's suit meant that Defendants had nearly doubled their inventory by the time they were first told of their alleged counterfeiting. Furthermore, Fossil's representative testified that if the TRO had been filed prior to September 2010, Fossil could have switched the snaps on its handbags to generic snaps and still have been able to take its products to market for the profitable holiday selling season. Based on this evidence, Defendants have met their burden of establishing that they suffered material economic prejudice as a result of Plaintiff's unreasonable delay in bringing suit.

Plaintiff has not offered any excuse for its delay in this case, beyond Mr. Reiter's discredited claim that he had no idea of Fossil's infringement until October 2010. Plaintiff points to no egregious or outrageous conduct by Defendants that would counsel against the application of laches in this case, especially in light of the jury's finding that

20

Defendants' infringement was not willful. Thus, the Court concludes that based on the balance of the equities, laches should be applied in this case. Therefore, the Court will exclude the sales between June 2010 and November 2010 from the jury's award of a reasonable royalty, representing approximately eighteen percent of the twenty-eight-month period of infringement, and the jury's reasonable royalty awards will be reduced by eighteen percent to $41,862.75 and $12,562.90 respectively.

### 2. Laches—Trademark Claims

Defendants also claim that laches operates as a complete bar to Plaintiff's recovery of profits on its trademark infringement claims. In this context, Defendants must demonstrate that Romag had knowledge of their use of counterfeit snaps, that Romag inexcusably delayed in taking action, and that Defendants suffered prejudice as a result of Romag's delay. *Tri-Star Pictures, Inc. v. Leisure Time Productions, B.V.*, 17 F.3d 38, 44 (2d Cir. 1994). "The inquiry is a factual one. The determination of whether laches bars a plaintiff from equitable relief is entirely within the discretion of the trial court." *Id.* Plaintiff raises largely the same arguments against Defendants' trademark laches defense as it does against Defendants' patent laches defense.

First, relying primarily on precedent other than civil trademark cases, Plaintiff maintains that Defendants have no valid laches defense because Plaintiff's delay was not longer than Connecticut's analogous three-year statute of limitations for fraud. *See, e.g.,* *United States v. Milstein*, 401 F.3d 53, 63 (2d Cir. 2005) ("[A]s a general rule, laches is not a defense to an action filed within the applicable statute of limitations."). However, in *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187 (2d Cir. 1996), the Second Circuit upheld a district court's application of laches in a trademark suit where suit was brought within the analogous limitation period, explaining that "[a]lthough laches is an equitable

21

defense, employed instead of a statutory time-bar, analogous statutes of limitation remain an important determinant in the application of a laches defense. . . . [the analogous state] statute of limitation . . . determines which party possesses the burden of proving or rebutting the defense." *Id.* at 191. Thus, similar to the patent context, in a trademark action, if the plaintiff's delay is longer than the analogous state statute of limitations, a presumption of laches applies, whereas if suit is brought within the limitations period, there is no presumption, and a defendant assumes the burden of proving the defense. *Id.* Therefore, although there is no presumption of laches in this case, the fact that Plaintiff delayed less than three years is not dispositive of Defendants' laches defense.

Plaintiff again claims that it had no knowledge of Defendants' use of counterfeit snaps until shortly before filing suit in November 2010, but the Court has not credited Mr. Reiter's testimony purporting to justify his delay in investigating or asserting potential counterfeiting claims until his alleged "epiphany" in late October 2010. Ms. Ellant raised her suspicions that Fossil was selling handbags with counterfeit ROMAG snaps on May 24, 2010, a mere three days after Mr. Reiter received the May 21, 2010 email informing him that Superior had been purchasing ROMAG snaps from an unauthorized source. These two events are simply too close in time for Mr. Reiter not to have made some connection between counterfeiting by Superior and potential infringement by Fossil and to have investigated it further. Mr. Reiter's response to "Joe" was immediate and expressed a desire to uncover the identity of the American brands using the counterfeit snaps in order to use the United States' legal system to enforce Romag's rights. (Pl.'s Ex. 27 ("What is more important to us is what handbag maker and what brands in [the USA] are getting these on their handbags. It is hard for the law to work in [C]hina . . . easier in [the USA].").) Thus, it defies belief that once he knew the

22

identity of the Chinese manufacturer purchasing the snaps, i.e., Superior, and was presented with Ms. Ellant's suspicions that counterfeit snaps were being used on Fossil-branded bags that he would have stopped any further investigation, especially in light of Romag's prior record of aggressive enforcement of its intellectual property rights.

Because the Court does not credit Mr. Reiter's testimony that it was only his "epiphany" in October 2010 that motivated him to act on the evidence of counterfeiting, rather than the evidence he had in May 2010, his testimony that he did not check or think to check his email archive for references to Superior until his October 2010 "epiphany" is called into doubt. At best, his failure to search for references to Superior as soon as he received the May 21, 2010 email appears to have been the result of conscious avoidance. Similarly, his failure to raise the allegations regarding Hechuang and Fossil with Romag's inspectors in China, or to investigate these allegations himself when he visited his Chinese factories in July 2010, lacks a good faith explanation. Therefore, as discussed above, the Court concludes that Romag had sufficient knowledge of Fossil's counterfeiting by June 2010 to bring suit. Additionally, as detailed above, the Court concludes that Plaintiff's five-month delay before filing suit was inexcusable and is tainted by its prior track record of similarly seeking emergency relief on the eve of Black Friday to maximize the economic pressure on retailers.

Finally, Plaintiff argues that Defendants have not established that they suffered prejudice as a result in the delay in filing suit. In the context of a trademark infringement action, "[a] defendant has been prejudiced by a delay when the assertion of a claim available some time ago would be inequitable in light of the delay in bringing that claim. Specifically, prejudice ensues when a defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed." *Id.* at 192. In *Conopco*, the

23

Second Circuit found that the defendant had been prejudiced by the plaintiff's delay because it had forgone other marketing positions that had been assumed by other producers in the interval of the plaintiff's delay. *Id.* at 192–93. Plaintiff argues that Defendants did not change their position between May 2010 and November 2010. However, Fossil's representative testified that Fossil had increased its inventory during that time period to prepare for the holiday shopping season. She further testified that because of Plaintiff's delay, Fossil lost the opportunity to replace the counterfeit snaps with generic snaps in time for the higher holiday demand. Therefore, the Court finds that Defendants have established that they were prejudiced by their delay.

Although the Court concludes that Defendants have sustained their burden with respect to their trademark laches defense, the Court does not believe that Plaintiff's delay should operate as a total bar to its recovery of profits in this case. The delay at issue here, while significant in light of the unique timing circumstances of this case, does not cover the majority of Defendants' infringement. Therefore, the Court will consider Plaintiff's laches as a factor in reducing the jury's advisory award of profits when it performs the equitable adjustment of that award. *See George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1540 (2d Cir. 1992) (listing plaintiff's laches as a factor courts should consider in awarding an accounting of profits).

### C.    Mitigation of Damages

Defendants assert that Romag failed to mitigate its damages by not filing suit when it first learned of Fossil's counterfeiting. Plaintiff counters that Defendants have waived this affirmative defense by failing to plead it in their Answer [Doc. # 31] and that Defendants have failed to show that the concept of mitigation of damages is applicable in trademark and patent actions. "Failure to mitigate damages is an affirmative defense and

24

therefore must be pleaded. The general rule in federal courts is that a failure to plead an affirmative defense results in waiver." *Travellers Internat'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1580 (2d Cir. 1994). Here Defendants did not plead a failure to mitigate defense in their Answer and did not raise the issue until the eve of trial. Therefore, Defendants have waived this defense. *Id.* at 1580–81.

Furthermore, even if the defense had not been waived, Defendants have failed to establish that the concept of mitigation of damages has relevance to this case. Defendants rely on one case, *IMX, Inc. v. E-Loan, Inc.*, 748 F. Supp. 2d 1354 (S.D. Fla. 2010) for the proposition that plaintiffs have a duty to mitigate in patent and trademark cases. In that case, which included no trademark claims, the court rejected the plaintiff's argument that because there was no authority recognizing a failure to mitigate defenses in the patent context, such a defense could never be relevant in a patent action. *Id.* at 1361. The court concluded that because the plaintiff was seeking compensatory damages for the alleged infringement "it is entirely appropriate for a defendant to assert a defense of failure to mitigate damages when considering what amount of compensation is appropriate for [the p]laintiff." *Id.* Thus, *IMX* is distinguishable from this case where Plaintiff seeks a reasonable royalty, rather than compensatory damages. *See* Robert A. Matthews, Jr., 4 *Annotated Patent Digest* § 30:6.100 (interpreting *IMX* to find that a mitigation defense would not apply to a reasonable royalty damage award because such an award "determines compensation to the patentee based on the infringer's use of the patented invention, not 'harm' suffered by the patentee"). By analogy, the same principle would apply to an award of a defendant's profits, rather than compensatory trademark damages, because such an award is based on the unjust enrichment or deterrence of a defendant, rather than on harm to the plaintiff.

25

Additionally, Defendants' argument that Romag failed to mitigate its damages by not giving notice of its claims earlier, either by contacting Fossil or by bringing suit immediately, is merely a re-tooling of their laches defense. In *Voda v. Medtronic, Inc.,* No. CIV-09-95-L, 2011 WL 6210760, at *3 (W.D. Okla. Dec. 14, 2011), another patent case, the court reasoned that "[a]lthough defendants present[ed] failure to mitigate as a separate defense . . . it is simply the opposite side of the laches defense. Both defenses have their genesis in plaintiff's delay in bringing this action." *Id.; see also* Robert A. Matthews, Jr., 4 *Annotated Patent Digest* § 30:6.100 ("Under some circumstances a 'failure to mitigate' defense may be nothing more than a laches defense if the lack of mitigation is based on an allegation that the patentee should have sued earlier."). The court went on to analyze both defenses under the doctrine of laches. Here, Defendants have already asserted and succeeded on a laches defense, and the only appreciable difference between the two defenses asserted by Defendants is their claim that Plaintiff had a duty to warn them about possible counterfeiting as early as 2007, when the J.C. Penney suit was filed. However, the Court is not persuaded that such a duty existed, and the claim that such a warning would have mitigated all damages in this case is speculative at best. Therefore, the Court concludes that Defendants' arguments with respect to Plaintiff's delay are properly addressed under the rubric of laches.

Finally, during the jury portion of the trial, Defendants raised the argument that the failure to mitigate damages was relevant to the determination of whether Plaintiff suffered an ascertainable loss with respect to its CUTPA claim. In support of this argument, Defendants relied on *Landmark Inv. Group, LLC v. Calco Const. & Development Co.,* No. CV096002117, 2013 WL 5969076 (Conn. Super. Ct. Oct. 11, 2013), in which the court held that because the plaintiff failed to mitigate its damages, it could

26

not prove actual loss with respect to its tortious interference claim or an ascertainable loss with respect to its CUTPA claim. *Id.* at *22–23. There, the plaintiff based its claims for actual and ascertainable loss on the loss of its anticipated profits in developing a piece of real estate. *Id.* However, the court concluded that the plaintiff had failed to purchase the property in question after it had been awarded a judgment of specific performance to do so. *Id.* Because the plaintiff failed to purchase the property when given a chance to do so, it could not claim that it lost profit from not being able to develop that same property. *Id.* Thus, the *Landmark* decision is distinguishable from this action, which lacks any similar condition precedent to the claimed loss. Although Romag improperly delayed filing this action, it cannot be claimed that Romag completely failed to exercise its rights pursuant to the ROMAG mark and the '126 patent. Furthermore, Fossil's counterfeiting began long before Mr. Reiter received the email from "Joe" warning him about Superior's purchase of counterfeit snaps. Therefore, the Court further concludes that Defendants' failure to mitigate defense is not relevant to Plaintiff's CUTPA claim.

Because the Court concludes that Defendants waived their failure to mitigate defense, and that the defense was not relevant to any of Plaintiff's claims, Plaintiff's recovery is unaffected by mitigation considerations.

D.    **Sanctions**

Defendants ask this Court to impose sanctions pursuant to its inherent authority and under section 1927 of the Judicial Code based on the submission of the Reiter Declaration in support of the TRO in this case, which Defendants claim was false and misleading. "In order to impose sanctions pursuant to its inherent power, a district court must find that: (1) the challenged claim was without a colorable basis and (2) the claim was brought in bad faith, i.e., motivated by improper purposes such as harassment and

27

delay." *Enmon v. Prospect Capital Corp.*, 675 F.3d 128, 143 (2d Cir. 2012) (internal citations and quotation marks omitted). "Although both findings must be supported by a high degree of specificity in the factual findings, bad faith may be inferred only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Id.* (internal citations and quotation marks omitted). "The showing of bad faith required to support sanctions under 28 U.S.C. §1927 is similar to that necessary to invoke the court's inherent power. In practice, the only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent power is that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both." *Id.* at 143–44 (internal citations and quotation marks omitted).

As discussed above, the Court believes that the Reiter Declaration, which contains language that is nearly identical to the declaration filed in connection with the J.C. Penney case three years earlier, (*compare* Reiter Decl. ¶¶ 8–9 *with* J.C. Penney Reiter Decl. ¶¶ 8–9), was misleading in several respects. Its limited contents conveyed the impression that Mr. Reiter had just discovered the counterfeit ROMAG snaps and only by mere happenstance, (*see* Reiter Decl. ¶ 8 ("On November 15, 2010, I was shopping in a Macy's store in Milford, Connecticut, near my office. As is my habit and custom, I looked at some of the handbags in the handbag department.")), contrary to his sworn trial testimony that he went to Macy's that day with the express purpose of confirming his suspicions that Fossil was using counterfeit ROMAG snaps in their handbags, (*see* Trial Tr. Vol. I at 202 ("Well, after we contacted Fossil, I wanted to be sure before we went to the next step that they were still in the stores and verify the existence of these Fossil bags

28

with counterfeits being on the floor of some stores. So I went to Macy's and I went to Fossil's outlet in Clinton, Connecticut, to check bags.")). His testimony also belies his sworn statements in his declaration that he was "surprised" that the Fossil handbags contained ROMAG snaps and that he was "shocked" to discover that they were counterfeits. (*See* Reiter Decl. ¶¶ 8–9.)

More troubling, however, is the absence in the declaration of any reference to Mr. Reiter's knowledge about this counterfeiting prior to his November shopping trip, particularly because he acknowledged at trial that by late October he had strong suspicions that the counterfeit snaps purchased by Superior were being used in Fossil bags, and that once those suspicions were aroused, he requested Superior's invoices from Wing Yip, inspected the snaps from the bags purchased by Ms. Ellant and Ms. Katz, sent them to China for further inspection, and contacted Fossil both directly and through his attorney. (Trial Tr. Vol. I at 174–75, 177–78, 183–84; Trial Tr. Vol. II at 299–300; Pl.'s Exs. 28, 149.) Without mention of the May 19, 2010 email, Romag's General Counsel's May 24, 2010 shopping trip, or Mr. Reiter's investigation in late October and early November, the import of the declaration was that Mr. Reiter had no knowledge of counterfeiting before the November trip to Macy's and his chance discovery of the counterfeit snaps at that time.

The obvious significance of the omissions and contrived language in the Reiter Declaration was on Romag's claim of irreparable injury when it sought a TRO in this case. "In a trademark case, irreparable injury may be found where there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Media Group, Inc. v. Ontel Products Corp.*, No. CIVA300CV2034 (JCH), 2001 WL 169776, at *2 (D. Conn. Feb.

29

14, 2001) (quoting *Tough Traveler Ltd v. Outbound Products*, 60 F.3d 964, 968 (2d Cir.
1995) (internal quotation marks omitted). Although Romag may have had a colorable
claim for consumer confusion at the time it applied for the TRO, "any such presumption
of irreparable harm does not operate, however, when the plaintiff has delayed bringing
suit or in moving for preliminary injunctive relief." *Id.* In *Media Group*, the plaintiff had
delayed approximately six months from its discovery of the allegedly infringing product
until it sought a preliminary injunction, and based on this delay, the court denied
preliminary injunctive relief, finding that the plaintiff could not show irreparable harm.
*Id.* at *4. Thus, Romag's sparse and misleading representations deprived Judge Droney of
the ability to accurately apply the appropriate standard in considering Romag's request
for emergency injunctive relief.

The Court further concludes that Romag acted in bad faith by delaying its TRO
filing until the beginning of the holidays. Romag explicitly relied on the fact that the
holiday selling season was in full swing when it sought emergency injunctive relief, (*see*
Reiter Decl. ¶ 19 ("It is, of course, a well-known fact that the holiday selling season is the
busiest time of year for retailers.")), and Judge Droney relied on this timing in granting
the TRO, (*see* TRO Ruling [Doc. # 20] at 4 ("Finally, given the high volume of shopping
during the holiday season, Romag stands to suffer an even more significant injury to its
reputation as it is likely that many Fossil handbags, which include the counterfeit snap
fasteners, will be purchased in the coming weeks.")). Given Romag's unmistakable
pattern of relying on the pressure point of the holiday season when seeking to enforce its
intellectual property rights, it is evident that Romag intentionally sat on its rights between
late May 2010 and late November 2010 to orchestrate a strategic advantage and

30

improperly obtain emergency injunctive relief on a timetable of its choosing, not on the irreparability of its harm.

Based on these findings, the Court concludes that Defendants have shown through clear and convincing evidence that sanctions should be imposed on Romag pursuant to the Court's inherent powers. However, because there is no evidence implicating Plaintiff's counsel in this deception, the Court declines to impose sanctions pursuant to section 1927. Because the Court concludes that Romag's sanctionable conduct was limited to the TRO proceedings, and had no bearing on the underlying merits of this suit, the Court will not bar Romag's recovery or impose a large monetary fine, but instead will limit the sanction to preclude Romag from recovering its expenditures in relation to the prosecution of its TRO.

### E.    Award of Profits

In granting Plaintiff's motion to bifurcate the trial, the Court ruled that the jury would make an initial determination of the amount of Defendants' profits that Plaintiff was entitled to recover for Defendants' trademark infringement, and that a bench trial would be held to address the equitable factors affecting the final profits award to be imposed by the Court. The Court reserved judgment as to whether a finding of willfulness was necessary as a matter of law to entitle Plaintiff to an award of Defendants' profits in order to have the jury make an advisory determination on profits. At the bench trial, Fossil argued that Plaintiff was not entitled to any award of profits because the jury found that Fossil's trademark infringement was not willful, and asserted that even if the Court were to determine that willful infringement was not necessary for an award of profits, the jury's advisory award should be reduced to zero based on the equitable factors to be considered in granting an accounting of profits. Plaintiff urges that the 1999

31

amendments to the Lanham Act effectively abrogated Second Circuit precedent requiring willfulness for an award of profits for proven infringement, and maintains that the Court should award the full amount of Fossil's profits to compensate Plaintiff for Fossil's infringement of the ROMAG mark.

The jury awarded $90,759.36 of Fossil's profits for trademark infringement under an unjust enrichment theory and $6,704,046.00 of Fossil's profits for trademark infringement under a deterrence theory, determining that one percent of Fossil's profits was attributable to its infringement of the ROMAG mark. Defendants argue that if the Court determines that Romag may recover an award of profits absent willful infringement, the jury's award should be reduced to zero based on a consideration of the equitable factors. Plaintiff contends that the award should be increased to $9,075,936, theorizing that because the jury awarded $90,759.36 in unjust enrichment profits, and found that only one percent of Fossil's total profits was attributable to the use of the ROMAG mark, the jury must have determined that the total amount of profits Fossil made on the sale of the accused handbags was in fact $9,075,936. While there are several equitable factors present in this case that would bear on an award of profits, the Court need not perform this equitable analysis because it concludes that Romag is not entitled to any award of profits as a result of Plaintiff's failure to prove that Fossil's trademark infringement was willful.

Under existing Second Circuit precedent, a plaintiff must establish willful infringement in order to recover an award of the defendant's profits in a trademark action. *Internat'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 753 (2d Cir. 1996) ("In order to recover an accounting of an infringer's profits, a plaintiff must prove that the infringer acted in bad faith."); *George Basch*, 968 F.2d at 1540

32

("[U]nder § 35(a) of the Lanham Act, a plaintiff must prove that an infringer acted with willful deception before the infringer's profits are recoverable by way of an accounting."). However, in 1999, after both of these cases were decided, section 1117(a), which provides for an accounting of profits under the Lanham Act, was amended to read:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a *willful* violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled . . . subject to the principles of equity, to recover (1) defendant's profits . . . .

25 U.S.C. § 1117(a) (emphasis added). Plaintiff argues that this amendment, which added the language "or a willful violation under section 1125(c)," effectively abrogated prior Second Circuit law requiring a finding of willfulness before defendant's profits could be awarded for a violation of section 1125(a) because Congress failed to insert the word "willful" in the phrase "a violation under section 1125(a) or (d) of this title." The Second Circuit has expressly declined to decide this question thus far. *See Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*, 507 F. App'x 26, 31 (2d Cir. 2013).

The circuits that have considered the issue of whether willfulness is required for an award of profits after the 1999 amendments were passed are split. The Tenth Circuit is the only circuit to affirmatively maintain its prior willfulness requirement after the 1999 amendments. In *Western Diversified Servs., Inc. v. Hyundai Motor America, Inc.*, 427 F.3d 1269 (10th Cir. 2005), the court held that in light of section 1117(a)'s direction that an award of profits is "subject to the principles of equity" and in light of the punitive nature of such an award and the increased risk of granting plaintiff a windfall, it was appropriate under the statute to require "a showing that Defendant's actions were willful to support an award of profits under 15 U.S.C. § 1117(a)." *Id.* at 1272–73. Additionally,

33

the First Circuit, while not speaking in terms of whether willfulness was a condition precedent to the recovery of the defendant's profits, has noted in a decision post-dating the 1999 amendments that a finding of willfulness is usually required for disgorgement of profits. *Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 191 (1st Cir. 2012).[6]

Two other circuits have declined to address the issue of abrogation directly. The Ninth Circuit has expressed doubts that the 1999 amendments abrogated the willfulness requirement in that Circuit without affirmatively deciding the question. *M2 Software, Inc. v. Viacom, Inc.*, 223 F. App'x 653, 656–57 (9th Cir. 2007) (characterizing the argument that the 1999 amendments abrogated prior case law as a "shaky assumption"). The Eighth Circuit has similarly declined to address the question, but has assumed without deciding that willful infringement is a prerequisite for an award of profits. *See Masters v. UHS of Delaware, Inc.*, 631 F.3d 464, 472 n.2 (8th Cir. 2011) (noting circuit split).

Finally, three circuits have interpreted the 1999 amendments to permit an award of defendant's profits absent a finding of willful infringement. In *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168 (3d Cir. 2005), the Third Circuit concluded that the 1999 amendment did abrogate Third Circuit precedent requiring a finding of willfulness before an award of defendant's profits could be made. *Id.* at 176. It presumed that Congress was aware of the large body of case law requiring a finding of willfulness for an accounting of

---

[6] One leading commentator has dubbed as "inaccurate" a reading of the 1999 amendments as reflecting Congressional intent to abrogate the willfulness requirement typically imposed by courts. J. Thomas McCarthy, *5 McCarthy on Trademarks and Unfair Competition* § 30:62 (4th ed.) ("In fact, the 1999 amendment of Lanham Act § 35(a) was not intended to change the law by removing willfulness as a requirement for an award of profits in a classic infringement case, but rather was meant to correct a drafting error when Congress intended to limit the recovery of damages in dilution cases (and only dilution cases) to instances of 'willful violation.'").

34

profits under section 1125(a) and reasoned that in light of this awareness, Congress's failure to add the word willfulness to that section of the statute indicated a desire to supersede the judicially created doctrine requiring willfulness. *Id.* at 174. The Fifth Circuit reached a similar conclusion in *Quick Technologies, Inc. v. Sage Group PLC*, 313 F.3d 338 (5th Cir. 2002). Although *Quick Technologies* does not address the issue of abrogation because the Fifth Circuit had never adopted a bright-line rule, it noted that the decisions in other circuits adopting such a rule were of limited value because they predated the 1999 amendments, and held that the plain language of section 1117(a) indicated that such a bright-line rule requiring a finding of willfulness for an accounting of profits would be contrary to the statute. *Id.* at 350. Similarly, the Fourth Circuit, noting the 1999 amendments, has held that a finding of willfulness, although an important factor in the court's equitable analysis, is not a condition precedent to an accounting of profits. *Synergistic Internat'l, LLC v. Korman*, 470 F.3d 162, 175 & n.13 (4th Cir. 2006).

District courts within this Circuit are also split with respect to the effect of the 1999 amendments on the willfulness requirement, with the majority of courts and the more recent decisions favoring the interpretation that the requirement has not been abrogated. Two judges in the Southern District of New York have concluded that the plain meaning of section 1117(a) indicates that the willfulness requirement has been abrogated, while eight judges from the Southern and Eastern Districts of New York have held that the willfulness requirement remains good law. *Compare Chanel, Inc. v. Veronique Idea Corp.*, 795 F. Supp. 2d 262, 268–69 (S.D.N.Y. 2011) (Marrero, J.) (holding that the 1999 amendments abrogated the willfulness requirement), *and Cartier v. Aaron Faber, Inc.*, 512 F. Supp. 2d 165, 172–73 (S.D.N.Y. 2007) (Marrero, J.) (same), *and Nike,*

35

*Inc. v. Top Brand Co. Ltd.*, No. 00 Civ. 8179 (KMW)(RLE), 2005 WL 1654859, at *9–11 (S.D.N.Y. July 13, 2005) (same), *with Beastie Boys v. Monster Energy Co.*, No. 12 Civ. 6065 (PAE), 2014 WL 1099809, at *9–11 (S.D.N.Y. Mar. 18, 2014) (holding that the 1999 amendments did not abrogate the willfulness requirement), *and Guthrie Healthcare v. Contextmedia, Inc.*, No. 12 Civ. 7992 (KBF), 2014 WL 185222, at *5–6 (S.D.N.Y. Jan. 16, 2014) (same), *and GMA Accessories, Inc. v. BOP, LLC*, 765 F. Supp. 2d 457, 469–71 (S.D.N.Y. 2011) (Castel, *J.*) (same), *and Mr. Water Heater Enterprises, Inc. v. 1-800-Hot Water Heater, LLC*, 648 F. Supp. 2d 576, 589–90 (S.D.N.Y. 2009) (Pauley, *J.*) (same), *and Pedinol Pharmacal, Inc. v. Rising Pharmaceuticals, Inc.*, 570 F. Supp. 2d 498, 502–503 (E.D.N.Y. 2008) (Wexler, *J.*) (same), *and Life Servs. Supplements, Inc. v. Natural Organics, Inc.*, No. 03 Civ. 6030 (SHS), 2007 WL 4437168, at *2–7 (S.D.N.Y. Dec. 17, 2007) (same), *and Luis Vuitton Malletier v. Dooney & Bourke, Inc.*, 500 F. Supp. 2d 276, 278–82 (S.D.N.Y. 2007) (Scheindlin, *J.*) (same), *and Mastercard Internat'l, Inc. v. First Nat'l Bank of Omaha, Inc.*, No. 02 Civ. 3691 (DLC), 2004 WL 326708, at *10–11 (S.D.N.Y. Feb. 23, 2004) (same).

After reviewing this precedent and the parties' respective arguments, this Court is persuaded by those authorities that have concluded that a finding of willfulness remains a requirement for an award of defendants' profits in this Circuit. Contrary to Romag's arguments, the plain language of § 1117(a) does not indicate that Congress intended to abrogate the common-law willfulness requirement by adding the word "willful" to modify the trademark dilution section of the statute. Congress made no change with respect to the language governing section 1125(a) violations. The post-amendment language with respect to section 1125(a) is the same language that the Second Circuit interpreted, based on the principles of equity, to require a finding of willfulness before disgorgement of

36

profits could be awarded. *Pedinol Pharmacal, Inc.*, 570 F. Supp. 2d at 502–03 ("First and most importantly, when Section 1117 was amended to provide for recovery of a defendant's profits for a willful violation under Section 1125(c), no changes were made regarding the recovery provisions of Section 1125(a) or (d). . . . The court holds therefore, that the Second Circuit's interpretation of 1117(a) in *Basch*, which construed the same statutory language that existed prior to the 1999 amendment of the statute, remains good law."); *Life Servs. Supplements*, 2007 WL 4437168, at *6 ("On its face, then, the amended statute restricts monetary awards in dilution cases to willful violations, but leaves the appropriate remedy for other Lanham Act remedies subject to the principles of equity, just as it was prior to 1999 amendments."); *Louis Vuitton Malletier*, 500 F. Supp. 2d at 281 ("[T]he addition of 'willful violation under section 1125(c)' does not indicate that it was Congress's intention to simultaneously *sub silentio* overturn the weight of authority with respect to 1125(a).").

Plaintiff's argument that this interpretation renders the provisions for treble damages in cases of willful counterfeiting in section 1117(b) superfluous is unavailing. Plaintiff claims that Congress has already provided for increased damages in cases of willful infringement by including this provision for treble damages, and that to require willful damages for a simple award of profits would upset this scheme. However, this argument ignores the fact that section 1117(b) applies only to the use of a counterfeit mark, whereas section 1117(a) applies to all cases of trademark infringement. 15 U.S.C. § 1117(b). Other courts in this Circuit have reasoned that the addition of the "willful" modifier to section 1125(c) violations was not superfluous, because the Second Circuit draws a distinction between the requirements for a recovery of damages and a recovery of profits. *Mastercard Internat'l, Inc.*, 2004 WL 326708, at * 11 ("Since the Second Circuit

37

permits the recovery of damages when a plaintiff is able to prove actual confusion but not intentional deception, . . . the inclusion of the "willful" modifier before "section 1125(c)" in the 1999 Amendment provides a more stringent standard for recovery than is available for a violation under Section 1125(a). The language of the 1999 Amendment is not rendered superfluous by the incorporation of the standards in this Circuit governing recovery under Section 35(a) of the Lanham Act."). Thus, under the interpretation that willfulness is required for an award of profits, section 1117 sets forth a three-tiered system of recovery: compensatory damages for non-willful infringement, an award of profits for willful infringement, and treble damages or profits for willful counterfeiting.

As Judge Sidney Stein outlined in his opinion on this issue, the legislative history of the 1999 amendments supports the view that they addressed only recovery in dilution actions, as the history is silent as to any other intended consequence of the amendments. *See Life Servs. Supplements, Inc.*, 2007 WL 4437168, at *6. The section of the Trademark Amendments Act of 1999 containing the relevant amendment is entitled "Remedies in Cases of *Dilution* of Famous Trademarks." Pub. L. No. 106-43, 113 Stat. 218 (emphasis added). Furthermore, the Congressional Record contains comments by Congressman Elijah E. Cummings indicating that the purpose of the bill was to harmonize section 1117(a) with the recent Federal Trademark Dilution Act of 1995:

> This legislation is a necessary follow-up to the Federal Trademark Dilution Act of 1995, which was enacted last Congress and which gave a Federal cause of action to holders of famous trademarks for dilution. *The bill before us today is necessary to clear up certain issues in the interpretation of the dilution act which the Federal courts have grappled with since its enactment.*

145 Cong. Rec. H6363 (emphasis added). Thus, the legislative history gives no support to the argument that the 1999 amendments were intended to abrogate the common-law

**Addendum 50**

willfulness requirement enacted by this Circuit because they are silent with respect to their intended consequences for awards made pursuant to section 1125(a).

Therefore, in light of the absence of evidence in the language of the statute or the legislative history of the 1999 amendments of a clear congressional intent to abrogate the existing Second Circuit precedent requiring a finding of willfulness before an award of profits can be made, the Court concludes that the holdings of *Internat'l Star Class Yacht Racing Ass'n* and *George Basch* remain good law. *Life Servs. Supplements, Inc.*, 2007 WL 4437168, at *7 ("Finally, jurisprudential considerations counsel in favor of this Court recognizing the continued validity of the willfulness standard. The law of this circuit is that profits cannot be awarded under the Lanham Act absent a showing of willfulness. While it is true that the Second Circuit has not revisited that question since the enactment of the 1999 amendments, the 1999 amendments do not directly contradict that precedent; at the most, they do so only by implication. Therefore, to the extent that the impact of the 1999 amendments is ambiguous, this Court should follow Second Circuit precedent." (internal citation omitted)). Thus, based on the jury's finding that Fossil's trademark infringement had not been proved willful, the Court concludes that Romag is not entitled to an award of Fossil's profits.

## G.    Permanent Injunction

In its Proposed Findings of Fact and Conclusions of Law [Doc. # 421], Romag claims entitlement to a permanent injunction under the Lanham Act and Connecticut law barring Fossil from importing, selling, or offering for sale Fossil handbags bearing counterfeit ROMAG snaps and directing Fossil to destroy all counterfeit ROMAG snaps in its possession, custody, or control. *See* 15 U.S.C. §§ 1116, 1118. Defendants did not specifically object to the issuance of a permanent injunction in their Proposed Findings of

39

Fact and Conclusions of Law. "A permanent injunction is appropriate where the party seeking the injunction has succeeded on the merits and shows the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *Patsy's Italian Restaurant, Inc. v. Banas*, 658 F.3d 254, 272 (2d Cir. 2011) (internal citations and quotation marks omitted). "A district court has a 'wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct.'" *Id.* at 273. "However, the injunctive relief should be narrowly tailored to fit specific legal violations." Thus, in fashioning the injunction, the Court should balance the equities to reach an appropriate result protective of the interests of both parties." *Id.* "In trademark cases, irreparable harm is presumed once infringement or dilution has been shown, based on the ensuing loss of goodwill and ability to control one's reputation." *Gucci America, Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 243 (S.D.N.Y. 2012). "Courts in this circuit have long held that a permanent injunction should issue in trademark cases where a defendant asserts that its pre-lawsuit use was lawful." *Id.* at 256.

Here, the jury found that the snaps on the accused handbags were counterfeits, and that Fossil was liable for trademark infringement and false designation of origin. In light of these findings, Romag is entitled to a presumption of irreparable injury based on loss of goodwill and the inability to control its reputation. The Court concludes that a monetary award would be inadequate to protect Plaintiff from the ongoing threat posed by such counterfeiting. Although the Court has found merit in Fossil's laches defense, the Court does not conclude that Plaintiff's laches should bar all recovery and injunctive relief in this suit, especially because Fossil had been selling handbags with counterfeit ROMAG snaps long before May 2010. The balance of the equities weighs in favor of granting a permanent injunction enjoining Fossil from selling bags with counterfeit

ROMAG snaps given Fossil's position at trial that the snaps were genuine, Fossil's own testimony that the counterfeit snaps can easily be replaced with non-infringing generics, and the public's interest in avoiding the sale of counterfeit goods.

Romag also requests that Fossil be ordered to destroy all counterfeit snaps in its possession. However, "it has been held that where an injunction is issued under the Lanham Act enjoining an infringer from further infringement, the rights of the plaintiff are adequately protected and an order requiring destruction of infringing articles, though permitted, may be unnecessary." *Breaking the Chain Foundation, Inc. v. Capitol Educational Support, Inc.*, 589 F. Supp. 2d 25, 33 (D.D.C. 2008) (citing *Kelley Blue Book v. Car-Smarts, Inc.*, 802 F. Supp. 278, 293 (C.D. Cal. 1992)); *Neva, Inc. v. Christian Duplications Int'l, Inc.*, 743 F. Supp. 1533, 1549 (M.D. Fla. 1990); *see also Bonanza Int'l, Inc. v. Double "B"*, 331 F. Supp. 694, 697 (D. Minn. 1971). The court concludes that an injunction barring Fossil from further infringement is adequate to protect Plaintiff's rights in this case. Therefore Fossil is hereby permanently enjoined from importing, selling, or offering for sale Fossil products bearing counterfeit Romag magnetic snap fasteners.

III.    **Conclusion**

For the reasons set forth in this Memorandum of Decision, the Court concludes that Defendants have failed to establish their equitable defense of unclean hands or that Plaintiff had a duty to mitigate its patent or trademark damages. The Court further finds that Defendants have established their equitable defense of laches and the jury's award of a reasonably royalty shall be reduced accordingly. The Court also finds that sanctions are merited in this case. Plaintiff shall not be entitled to recover its attorney's fees in connection with the TRO proceedings. Finally, the Court concludes that Plaintiff is not

entitled to an award of Fossil's profits because there was no willful infringement in this case. A permanent injunction shall issue as set forth above. The jury's verdict is altered only with respect to its award of a reasonable royalty, which is reduced $41,862.75 for Fossil and $12,562.90 for Macy's, and that the award of Fossil's profits is eliminated in its entirety.


IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 27th day of June, 2014.


42

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

ROMAG FASTENERS, INC.,

　　　　v.                                    Civil No.  3:10cv1827 (JBA)

FOSSIL, INC., FOSSIL STORES  I, INC.,
BELK, INC., THE BON-TON STORES, INC.,
THE BON-TON DEPARTMENT STORES, INC.,
DILLARD'S INC., MACY'S INC., MACY'S
RETAIL, INC., NORDSTROM, INC.,
ZAPPOS.COM, INC. AND ZAPPOS
RETAIL, INC.

## AMENDED FINAL JUDGMENT

This matter came on for trial before a jury and the Honorable Janet Bond Arterton, United States District Judge, and for consideration of  Plaintiff's  Motion for Judgment as a Matter of Law and for a New Trial.

On August 8, 2014, the Court entered a Ruling granting Plaintiff's Motion for Judgment as a Matter of Law and directing in that judgment be  against Defendants Macy's Inc. and Macy's Retail, Inc. with respect to claims of trademark infringement and patent infringement in the amount of $12,562.90; and in favor of Macy's Inc. and Macy's Retail, Inc. on all remaining counts; directing judgment be entered against Fossil, Inc. and Fossil Stores I, Inc. with respect to claims of trademark infringement, false designation of origin, state common law unfair competition, violation of CUTPA, and patent infringement in the amount of $41,862.75; and directing judgment be entered for Belk, Inc., The Bon-Ton Stores, Inc., The Bon-Ton Department Stores, Inc., Dillard's Inc., Nordstrom, Inc.,

EOD:9/22/14

Zappos.com, Inc. and Zappos Retail Inc. on all claims.

Therefore, it is hereby ORDERED, ADJUDGED and DECREED that judgment is entered for plaintiff Romag Fasteners, Inc., against defendants Macy's Inc. and Macy's Retail, Inc. with respect to the trademark infringement and patent infringement claims in the amount of $12,562.90 and against Fossil, Inc. and Fossil Stores I, Inc. with respect to claims of trademark infringement, false designation of origin, state common law unfair competition, violation of CUTPA, and patent infringement in the amount of $41,862.75. Judgment is entered for Belk, Inc., The Bon-Ton Stores, Inc., The Bon-Ton Department Stores, Inc., Dillard's Inc., Nordstrom, Inc., Zappos.com, Inc. and Zappos Retail Inc on all claims asserted against them. Judgment is entered for Macy's Inc. and Macy's Retail Inc., with respect to claims of false designation of origin, state common law unfair competition and violation of CUTPA.

Dated at New Haven, Connecticut this 22th of September, 2014.

ROBIN D. TABORA, Clerk

_____/s/_____
Betty J. Torday
Deputy Clerk

**Federal Rules of Appellate Procedure Form 6. Certificate of Compliance With Rule 32(a)**

**Certificate of Compliance With Type-Volume Limitation, Typeface Requirements and Type Style Requirements**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    ☒  This brief contains 13,972 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), **or**

    ☐  This brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because:

    ☒  This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point type Times New Roman type style, **or**

    ☐  This brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: January 29, 2015        /s/Jonathan M. Freiman
                               Jonathan M. Freiman

## **CERTIFICATE OF SERVICE**

I hereby certify that, on January 29, 2015, the foregoing Brief, with attached Addendum, of Appellant Romag Fasteners, Inc. was filed with the Court and served on the following counsel electronically through the Court's CM/ECF System.

Parties may access this filing through the Court's CM/ECF System.

Jeffrey E. Dupler
Gibney Anthony & Flaherty, LLP
665 Fifth Avenue
New York, NY 10022

Lauren Albert, Attorney
The Law Offices of Lauren S. Albert
830 Third Avenue
5th Floor
New York, NY 10022

Lawrence Brocchini
Reavis Parent Lehrer LLP
41 Madison
41st Floor
New York, NY 10010

William J. Cass
Cantor Colburn LLP
20 Church Street
22nd Floor
Hartford, CT 06103

/s/Jonathan M. Freiman
Jonathan M. Freiman