**14-1856, -1857**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

ROMAG FASTENERS, INC.,
*Plaintiff-Appellant,*

v.

FOSSIL, INC., FOSSIL STORES I, INC., MACY'S INC.,
MACY'S RETAIL HOLDINGS, INC., BELK, INC.,
THE BON-TON STORES, INC.,
THE BON-TON DEPARTMENT STORES, INC., DILLARD'S, INC.,
NORDSTROM, INC., ZAPPOS.COM, INC., AND ZAPPOS RETAIL, INC.,
*Defendants - Cross-Appellants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

10-cv-01827-JBA and 11-cv-00929-CFD

Janet Bond Arterton, United States District Judge

## PRINCIPAL AND RESPONSE BRIEF
## FOR DEFENDANTS - CROSS-APPELLANTS

Lauren S. Albert
LAW OFFICES OF LAUREN S.
ALBERT LLC
830 Third Avenue, 5th Floor
New York, NY 10010
Telephone: (212) 267-1300

Lawrence Brocchini
REAVIS PARENT LEHRER LLP
41 Madison Avenue, 41st Floor
New York, New York 10010
Telephone: (212) 763-4100

Jeffrey E. Dupler
GIBNEY, ANTHONY & FLAHERTY LLP
665 Fifth Avenue
New York, NY 10022
Telephone: (212) 688-5151

Nicholas A. Geiger
CANTOR COLBURN LLP
20 Church Street, 22nd Floor
Hartford, CT 06103
Telephone: (860) 286-2929

*Attorneys for Defendants-Cross-Appellants*

## CERTIFICATE OF INTEREST

Counsel for all Defendants-Cross-Appellants certifies the following:

1.  The full name of every party or amicus represented by the undersigned is:

    **FOSSIL, INC., FOSSIL STORES I, INC., MACY'S INC., MACY'S RETAIL HOLDINGS, INC., BELK, INC., THE BON-TON STORES, INC., THE BON-TON DEPARTMENT STORES, INC., DILLARD'S, INC., NORDSTROM, INC., ZAPPOS.COM, INC., AND ZAPPOS RETAIL, INC.,**

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    **Fossil, Inc. formally changed its name to Fossil Group, Inc. as of May 2013.**

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    **Fossil, Inc., now known as Fossil Group, Inc., has no parent corporation and no publicly held corporation owns 10% or more of its stock.  Fossil Stores I, Inc. is a wholly-owned subsidiary of Fossil Group, Inc.**

    **Macy's, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.  Macy's Retail Holdings, Inc. is a wholly-owned subsidiary of Macy's, Inc.**

    **Dillard's, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.**

    **Nordstrom, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.**

    **The Bon-Ton Stores, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.  The Bon-Ton Department Stores, Inc. is a wholly-owned subsidiary of The Bon-Ton Stores, Inc.**

    **Belk, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.**

**Zappos.com, Inc. is wholly owned by Amazon.com, Inc.  Zappos Retail, Inc. is a wholly-owned subsidiary of Zappos.com, Inc.**

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

| | |
|---|---|
| **Axinn, Veltrop & Harkrider LLP ("AVH")** | **Lauren S. Albert – AVH and LSA** |
| **The Law Offices of Lauren S. Albert, LLC ("LSA")** | **Jeffrey E. Dupler – GAF** |
| | **Brian W. Brokate – GAF** |
| **Gibney, Anthony & Flaherty LLP ("GAF")** | **Nicholas A. Geiger – AVH and CC** |
| | **Lawrence Brocchini – RPL** |
| **Reavis Parent Lehrer LLP ("RPL")** | **Francis H. Morrison, III – AVH** |
| | **Jonathan A. Harris – AVH** |
| **Cantor Colburn LLP ("CC" )** | **Matthew J. Becker – AVH** |
| | **Aaron J Feigenbaum – AVH** |
| | **William J. Cass – CC** |

Dated: May 1, 2015

/s/ Jeffrey E. Dupler
Jeffrey E. Dupler

*Counsel for Defendants-Cross Appellants*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF CONTENTS ..................................................................... iii

TABLE OF AUTHORITIES ............................................................... vii

STATEMENT OF RELATED CASES ................................................... 1

STATEMENT OF JURISDICTION .................................................... 2

STATEMENT OF THE ISSUES .......................................................... 3

STATEMENT OF THE CASE ............................................................. 5

A.    Romag Sues Days Before Thanksgiving 2010 and Obtains
      Emergency Injunctive Relief .................................................. 5

B.    The Trial, Verdict, and Subsequent Decisions ............................. 6

STATEMENT OF THE FACTS ........................................................... 9

A.    The Parties, Their Businesses and Third-Parties .......................... 10

      1.    Romag ........................................................................ 10

      2.    Fossil .......................................................................... 11

      3.    Superior Manufactures Handbags Containing Romag Snaps ............. 11

B.    Romag's Prior Knowledge of Counterfeit Snaps in 2007 and 2009 and
      Pattern of Asserting Claims During the Busy Holiday Season .................... 13

C.    Reiter and Romag Receive a "Hot Tip" about Counterfeiting in
      May 2010 and Purposefully Keep it to Themselves ........................ 14

D.    Romag Intentionally and Tactically Delays Filing ........................ 17

E.    Romag Sues Fossil and Obtains Emergency Injunctive Relief
      Based on What the District Court Found was Reiter's
      Sanctionable Fraudulent Declaration ........................................ 19

F.    Fossil Affirmatively Responds to the First
      Information of Possible Counterfeiting of Romag Snaps ............................22

G.    As the Jury Found, Fossil Attained No Benefit from
      Superior's Use of Romag Snaps....................................................................23

H.    As the Trial Court Confirmed, Romag Cites No Evidence
      Establishing Willful Infringement or Reckless Disregard ..........................24

SUMMARY OF THE ARGUMENT .......................................................................27

ARGUMENT .........................................................................................................31

RESPONSE TO ROMAG'S APPEAL.....................................................................31

I.    The District Court's Judgment Properly Applied Long-Standing
      Second Circuit Authority in Denying Romag an Award of
      Non-Willful Infringer Fossil's Profits and Should be Affirmed ..................31

      A.    Choice of Law, Standard of Review, and
            Jurisprudential Considerations............................................................31

      B.    Applying Second Circuit Precedent, the District Court
            Properly Refused to Award Fossil's Profits to Romag
            Because the Jury Found Fossil's Infringement Was Not Willful .......33

      C.    Under Section 1117(a)'s Equitable Principles, A
            Finding of Willful Infringement Remains a
            Prerequisite to Recovery of a Defendant's Profits..............................34

            1.    The Second Circuit Continues to Cite and Apply the
                  Willfulness Requirement ..........................................................35

            2.    The 1999 Dilution Remedy Amendment to the Lanham Act
                  Did Not Affect the Willfulness Requirement at Issue Here .....38

                  i.    The 1999 Dilution Remedy Amendment Did Not
                        Alter the Language Governing the Monetary
                        Remedies for the Claims at Issue Here or the
                        Willfulness Requirement for an Award of Profits................38

iv

           ii.  The Legislative History to the 1999 Dilution Remedy
                 Amendment Explains it Was Intended Merely to
                 Remedy a Drafting Error Regarding Dilution ..................... 44

         3.      The 1996 Amendment Adding Section 1117(c) to the
                Lanham Act Did Nothing to Change The Language or
                Standard of Recovery Under Section 1117(a) ........................ 47

    D.    This Court Should Not Overrule Decades of Second
          Circuit Case Law Conditioning an Award of
          Defendant's Profits on a Willfulness Finding Under
          Long-Standing Principles of Equity .................................................. 49

    E.    Remand is Unnecessary Even if Equitable Balancing is Required,
          As this Court Can and Should Affirm the Judgment Based
          On the Jury's and District Court's Unchallenged Findings .............. 55

II.   The District Court Properly Reduced Romag's
    Patent Damages Due to Romag's Laches ..................................... 60

    A.    The Patent Act Has No Statute of Limitations, and Laches
          Performs the Gap-Filling Role Recognized in *Petrella* ..................... 61

    B.    Legislative History and Practice Demonstrate Congress' Intent
          That Laches Remain Available to Bar Patent Damage Claims .......... 63

CROSS-APPELLANT'S PRINCIPAL BRIEF ........................................ 65

If the Case is Remanded, The Jury's Flawed Advisory
Award of Deterrence-based Profits Should be Vacated .......................... 65

    A.    The District Court Failed to Instruct the Jury that
          Deterrence-based Profits Could Only be Awarded
          Against a Willfully Deceptive Defendant ........................................... 67

    B.    The District Court Erroneously Instructed the Jury that
          Attribution Could Not Reduce a Deterrence-based Profit
          Award Under the Facts of this Case .................................................. 69

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ............................... 71

ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

*Cases*                                                                 *Page*

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,*
    960 F.2d 1020 (Fed. Cir. 1992) (en banc) ............................................*passim*

*Alpo Petfoods, Inc. v. Ralston Purina Co.,*
    913 F.2d 958 (D.C. Cir. 1992)........................................................................44

*Baden Sports, Inc. v. Molten USA, Inc.,*
    556 F.3d 1300 (Fed. Cir. 2009) ....................................................................31

*Bailey v. Dart Container Corp. of Michigan,*
    292 F.3d 1360 (Fed. Cir. 2002) ....................................................................65

*Bandag, Inc. v. Al Bolser's Tire Stores, Inc.,*
    750 F.2d 903 (Fed. Cir. 1984) ...........................................29, 30, 32, 43 n.11

*Banjo Buddies, Inc. v. Renosky,*
    399 F.3d 168 (3d Cir. 2005) ...................................... 41 n.10, 47, 54, 55 n.14

*Beastie Boys v. Monster Energy Co.,*
    983 F. Supp. 2d 354 (S.D.N.Y. 2014) ..........................................................42

*Borghese Trademarks, Inc. v. Borghese,*
    No. 10 Civ. 5552, 2013 WL 143807 (S.D.N.Y. Jan. 14, 2013) ...................37

*Bradford Co. v. Jefferson Smurfit Corp.,*
    Nos. 00-1511, 00-1546, 2001
    WL 35738792 (Fed. Cir. Oct. 31, 2001) ......................................................62

*Carl Zeiss Stiftung v. VEB Carl Zeiss Jena,*
    433 F.2d 686 (2d Cir. 1970) .........................................................................33

*Cartier v. Aaron Faber, Inc.,*
    512 F. Supp. 2d 165 (S.D.N.Y. 2007) ..................................................41 n.10

*Champagne v. Diblasi,*
    36 Fed. App'x 15 (2d Cir. 2002) ..................................................................36

*Champion Spark Plug Co. v. Sanders,*
    331 U.S. 125 (1947)........................................................... 29-30, 33, 52, 58

*Chavis v. Chappius*,
  618 F.3d 162 (2d Cir. 2010) ........................................................31

*C & L Int'l Trading Inc. v. Am. Tibetan Health Inst., Inc.*,
  No. 13 Civ. 2638, 2015 WL 1849863 (S.D.N.Y. Apr. 22, 2015) ................36

*De Venustas v. Venustas Int'l, LLC*,
  No. 07 Civ. 4530, 2008 WL 4735223 (S.D.N.Y. Oct. 24, 2008)................42

*eBay Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006)................................................................35, 46

*Ericsson, Inc. v. Harris Corp.*,
  352 F.3d 1369 (Fed. Cir. 2003) ....................................................65

*Excell Consumer Prods. Ltd. v. Smart Candle LLC*,
  No. 11 C 722, 2013 WL 4828581 (S.D.N.Y. Sept.10, 2013) .....................37

*Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*,
  507 Fed. App'x 26 (2d Cir. 2013) ................................................35, 35 n.9

*Fendi Adele S.R.L. v. Filene's Basement, Inc.*,
  696 F. Supp. 2d 368 (S.D.N.Y.2010) ............................................37

*Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*,
  778 F.3d 1059 (9th Cir. 2015) ..............................................43 n.11

*Fishman Transducers, Inc. v. Paul*,
  684 F.3d 187 (1st Cir. 2012).......................................................43

*George Basch Co. v. Blue Coral, Inc.*,
  968 F.2d 1532 (2d Cir. 1992) ..............................................*passim*

*Getty Petroleum Corp. v. Bartco Petroleum Corp.*,
  858 F.2d 103 (2d Cir. 1988) .......................................................70

*GMA Accessories, Inc. v. BOP, LLC*,
  765 F. Supp. 2d 457 (S.D.N.Y. 2011) ........................................42, 44, 45, 46

*Gordon v. New York City Bd. of Educ.*,
  232 F.3d 111 (2d Cir. 2000) .......................................................68

*Gucci Am., Inc. v. Guess?, Inc.*,
  868 F. Supp. 2d 207 (S.D.N.Y. 2012) ............................................37

*Guthrie Healthcare v. Contextmedia, Inc.*,
  No. 12 Civ. 7992, 2014 WL 185222 (S.D.N.Y. Jan. 16, 2014) ....................42

*High Point Design LLC v. Buyers Direct, Inc.*,
  730 F.3d 1301 (Fed. Cir. 2013) ...................................................32

*Hilton v. UK Fragrances, Inc.*,
  No. 12-CV-6346,
  2014 WL 794304 (E.D.N.Y. Feb. 25, 2014) ................................37

*Horlick's Malted Milk Corp. v Horluck's, Inc.*,
  51 F.2d 357 (W.D. Wash. 1931).............................................52

*Imig, Inc. v. Electrolux Home Care Prods., Ltd.*,
  No. CV 05-0529, 2008 WL 905898 (E.D.N.Y. 2008) .................................37

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*,
  80 F.3d 749 (2d Cir. 1996) .............................................33, 56 n.15

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*,
  No. 04 Civ. 7369, 2006 WL 2128785 (S.D.N.Y. July 28, 2006)................37

*J.P. Stevens & Co. v. Lex Tex, Ltd.*,
  747 F.2d 1553 (Fed. Cir. 1984) ...............................................64

*Kloster Speedsteel AB v. Crucible Inc.*,
  No. 85-2174, 1986 WL 721181 (Fed. Cir. June 11, 1986) ..........................56

*Lane & Bodley Co. v. Locke*,
  150 U.S. 193 (1893).........................................................64

*Liberty Oil Corp. v. Crowley, Milner & Co.*,
  270 Mich. 187 (1935) .......................................................52

*Life Servs. Supplements, Inc. v. Natural Organics, Inc.*,
  No. 03 Civ. 6030, 2007 WL 4437168
  (S.D.N.Y. Dec. 17, 2007) .........................................39, 42, 44, 46

*Eli Lilly and Co. v. Aradigm Corp.*,
  376 F.3d 1352 (Fed. Cir. 2004) ...............................................68

*Lindy Pen Co. v. Bic Pen Corp.*,
    982 F.2d 1400 (9th Cir. 1993) ...............................................................43 n.11

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
    753 F.3d 395 (2d Cir. 2014) ..........................................................................31

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
    500 F. Supp. 2d 276 (S.D.N.Y. 2007) ............................................... 39-40, 42

*Louis Vuitton Malletier S.A. v. LY USA, Inc.*,
    676 F.3d 83 (2d Cir. 2012) ...........................................................................48

*M2 Software, Inc. v. Viacom, Inc.*,
    223 Fed. App'x 653 (9th Cir. 2007) .............................................................43

*Mastercard Int'l, Inc. v. First Nat'l Bank of Omaha, Inc.*,
    No. 02 Civ. 3691, 2004 WL
    326708 (S.D.N.Y. Feb. 23, 2004).....................................................40, 41, 42

*McLean v. Fleming*,
    96 U.S. 245 (1878)........................................................................................51

*Mendez v. Starwood Hotels & Resorts Worldwide, Inc.*,
    746 F. Supp. 2d 575 (S.D.N.Y. 2010) ..........................................................36

*Merchant Media, LLC v. H.S.M. Int'l*,
    No. 05 Civ. 2817, 2006 WL 3479022 (S.D.N.Y. Nov. 30, 2006)................37

*Merck Eprova AG v. Gnosis S.p.A.*,
    901 F. Supp. 2d 436 (S.D.N.Y. 2012) ..........................................................37

*Merck Eprova AG v. Gnosis S.p.A.*,
    760 F.3d 247 (2d Cir. 2014) ...........................................................35 n.9, 36

*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*,
    316 U.S. 203 (1942)................................................................ 65 n.18, 69-70

*Monsanto Chemical Company v. Perfect Fit Products Manuf. Co.*,
    349 F.2d 389(2d Cir. 1965) ............................................................ 58, 68-70

*Mr. Water Heater Enterprises, Inc. v. 1-800-Hot Water Heater, LLC*,
    648 F. Supp. 2d 576 (S.D.N.Y. 2009) ..........................................................42

*Nike, Inc. v. Top Brand Co.*,
  No. 00 Civ.8179, 2005 WL
  1654859 (S.D.N.Y. July 13, 2005) .........................................41 n.10, 55 n.14

*N.K. Fairbank Co. v. Windsor*,
  124 F.200 (2d Cir. 1903) ...............................................................51

*Pedinol Pharmacal, Inc. v. Rising Pharm., Inc.*,
  570 F. Supp. 2d 498 (E.D.N.Y. 2008)..............................................38, 39, 42

*P.E. Sharpless Co. v. Lawrence*,
  213 F. 423 (3d Cir. 1914) ..............................................................52

*Petrella v. Metro-Goldwyn- Mayer, Inc.*,
  __ U.S. __, 134 S. Ct. 1962 (2014) .................................................. 28, 61-65

*Petrusch v. Teamsters Local 317, Syracuse, NY*,
  667 F.2d 297 (2d Cir. 1981) .........................................................46

*Pfizer, Inc. v. Y2K Shipping & Trading, Inc.*,
  No.00 CV 5304, 2004 WL 896952 (S.D.N.Y. March 26, 2004) .................37

*Power Mosfet Technologies, L.L.C. v. Siemens AG*,
  378 F.3d 1396 (Fed. Cir. 2004) .............................................. 65-66

*Quick Techs. Inc. v. Sage Group Plc*,
  313 F.3d 338 (5th Cir. 2002) .........................................41 n.10, 55 n.14, 60

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
  659 F.3d 1142 (Fed. Cir. 2011) ....................................................56

*Rubber & Celluloid Harness Trimming Co. v.*
  *F.W. DeVoe & C.T. Reynolds Co.*,
  233 F.150 (D.N.J. 1916) ...............................................................52

*Saxlehner v. Siegel-Cooper Co.*,
  179 U.S. 42 (1900).......................................................................51

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*,
  No. 2013-1564, 2014 WL 7460970 (Fed. Cir. Dec. 30, 2014) ................1, 62

*In re Seagate Technology, LLC*,
  497 F.3d 1360 (2007) ..................................................................49

*Seattle Box Co. v. Indus. Crating & Packing Inc.*,
    756 F.2d 1574 (Fed. Cir. 1985) ...................................................55

*Standard Oil, Co. v. Nippon Shokubai Kagaku Kogyo Co.*,
    754 F.2d 345 (Fed. Cir. 1985) ....................................................62

*Symbol Techs., Inc. v. Lemelson Med.*,
    277 F.3d 1361 (Fed. Cir. 2002) .............................................63, 64

*Synergistic Int'l, LLC v. Korman*,
    470 F.3d 162 (4th Cir. 2006) ...............................................41 n.10

*United States v. Payne*,
    591 F.3d 46 (2d Cir. 2010) .........................................................36

*W.E. Bassett Co. v. Revlon, Inc.*,
    435 F.2d 656 (2d Cir. 1970) .......................................................68

*WE Media, Inc. v. Cablevision Systems Corp.*,
    94 Fed. App'x 29 (2d Cir. 2004) ................................................36

*Western Diversified Servs., Inc. v. Hyundai Motor America, Inc.*,
    427 F.3d 1269 (10th Cir. 2005) .............................................42-43

## Rules and Statutes

15 U.S.C. §1117 ...................................................................*passim*

15 U.S.C. §1117(a) ..............................................................*passim*

15 U.S.C. §1117(c) .............................................................. 47-49

15 U.S.C. §1125(a) .............................................38, 39, 40, 41, 44

15 U.S.C. §1125(c) .............................................................*passim*

15 U.S.C. §1115(a)(9) .........................................................50 n.12

28 U.S.C. §1295(a)(1) ................................................................2

35 U.S.C. §282 .................................................................. 63-64

35 U.S.C. §282(b)(1)......................................................................... 63-64

35 U.S.C. §286 ..............................................................................62, 64

Anticounterfeiting Consumer Protection Act of 1996,
    Pub. L. 104-153, 110 Stat 1386 (1996) ........................................48

Fed. Cir. R. 28.1, Practice Notes.........................................................66

Fed. R. App. P. 4(a)(1), (2), (3), and (a)(4)(A)(i), (iv), and (v)................2

Fed. R. Civ. P. 50 ................................................................................2

Fed. R. Civ. P. 59 ...............................................................................2

Second Cir. Local R. 32.1.1 ...............................................................36

Section 19 of the 1905 Trademark Act,
    15 U.S.C. § 99................................................................................51

Trademark Amendments Act of 1999,
    Pub. L. No. 106–43, 113 Stat. 218 (1999)....................................44

## Other Authorities

145 Cong Rec H6363-01 (1999) .........................................................46

*Black's* Law Dictionary (4th ed. 1968)...............................................62

Eric J. Magnuson and David F. Herr,
    *Fed Appeals Jurisdiction and Practice* § 6.9 (2015 ed.)...............66

Hearings on HR 102, HR 5461, and S 895 Before the
    Subcommittee on Trade-Marks of the House
    Comm. On Patents, 77th Cong, 1st Sess. 39 (1941)......................50

HR 13109, 70th Cong, 1st Sess § 30, 1928 Cong. Rec. 9357, 9362 (1928) ...........53

H.R. Rep. No. 82-1923 (1952)............................................................63

H.R. Rep. 106-250 (1999)..................................................................45

J. Thomas McCarthy, *4 McCarthy on Trademarks and
    Unfair Competition*, §25:3 (4th ed. database
    updated March 2015)................................................................30 n.7

J. Thomas McCarthy, *5 McCarthy on Trademarks and
    Unfair Competition* § 30:62 (4th ed. database
    updated March 2015)........................................................................47

*Nims on Unfair Competition and Trade-Marks* (p. 1078)......................................52

P.J. Federico, *Commentary on the New Patent Act*,
    reprinted in 75 J. Pat. & Trademark Off. Soc'y 161, 215 (1993) ........... 63-64

*Restatement (First) of Torts* § 747 Profits (1938) ....................................53

*Restatement (Third) of Unfair Competition* § 37(1)(a) (1995)..............................54

*Restatement (Third) of Unfair Competition* § 37(1)(a), cmt. c (1995)....................54

*Restatement (Third) of Unfair Competition* § 37(1)(a), cmt. e (1995) ...................54

*Restatement (Third) of Unfair Competition* § 37(2)(1995) ....................................54

*Restatement (Third) of Unfair Competition* § 37(2)(f) (1995) .......................59 n.16

*Restatement (Third) of Unfair Competition* § 37(2), cmt. f....................................57

## STATEMENT OF RELATED CASES

Defendants-Cross-Appellants Fossil, Inc. and Fossil Stores I, Inc., (collectively "Fossil") do not dispute Plaintiff-Appellant Romag Fasteners, Inc.'s ("Romag") Statement of Related Cases, but note that they are aware of four cases pending before this Court involving the issue presented in Argument Section II below concerning the impact of recent Supreme Court precedent on the availability of the laches defense to bar recovery of damages under the Patent Act.  This Court stayed the briefing schedules in *Reese v. Sprint Nextel Corp.*, Nos. 2015-1030, -1031, -1032, -1035, -1036; *Medinol Ltd. v. Cordis Corp*., No. 2015-1027; and *LendingTree, LLC v. Zillow, Inc.*, Nos. 2014-1435, -1531, -1532, and 2015-1186, pending resolution of that issue by this Court *en banc* in *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, No. 2013-1564, 2014 WL 7460970, at *1 (Fed. Cir. Dec. 30, 2014).

## STATEMENT OF JURISDICTION

Romag properly sets forth the basis for the District Court's subject matter jurisdiction. This Court has exclusive appellate jurisdiction of this appeal and cross-appeal pursuant to 28 U.S.C. § 1295(a)(1) and Rule 4(a)(1), (2), (3), and (4)(a)(4)(A)(iv), and (v) of the Federal Rules of Appellate Procedure because this action arises under the patent laws, JA210; because the District Court's September 22, 2014 Amended Final Judgment constituted a final decision disposing of all the parties' claims (except Romag's claim for attorney's fees); and because Defendants-Cross-Appellants timely moved under Fed. R. Civ. P. 50 and 59 on July 18, 2014, JA2417.001-.003, which motions the District Court disposed of in its Ruling on Post-Trial Motions, *Romag Fasteners, Inc. v. Fossil, Inc.*, No. 3:10-cv-1827 (JBA), 2014 WL 3895905 (D. Conn. August 8, 2014), JA45-68 ("Ruling");[1] and because Romag noticed its appeal within 30 days on September 8, 2014, and Defendants-Cross-Appellants cross-appealed within 14 days on September 15, 2014.

---

[1] Citations to the Ruling and referenced record support are to "JA__ (Ruling), citing JA__"; the District Court's June 27, 2014 Memorandum of Decision, *Romag Fasteners, Inc. v. Fossil, Inc.*, 29 F. Supp. 3d 85 (D. Conn. 2014), containing Findings and Conclusions (referred to alternately as "Findings," or "Conclusions"), reproduced at JA3-44, is cited, along with referenced record support, as "JA __ (Findings [or Conclusions]) at __), citing JA __"; other record citations are to "JA__."

## STATEMENT OF THE ISSUES

**Counter-Statement of Issues on Appeal**

      1.    **No Willful Infringement to Justify an Award of Defendant's Profits.**  Second Circuit authority permits a Lanham Act plaintiff to recover a defendant's profits, subject to equitable principles, only after first proving willful infringement.  The jury found, and the trial court agreed, that Fossil's infringement was not willful.  Did the District Court properly apply controlling Second Circuit law to enter judgment denying Romag an award of Fossil's profits?  (Yes.)

      2.    **Patent Laches.**  In unchallenged findings, the District Court found that Romag's inexcusable delay suing Fossil economically prejudiced Fossil. Applying this Court's *en banc* decision in *Aukerman*, the District Court partially reduced Romag's patent damages based on Romag's laches.  Given that the Patent Act contains no statute of limitations and laches is a defense under that statute, did the District Court properly apply *Aukerman* to reduce Romag's patent damages? (Yes.)

**Statement of Issues on Cross-Appeal**

      1.    **Willful Deception and Attribution.**  Under Second Circuit law, an award of a defendant's profits under the Lanham Act under a deterrence-based rationale is proper only if the defendant acted with willful deception.  The District Court refused to instruct the jury of that requirement, and also erroneously instructed the jury that deterrence-based profits were not subject to reduction based

on attribution under the facts of this case.  The jury then made an advisory award of *all* of Fossil's profits despite its findings that (1) Fossil did not willfully infringe and (2) only 1% of Fossil's profits were attributable to the infringed trademark. Were the jury instructions in error?  (Yes.)

## STATEMENT OF THE CASE

**A.    Romag Sues Days Before Thanksgiving 2010 and Obtains Emergency Injunctive Relief**

As the jury and District Court found, *unbeknownst to Fossil and without its involvement*, one of Fossil's independent handbag suppliers purchased Romag-branded magnetic snaps from an unauthorized source and placed them in Fossil-branded handbags.  JA2406-08 and JA52-59 (Ruling)  Romag knew in 2007 and 2009 that counterfeits of it snaps were in the market place.  And it learned – or, at minimum, as the District Court found, "consciously avoided" learning – in May 2010 of that independent manufacturer's unauthorized use of such snaps in Fossil handbags.  Nevertheless, Romag intentionally and in bad faith delayed telling Fossil or filing suit, economically prejudicing Fossil.  On November 22, 2010, just four days before Black Friday and the kick-off of the busy holiday shopping season, Romag sued Fossil and Macy's, Inc. and Macy Retail Holdings, Inc. (collectively "Macy's") in the District Court alleging patent and trademark infringement, false designation of origin and unfair competition under federal and state law.  JA210-37

Relying on what the District Court later found to be a false and misleading sworn declaration of Romag's principal, Howard Reiter, on November 30, 2010, Romag obtained a TRO, later converted into a preliminary injunction by

stipulation, enjoining the sale of Fossil handbags containing Romag snaps.  JA238-44; JA274-330, JA331-39, JA340-43[2]

## B.    The Trial, Verdict, and Subsequent Decisions

During March and April 2014, the District Court conducted a seven-day jury trial, after which the jury returned its verdict, finding that Fossil infringed the Romag mark and engaged in unfair competition under Connecticut common law and the Connecticut Unfair Trade Practices Act, and that Fossil and Macy's infringed Romag's patent.  JA2406, 2407, 2411, 2415  The jury made an advisory award of $90,759.36 of Fossil's profits to Romag under an unjust enrichment rationale, and an advisory award of all of Fossil's profits ($6,704,046.00) under a deterrence rationale; and it awarded Romag a 9 cent reasonable royalty per unit, for a total patent royalty of $51,052.14 against Fossil and $15,320.61 against Macy's.  JA2409, JA2416

The jury found that Fossil and Macy's were not willful infringers and denied Romag an award of punitive damages under Connecticut law, reflecting its conclusion that there was no need to punish or deter Fossil for the nonwillful

---

[2]  On June 9, 2011, Romag sued Defendants Belk, Inc., The Bon-Ton Stores, Inc., The Bon-Ton Department Stores, Inc., Dillard's Inc., Nordstrom, Inc., Zappos.com, Inc. and Zappos Retail Inc ("Non-Macy's Retailer Defendants") in Civil Action No. 3:11-cv-00929, asserting claims of trademark infringement and unfair competition.  The jury found for the Non-Macy's Retailer Defendants on all claims, JA2406-07, the District Court denied Romag's motion for judgment as a matter of law, JA1-2 and JA48-51, and they are not party to this appeal.

conduct at issue.  JA2407-08, 2413, 2415; and JA2390 (instructing jury that

punitive damages are intended to punish for outrageous conduct or, if needed, to

deter or prevent similar conduct).  It also found that 99% of Fossil's handbag

profits were attributable to factors other than Romag's mark, with only 1%

attributable to Romag's mark.  JA2410[3]

On April 8 and 9, 2014, the District Court held a two-day bench trial and

received additional evidence concerning Fossil's equitable laches and unclean

hands defenses; its sanctions motion; and equitable considerations under section

1117(a) of the Lanham Act.  JA348  On June 27, 2014, the District Court issued its

Finding and Conclusions, JA3-44, including the following:

---

[3] Romag implies that the jury's advisory award of profits under a deterrence rationale should be read as a determination that Fossil acted with "callous disregard," from which it dangles the implication of some level of heightened culpability.  This, in turn implies some inconsistency with the jury's express finding of no willful infringement.  Romag did not assert any supposed inconsistency between the jury's no willfulness finding and advisory award of deterrence profits below or on appeal and thus has waived any such attack.

Regardless, there is no inconsistency.  As discussed below, the jury instructions erroneously failed to limit deterrence profits *to those needed to deter a willful infringer*.  See Argument, Fossil's Cross-Appeal, Sec. A.  Further, Romag's effort to wring some bad faith from that advisory award fails because the instruction gave the jury unbridled discretion to consider – or reject – whatever information it saw fit in determining "callous disregard."  JA2385 (instruction)  The jury's basis for that finding is known only to its members.  To equate it with willfulness, as Romag hints, defies both the jury's express finding of no willful infringement and of no need to award punitive damages, JA2407-08, 2413, 2415; and JA2389-90, as well as the District Court's findings that the evidence failed to show that Fossil acted "in reckless disregard, with willful blindness, or with actual knowledge of Superior's purchase of counterfeit snaps."  JA57-59 (Ruling)

First, based on its unchallenged findings that Defendants had established their laches defense that Romag had unreasonably and unjustifiably delayed this suit until the eve of Black Friday, thus prejudicing Fossil, JA8-13 (Findings), JA17-26, 43 (Conclusions), the District Court reduced Romag's royalty recovery by 18% to $41,862.75 and $12,562.90, respectively.  JA17-23, 43-44 (Conclusions)

Second, the District Court sanctioned Romag.  JA29-33, 43 (Conclusions)  It found that Romag acted in bad faith and for an improper purpose by obtaining a TRO based on a false and misleading sworn declaration; "by delaying its TRO filing until the beginning of the holidays"; and by "intentionally [sitting] on its rights between late May 2010 and late November 2010 to orchestrate a strategic advantage and improperly obtain emergency injunctive relief on a timetable of its choosing, not on the irreparability of its harm."  JA29-33, 43 (Conclusions)

Finally, the District Court found that the jury's finding that Fossil's infringement was not willful precluded an award of Fossil's profits.  JA33-41, 43-44 (Conclusions)  While the jury and District Court made unchallenged factual determinations on the additional equitable factors potentially relevant to an award of a defendant's profits, the jury's finding of no willful infringement obviated the need for that balancing.  JA34

Defendants filed a conditional motion for judgment as a matter of law and a new trial on the issue of an award of profits if, first, the District Court's ruling with respect to the willfulness requirement is overturned on appeal and, second, the District Court were to determine, after analyzing the equitable factors governing an award of profits, that Plaintiff is entitled to any such award. JA2417.001-.003 The Ruling, JA45-68, denied that motion without prejudice to renewal in the event the foregoing two conditions were first satisfied. JA66-67

On September 22, 2014, the District Court entered an Amended Final Judgment for $12,562.90 against Macy's for patent and trademark infringement and for $41,862.75 against Fossil for trademark and patent infringement, false designation of origin, and state common law violations. JA1-2

## STATEMENT OF THE FACTS

The jury's and District Court's unchallenged – and therefore final – verdict, factual findings and conclusions are summarized below. Romag's "factual" recitation ignores the triers' findings and conclusions and seems to improperly attempt to retry the case on appeal. *See Carnes Co. v. Stone Creek Mech., Inc.*, 412 F.3d 845, 847-48 (7th Cir. 2005). Because Romag mounts only two purely legal challenges, the factual findings and legal conclusions on uncontested matters are final.

A.    **The Parties, Their Businesses, and Third-Parties**

1.    **Romag**

Romag is a multi-million dollar corporation with a history of suing or threatening to sue retailers right before the busy holiday shopping season, having done so in three of four years from 2007 to 2010.  *See* JA7-11 (Findings)  Romag is the owner by assignment of Patent No. 5,722,126 for a type of magnetic snap fastener and trademark Registration No. 2,095,367 for the mark ROMAG for magnetic snap fasteners in Class 22.  JA1858-59; JA2437-50; JA2451-54

Romag sells magnetic snap fasteners, but it does not make the snaps it sells.  JA 538-40; JA2889.009-.015  They are manufactured in factories in China by Romag's partner, Wing Yip Metal Manufactory Accessories Limited ("Wing Yip").[4]  JA5 (Findings), citing JA2889.009 and JA540-43, JA577-83  Wing Yip and Romag employ inspectors, who serve as Romag's "eyes and ears on the ground in China."  JA5 (Findings), quoting JA569  Pursuant to a license, Wing Yip sells Romag snaps to its own customers in Asia and pays Romag a $0.05 royalty per snap.  JA5 (Findings), citing JA2889.009-.015

---

[4] To try to imbue Fossil's conduct with some bad faith, which the findings below directly contradict, Romag asserts that "Fossil deliberately chose to manufacture its bags in China, a country known for its rampant counterfeiting."  Romag Br. 5-6  Romag itself (and countless other companies) "deliberately" choose to manufacture in China, and, as the District Court found, that fact does not support a finding of willfulness or even reckless disregard.  JA57-59

Wing Yip's first Chinese factory, Kong Yip, was shut down by a strike in early 2008, and several former Wing Yip employees started a new manufacturing company known as Hechuang Metal Manufactory ("Hechuang").  JA6 (Findings), citing JA2467-71 and JA680; JA5 (Findings), citing JA582  Reiter did not tell Fossil about the shutdown of the Kong Yip factory.  JA694; *see also* JA993 and JA1020

### 2. Fossil

Fossil sells a broad array of consumer fashion accessories, including handbags and small leather goods, both on its own and through other retailers.  JA6 (Findings), citing JA1357, 1856, 1858; Fossil does not manufacture the handbags it sells; it contracts with independent business entities to do so.  JA6 (Findings), citing JA2492-98 and JA1859

### 3. Superior Manufactures Handbags Containing Romag Snaps

One of Fossil's independent leather goods manufacturers is Superior Leather Limited a/k/a Dong Guan Red Lion Leather Products, Limited ("Superior"), which operates a factory in China and manufactured the handbags at issue.  JA6 (Findings), citing JA2492-98 and JA1859; *see also* JA751; JA972; JA974; and JA1036-37  As the District Court found, Superior, not Fossil, purchased the component parts for handbags, including the magnetic snaps.  JA6 (Findings), citing JA985-86

11

In 2002, Romag and Fossil entered into an agreement for the use of Romag magnetic snap fasteners in Fossil products.  JA6-7 (Findings), citing JA2477, 2478, 2479 and JA602-03  Under that agreement, Fossil instructed its factories, where necessary, to purchase Romag snaps from Wing Yip.  JA7 (Findings), citing JA2478 and JA602  In July 2002, Reiter was forwarded an email identifying Superior as a Fossil manufacturer.  JA7 (Findings), citing JA2483; *see also* JA983-85

During the relevant period after 2006 (namely, 2008-2010), with the expiration of an unrelated magnetic snap patent, Fossil did not specify the magnetic snap fasteners that its independent suppliers would use, and manufacturers like Superior determined for themselves whether to use branded or generic snaps.  JA996; JA1008-09; JA1018-19; JA2577; and JA2585; *see also* JA997-98, JA2613.001-006; and JA1034-35  The availability of generics as of 2006 made snaps "very cheap," in the area of 10 to 12 cents.  JA1019

Fossil has worked with Superior for 19-plus years and had a good business relationship without any significant negative experience and nothing that caused Fossil to question whether Superior was using genuine snaps in the handbags it made and sold to Fossil.  JA58-59 (Ruling), citing JA919-20, JA1037, JA2577-84, JA2584.001 and JA2594-98; *see also* JA1030; JA974-75

**B.    Romag's Prior Knowledge of Counterfeit Snaps in 2007 and 2009 and Pattern of Asserting Claims During the Busy Holiday Season**

In November 2007, Reiter discovered counterfeit Romag snaps being used in handbags for sale at J.C. Penney.  JA7 (Findings), citing JA689-90; *see also* JA693  On November 12, 2007, Romag's counsel in this action, Attorney Norman Zivin, sent a cease and desist letter to J.C. Penney.  JA7 (Findings), citing JA2889.016  Romag sued J.C. Penney, and on November 15, 2007, just eight days before Black Friday – the busiest shopping day of the year and start of the busiest season for retailers – moved for and obtained a TRO and preliminary injunction.[5]  JA7-8 (Findings), citing JA2436.001-027, JA2436.028-.032, and JA2436.033-.037, JA2436.038-.051, and JA2436.052-.054

In November 2009, Romag again discovered counterfeit ROMAG snaps, this time on bags being sold by DSW, Inc. ("DSW").  JA8 (Findings), citing JA691; *see also* JA691-94; and JA2889.018-.019  On November 17, 2009, almost exactly two years after the J.C. Penney lawsuit, Attorney Zivin sent a cease and desist letter to DSW.  JA8 (Findings), citing JA2889.018-.019

---

[5] At trial, Reiter evasively testified, "I don't know when Black Friday is…."; "When is Black Friday?"  JA689-90; JA20 (Conclusions)  The District Court found that "although Reiter claimed not to know what Black Friday was, he made note of the holiday selling season in his own declaration in support of the TRO in this case."  JA20 (Conclusions), citing JA279

13

Romag did not inform Fossil about either incident, or warn Fossil about the presence of counterfeit ROMAG snaps in the market.  JA8 (Findings), citing JA690-92; *see also* JA693

## C.    Reiter and Romag Receive a "Hot Tip" about Counterfeiting in May 2010 and Purposefully Keep it to Themselves

The District Court found that in May 2010, Reiter and Romag knew that alleged counterfeit Romag snaps were being used in handbags made by Superior and sold to Fossil.  Romag never told Fossil.

On May 12, 2010, Reiter received a "hot tip" email from an unidentified former Wing Yip employee calling himself "Joe."  Joe wrote that a factory in China was producing Romag's snaps without authorization.  JA8 (Findings), citing JA2467-71; *see also* JA616-19 and JA752  On May 19, Reiter asked "Joe" to identify the factory and if it was "the factory that many former workers from [W]ing [Y]ip went to."  JA8 (Findings), citing JA2467-71  Reiter stressed that the identity of the handbag maker using the snaps was the most important information because "it is hard for the law to work in [C]hina . . . easier in [the] USA."  JA8-9 (Findings), citing JA2467-71  On May 20, "Joe" identified Hechuang as the factory selling the snaps and attached two Superior invoices identifying it as the manufacturer that was purchasing the snaps.  JA9 (Findings), citing JA2467-71

Reiter and Romag had been familiar with Superior dating back to 1998 and 1999, and since 2001, Romag, via Wing Yip, had sold magnetic snaps to Superior

14

for use in products manufactured for many designers and retailers. JA7 (Findings), citing JA596 and JA626; *see also* JA608-09  Reiter knew Superior manufactured leather goods for Fossil. JA343.017

Reiter thought "Joe's" information was "very interesting." JA619-20 Nonetheless, Reiter claims he did not search or think to search his emails for references to Superior in May, although he "inexplicably" did search in October and found an email confirming that Superior was a Fossil manufacturer. JA9 (Findings), citing JA2211-12  The District Court "called into doubt" this testimony, finding, "[a]t best, [Reiter's] failure to search for references to Superior" in May 2010 "appears to have been the result of conscious avoidance." JA25 (Conclusions)

The very next day, May 21, Reiter contacted Attorney Zivin, Romag's intellectual property counsel for more than a decade, four times. JA9, citing JA752-53 and JA2889.079; *see also* JA755

Just three days later, on May 24, Reiter's sister-in-law, Elissa Ellant Katz, contacted Reiter's wife – Attorney Jody Ellant, who is Romag's General Counsel, JA9 (Findings), citing JA753 – to report that she had discovered ROMAG snaps on Fossil handbags at a Macy's store in Florida, JA9 (Findings), citing JA613, JA2215

Ellant "thought that was strange" that there were Romag snaps on Fossil handbags; and, "concerned by this discovery," she "asked her sister [Katz] to buy some bags and send them up" to Reiter in Connecticut, which Katz did.  JA9 (Findings), citing JA612-15; *see also* JA753-54, JA2456, and JA2456.001-.002 That same day, May 24, Ellant also purchased Fossil handbags from a Connecticut Macy's containing what she believed were seemingly counterfeit ROMAG snaps. JA9 (Findings), citing JA613 and JA2215-16; *see also* JA2456 and JA2456.001-.002; JA612-14; JA753

Ellant told Reiter about her discovery and "suspicion" that these were counterfeit snaps.  JA9 (Findings), citing JA613-15  Reiter testified that he did not suspect that the snaps were counterfeit because he knew Fossil was a customer, so he put the bags aside for several months.  JA9-10 (Findings), citing JA613-16, and JA757

Reiter did not contact Fossil, including Doug Dyment, the Fossil representative Reiter knew and had communicated with dating back to 2002, to inform Fossil of "Joe's" "very interesting" information; to tell Dyment of the snaps on the handbags; to confirm that Superior was buying genuine snaps for use in Fossil handbags; or to otherwise discuss the issue.  JA755-56, JA628, and JA512 Reiter sought to explain this failure by claiming that "[i]t is not really my practice to call customers casually."  JA614  However, Reiter "felt comfortable enough" to

16

contact Dyment over the years to ask Fossil to donate items for Reiter's charities; and before this lawsuit Reiter's "only interactions" with Fossil were asking it to make donations to Reiter's charities."  JA687-89; JA987-90; JA614; JA756; JA2889.001-.002; and JA2889.003

When Dyment first spoke with Reiter about Romag's snaps in 2002, Dyment was concerned about another litigious company with a patented magnetic snap; and "expressed to [Reiter] that they [Fossil] treat intellectual property seriously and that they didn't want any trouble."  JA686  So, Dyment was "surprised" that Reiter did not pick up the phone to tell him about counterfeit snaps because he would expect that from people he does business with.  JA1031  Randy Hyne, Fossil's General Counsel, and Gail Stoke, Fossil's trial representative and Senior Vice President of Global Leathers, testified that if, at any time, Fossil had learned of alleged counterfeiting, Fossil would have investigated it and shut it down. JA1292-93; JA1415-18

D.    **Romag Intentionally and Tactically Delays Filing**

Reiter claimed he had an "epiphany" in October 2010 that he should investigate the handbags purchased in May 2010.  JA10 (Findings), citing JA632; JA757 and JA349.134-.136 (transcript of recording of testimony played at trial as referenced at JA757);  JA20 (Conclusions)  Reiter could not say "what it was that stirred" him at that time to connect the alleged counterfeiting and the Fossil bags.

17

JA10 (Findings), citing JA632-33; JA20 (Conclusions)  The District Court refused to "credit" Reiter's testimony that an "epiphany," rather than a calculated lay-in-wait strategy, prompted him to act, finding that it does not "ring true," especially in light of his "prior track record of issuing cease and desist letters and seeking emergency relief on the eve of Black Friday, a time that is an obvious pressure point for retailer defendants."  JA20 (Conclusions)

"Despite Romag's assertion that it did not know of the alleged counterfeiting until late fall 2010, the [District] Court conclude[d] that Romag knew or should have known of the use of counterfeit snaps in Fossil bags prior to that date," based on the May 2010 events.  JA18 (Conclusions), JA19-20(Conclusions)  Reiter testified, "inexplicably," JA19 (Conclusions), that he drew no connection between those May 2010 events and Fossil, but the District Court found "it defies belief" that with that information, "he would have stopped any further investigation, especially in light of Romag's prior record of aggressive enforcement of its intellectual property rights."  JA24-25 (Conclusions)  And, "[e]ven if [the District Court] were to credit Reiter's testimony" that he did not make that connection until late October 2010, "the record is clear that he had all the information he needed to make that connection by the end of May 2010."  JA20 (Conclusions)

As of October 2010, Reiter still refused to report his suspicions to Fossil. JA10 (Findings), citing JA756  Rather, he says he personally inspected the snaps

from the Fossil bags purchased in May 2010; sent them to Wing Yip for testing; and asked Wing Yip for computer reports on Superior's purchases, JA10 (Findings), citing JA633, JA 635-36; JA2613  Reiter could have, but did not, do all these things any time from May 2010 on, especially when he visited Wing Yip in China in July 2010.  JA10, citing JA635, JA698, and JA629-30; JA20 (Conclusions)  The District Court found Reiter "lacks a good faith explanation" for his failure to raise the allegations regarding Hechuang and Fossil with Romag's inspectors in China, or to investigate them himself during that visit.  JA25 (Conclusions)

Even when Romag finally did communicate with Fossil regarding the handbags at issue here, November 8, 2010, Reiter still did not mention his suspicions of counterfeiting.  JA10 (Findings), citing JA2472; *see also* JA756, JA759, JA1001, and JA1010-11

**E.    Romag Sues Fossil and Obtains Emergency Injunctive Relief Based on What the District Court Found was Reiter's Sanctionable Fraudulent Declaration**

On November 17, 2010, Romag's counsel sent Fossil a cease and desist letter nearly identical to the one he sent to DSW *exactly* one year earlier.  JA11 (Findings), citing JA2473-74; *see also* JA2889.018-.019  On November 22, Romag sued Fossil and Macy's.  JA210-37  It moved for a TRO and preliminary injunction on November 23, a mere three days before "Black Friday."  JA11

(Findings), citing JA238, JA 274, JA279  Reiter submitted a sworn declaration in support of that motion, claiming that only in November 2010 had Romag discovered the alleged counterfeit snaps on Fossil handbags after a happenstance shopping trip, during which Reiter feigned "surprise" and "shock" to find Romag magnetic snaps, as he purportedly did not recall selling snaps to Fossil or its manufacturers for several years.  JA274-76 and JA2889.021-.023  Based on the fraudulent Reiter Declaration, and without an evidentiary hearing, the District Court granted the TRO ordering Fossil and Macy's to cease selling the handbags at issue.  JA11(Findings), citing JA331-39

The District Court made clear, specific and express findings that the Reiter Declaration – nearly identical to his J.C Penney declaration three years earlier, JA30 (Conclusions) – "was misleading in several respects" and contained "omissions and contrived language," JA30-31 (Conclusions)  This included his purported "surprise" and "shock" at discovering counterfeits in November 2010 and the false impression it conveyed that the Fossil handbags were discovered "only by mere happenstance," JA30-31 (Conclusions), citing JA276, or "habit and custom," JA11-13 (Findings) and JA30 (Conclusions) both citing JA276.  To the contrary, Reiter swore in his trial testimony that he went to Macy's in November to confirm suspicions about Fossil's unauthorized use.  JA30 (Conclusions), citing JA660

The District Court found "more troubling," Reiter's misleading omission of his pre-November 2010 knowledge and "strong suspicion" that the counterfeit snaps purchased by Superior were being used in Fossil bags.  JA31 (Conclusions), citing JA632-33, JA635-36, JA641-42, JA757-58, JA2472, and JA2613  Those conclusions led the District Court to

> [t]he inescapable conclusion [] that Plaintiff carefully timed this suit to take advantage of the imminent holiday shopping season to be able to exercise the most leverage over Defendants in an attempt to extract a quick and profitable settlement, as it had done twice before in the past three years. Furthermore, Plaintiff, in filing for emergency relief, relied on misleading representations that obfuscated the months of delay, where full disclosure would have undermined its claim of irreparable harm.

JA21 (Conclusions); *see also* JA31-32 (Conclusions)

Citing Romag's "unmistakable pattern of relying on the pressure point of the holiday season when seeking to enforce its intellectual property rights," the District Court found that "Romag acted in bad faith by delaying its TRO filing until the beginning of the holidays"; "explicitly relied on the fact that the holiday selling season was in full swing when it sought emergency injunctive relief," and "intentionally sat on its rights between late May 2010 and late November 2010 to orchestrate a strategic advantage and improperly obtain emergency injunctive relief on a timetable of its choosing."  JA30, JA32-33  Accordingly, the District Court concluded that Defendants had "shown through clear and convincing evidence that sanctions should be imposed on Romag pursuant to this Court's inherent power,"

based on its bad faith conduct, lacking a colorable basis and motivated by improper purposes.  JA30, JA32-33

## F.    Fossil Affirmatively Responds to the First Information of Possible Counterfeiting of Romag Snaps

Fossil's infringement was not willful.  Before November 2010, Fossil did not know of actual or even possible unauthorized use of Romag snaps by Superior. *See* Factual References above; *see also* JA1001, JA1008, JA990-91; JA1031; and JA1415-16  Indeed, according to Romag, Fossil learned of Superior's unauthorized use only in December 2010.  Romag Br. at 15, citing JA942-44, JA2499

Upon learning of possible counterfeiting in November 2010, Fossil investigated and confirmed that Superior manufactured the bags in question.  JA11 (Findings), citing JA2498.001-.002 and JA2498.003; JA2893, JA2223-31; *see also* JA1457-60  Fossil immediately instructed its retailer customers and stores to stop selling the handbags, and diverted scarce resources during the busy holiday season to place affected products on hold and prevent their sale.  JA12-13 (Findings), citing JA2223-2231; *see also* JA2889.004-.009

Had Romag sought a TRO when it first learned of possible infringement, Fossil's inventory, which had nearly doubled to $4,148,093.39 to prepare for the busy holiday season, would have been much smaller.  JA13 (Findings), citing JA2238-40 and JA2897 and JA21-22 (Conclusions), citing same references  Fossil also could have replaced its holiday inventory with bags containing non-infringing,

generic snaps (which are used by Fossil and others), which it could have then sold for profit.  JA13 (Findings), citing JA2250-52; JA22 (Conclusions) and JA24 (Conclusions), citing JA2250-52; *see also* JA1083-88; JA1069  Thus, the District Court further found that Fossil suffered material economic prejudice from Romag's unreasonable delay and sustained Fossil's trademark and patent laches defenses.  JA22 (Conclusions); *see also* JA26 (Conclusions)

## G.    As the Jury Found, Fossil Attained No Benefit from Superior's Use of Romag Snaps

The jury found that Fossil did not benefit from snaps bearing Romag's trademark, agreeing that Fossil proved that 99% of its profits were attributable to factors other than Romag's mark, leaving only 1% of the profits attributable to Romag's mark.  JA2410  Fossil's expert Dr. Deborah Jay testified based on survey evidence that the Romag mark played "no role in the purchase of handbags with magnetic snaps," JA66 (Ruling), citing JA1727; *see also* JA1658-61; JA1677-79; JA1685-89; JA1695-99; JA1708-10; JA1549-53 (Retailer Defendants testifying that Romag brand played no role in purchasing)  Finally, Fossil received no benefit because Fossil paid full price for the handbags containing the unauthorized snaps that Superior used, and paid full price for the snaps themselves in those rare cases (like purchase order cancellations) where the snaps were separately itemized and paid for.  JA58-59 (Ruling), citing JA2577 and JA2584.001-.084

**H.    As the Trial Court Confirmed, Romag Cites No Evidence Establishing Willful Infringement or Reckless Disregard**

Ignoring both the jury's no willful infringement finding and the District Court's detailed Ruling (from which Romag has not appealed), Romag contends that Fossil failed to monitor Superior to ensure it was using authorized snaps.  *See Romag Br. 15-20*.  The District Court – in findings that Romag does not challenge – carefully examined and rejected Romag's position, finding that "the evidence at trial *at most* could have supported a finding that Fossil was negligent, *not that it acted in reckless disregard, with willful blindness, or with actual knowledge* of Superior's purchases of counterfeit snaps."[6] JA57 (emphasis added) (Ruling)

First, the District Court – consistent with the jury's no willfulness finding – rejected the argument that Fossil's "failure" to inspect Superior's sales records or to visually inspect the snaps on the bags produced by Superior constituted willful infringement.  JA57-59 (Ruling)  The evidence that Fossil "knew generally that counterfeiting was a serious problem in China, or that it had an issue with the use of counterfeit zippers [years earlier] by a different vendor [of different products] does not establish that Fossil suspected Superior of using counterfeit snaps."  JA58 (Ruling)  Furthermore, "when Fossil discovered the use of counterfeit YKK

---

[6] Romag raised that claim in its challenge to a jury instruction that *Romag itself had requested*.  JA52-57(Ruling)  ("Romag did not object to the [willfulness] instruction, and actually requested the charge given by the Court"  JA54 (Ruling))  The District Court rejected Romag's challenge, *id.* 52-57, and Romag does not appeal from it or otherwise attack the jury's verdict as erroneous or inconsistent.

zippers in its products by a vendor, rather than turning a blind eye, it quickly set up a quality control program in an attempt to avoid future issues." JA58 (Ruling), citing JA2599

The District Court further found Fossil cannot have "acted recklessly" or "with willful blindness" by not visually inspecting each and every snap on each and every bag, since even Reiter, the snaps' inventor, could not visually distinguish between counterfeit and authentic snaps. JA57 (Ruling), JA59 (Ruling), citing JA767

The District Court also found, contrary to Romag's contention, Romag Br. at 18-19, that a few scattered business disputes over a 20-year relationship regarding materials Superior used *did not* show that Fossil suspected there was a risk that Superior was using counterfeit snaps. For example, where PVC was once used instead of leather on some products, Fossil's Doug Dyment attributed that to "simply an honest mistake made without any intent to mislead Fossil." JA58-59 (Ruling), citing JA919 He further testified that in another isolated instance, although Fossil suspected that Superior was charging Fossil for YKK zippers while using generic zippers, *see* JA2594, this led to the concern that Superior was inflating its prices, rather than to a concern that Superior was using counterfeits. JA58 (Ruling), citing JA920-21 The District Court properly found that "neither of

these instances would have alerted Fossil to the risk that Superior was using counterfeit snap fasteners." JA58 (Ruling)

Romag cites only one instance where Fossil ever had an issue regarding snap fasteners used by Superior, and that was not until mid-2010 (the end of the period of infringement and after Romag learned of the infringement and hid it from Fossil). Romag Br. 17-18  There, in connection with a product order cancellation, Fossil questioned having to reimburse Superior for "licensed" snaps, because Superior could have used generics, as Fossil had previously instructed it. But Fossil ultimately reimbursed Superior for the *branded price*. JA58 (Ruling), citing JA2577 and JA2548.001-.008  The District Court found that this dispute over the reimbursement amount did not indicate that Fossil suspected Superior of using counterfeit snaps  Just the opposite is true:

> the fact that Fossil paid Superior the full amount requested indicate[d] that Fossil believed the snaps were genuine. A company would be highly unlikely to pay full price for a counterfeit, and then continue to ignore that counterfeiting, opening itself up to liability.

JA58-59 (Ruling)  In sum, that Fossil paid full price for the snaps further demonstrates it "[d]idn't believe that counterfeits were being used." JA59 (Ruling), citing JA1037, JA920-21, JA2577 and JA2584.001-08

No other evidence even potentially supports a finding that Fossil knew or suspected there was a risk that Superior was using counterfeit snaps. JA59 (Ruling)  As the District Court found, "there was no evidence that Fossil *acted*

26

*recklessly, with willful blindness, or with actual knowledge* of a risk of counterfeit snaps." JA59 (emphasis added); *see also* JA57 (Ruling)

## SUMMARY OF THE ARGUMENT

Faced with the unassailable trial findings that Fossil's infringement was unknowing and not willful – in contrast to Romag's own "conscious avoidance" and its proven bad faith and fraudulent filing – Romag does not challenge those findings. Unhappy, however, with the consequences of those findings under long-standing, controlling circuit precedent – the Second Circuit on trademark issues and this Court on patent law – Romag has no option left but to urge reversal. That effort falls well short.

*First*, this Court cannot and should not disturb the Second Circuit's long-standing authority that under "principles of equity" applicable under section 1117(a) of the Lanham Act, willful infringement is a necessary, but not sufficient, prerequisite to an award of defendant's profits. The Second Circuit has not overruled that authority and continues to apply it. And Lanham Act amendments in 1996 and 1999 did not, as Romag urges, *sub silentio* overrule that precedent. The 1999 dilution remedy amendment did nothing to change the language or the standard for recovery for infringement or false designation of origin, but rather was a technical amendment concerning recovery for trademark dilution, a claim not made here. Similarly, the 1996 statutory damages amendment left section 1117(a)

27

at issue here *completely unchanged*.  Nothing in the statutory language, legislative history or elsewhere suggests any intent to change the Second Circuit's willfulness requirement.

Nevertheless, if, as Romag urges, the jury's finding that Fossil did not willfully infringe is *only an important equitable factor under 1117(a)*, balancing that factor with the unchallenged findings below on other equitable factors leads to only one conclusion – and obviates the need for remand:  affirmance of the District Court's Judgment.

*Second*, the District's Court's proportional reduction in Romag's patent damages based on Romag's laches – the finding of which Romag does not challenge – should be affirmed under *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020 (Fed. Cir. 1992) (*en banc*).  *Aukerman* remains good law, and the Supreme Court's recent decision in *Petrella v. Metro-Goldwyn- Mayer, Inc.*, __ U.S. __, 134 S. Ct. 1962 (2014), confirms the gap-filling role and continued vitality of laches given that the Patent Act contains no statute of limitations and separately makes clear that laches remains available as a defense to infringement.

With respect to Fossil's cross-appeal, if this matter is remanded for an equitable assessment, that assessment should not be made with any regard for the jury's advisory deterrence-based profit award.  That advisory finding should be vacated because it was contrary to the jury's willfulness finding and infected by an

erroneous instruction that failed to limit such an award to an amount needed *to deter a willfully deceptive infringer*. Under that proper instruction, the jury's no willful infringement finding leaves only one result: the award of zero deterrence-based profits. Further, the District Court concluded that Fossil should be denied the benefit of the statutory reduction in profits based on the jury's 1% attribution finding. The District Court's refusal to allow that reduction against non-willful and unknowing infringer Fossil is unjustified.

Ultimately, well-settled "principles of equity" condition an accounting on, at minimum, proof of willful, bad faith, fraudulent infringement. Romag spends substantial time expressing – with no legal authority – why it hopes an accounting should be extended to even the most inadvertent, unknowing and non-willful infringement, like Fossil's here. "An accounting, however, is not automatic." *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 919 (Fed. Cir. 1984) (citing *Champion Spark Plug Co. v. Sanders,* 331 U.S. 125, 131 (1947)). "[T]he character of the conduct giving rise to unfair competition is relevant to the remedy which should be afforded." *Champion Spark Plug*, 331 U.S. at 131. So, in furtherance of the "goal of section 1117 [] to achieve equity between and among the parties" this Court has found that

> [i]t is essential in fashioning the remedy [] to rely, not merely on the legal conclusion of liability, but also to consider the nature of the infringing actions, *including the intent with which they were motivated* and the actuality, if any, of the adverse effects upon the aggrieved party.

*Bandag*, 750 F.2d at 917-18 (affirming denial of accounting) (emphasis added).

So, as the accounting remedy developed through equity, it has consistently been reserved for cases of "fraud or palming off."[7] *See Champion Spark Plug,* 331 U.S. at 130. Absent willfulness, a plaintiff could have an injunction or its actual damages. But before ordering the extraordinary remedy of disgorging an infringer's profits – often a windfall with little relation to, and grossly exceeding, plaintiff's loss (here 130 times Romag's actual out-of-pocket loss) – courts sensibly and consistently require a showing that the infringer *intentionally intended to confuse and deceive the public and palm off the mark holder's reputation.* Willfulness is properly a bright line rule – which, as Romag points out, permeates the Lanham Act and its remedies – because the higher degree of culpability gives rise to the extraordinary profit remedy. Only then must it be "balanced" against additional equitable considerations.[8]

Fossil's non-willful and unknowing infringement does not warrant the tremendous windfall Romag seeks.

---

[7] "Palming off" means use by a "defendant subjectively and knowingly intended to confuse buyers." 4 *McCarthy on Trademarks and Unfair Competition*, §25:3 (4th ed.) (database updated March 2015). Fossil did not palm off.

[8] Romag tries to equate "equity" with "balancing." They are not the same. For example, equitable estoppel, unclean hands and acquiescence are not balancing concepts. Once established, they act to bar relief, not invite a balancing.

## ARGUMENT

## RESPONSE TO ROMAG'S APPEAL

I.    **The District Court's Judgment Properly Applied Long-Standing Second Circuit Authority in Denying Romag an Award of Non-Willful Infringer Fossil's Profits and Should be Affirmed**

    A.    **Choice of Law, Standard of Review, and Jurisprudential Considerations**

This Court applies the law of the Second Circuit to Romag's appeal from Lanham Act claims and remedies from a district court within the Second Circuit. *See Baden Sports, Inc. v. Molten USA, Inc.*, 556 F.3d 1300, 1304 (Fed. Cir. 2009).

Consistent with long-standing Second Circuit precedent predicating an award of defendant's profits on a threshold finding of willful trademark infringement – and the jury's no willful infringement finding – the District Court properly denied Romag an award of Fossil's profits. That willfulness requirement is the law in the Second Circuit, which has not overruled it, but, in fact, cited it just last year in a *precedential opinion*. Thus, under *de novo* review applicable here, *see Chavis v. Chappius*, 618 F.3d 162, 169 (2d Cir. 2010), this Court should affirm the District Court's Judgment properly applying that law.

Before addressing the substantive reasons for rejecting Romag's request to overrule the Second Circuit's willfulness requirement, significant jurisprudential considerations compel that result. Second Circuit procedure provides that panels of that court are bound by the decisions of prior panels until they are overruled

31

either by the *en banc* Second Circuit or the Supreme Court. *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 405 (2d Cir. 2014). Any revisiting of the long-standing willfulness requirement should only be made by the Second Circuit *en banc*, not a panel of this Court.

Moreover, a Federal Circuit decision "predicting" that the Second Circuit would deem the willfulness requirement abrogated – even though the Second Circuit and courts within that circuit continue to cite and apply it – would create absolute chaos. Different standards would apply to trademark claims, with most subject to the Second Circuit's extant willfulness requirement, but those joined with patent claims subject to the Federal Circuit's view of Second Circuit law. This Court has eschewed such a result as antithetical to the uniformity it was created to promote. For such non-patent matters outside this Court's exclusive subject matter jurisdiction and mandate to unify intercircuit conflicts, this Court "avoid[s] exacerbating the problem of intercircuit conflicts in nonpatent areas," so that "[a] district court judge should not be expected to look over his shoulder to the law in this circuit, save as to those claims over which our subject matter jurisdiction is exclusive." *Bandag*, 750 F.2d at 909 (applying Ninth Circuit willfulness requirement); *see also High Point Design LLC v. Buyers Direct, Inc.*, 730 F.3d 1301, 1317 (Fed. Cir. 2013) (deferring to Second Circuit law on trade dress claim).

### B.  Applying Second Circuit Precedent, the District Court Properly Refused to Award Fossil's Profits to Romag Because the Jury Found Fossil's Infringement Was Not Willful

"Under the Lanham Act when trademark infringement is established the plaintiff is entitled to injunctive relief and 'subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) costs of the action.'"  *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena,* 433 F.2d 686, 706 (2d Cir. 1970) (quoting 15 U.S.C. §1117).   "This does not mean that a successful plaintiff is entitled in all cases to a monetary award in addition to injunctive relief.  The award for damages is 'subject to the principles of equity.'  Relief is properly denied where an injunction will satisfy the equities of the case and where 'there has been no showing of fraud or palming off.'"  *Id.* (quoting in part *Champion Spark Plug*, 331 U.S. at 131).

Second Circuit precedent on which the District Court relied requires a plaintiff to establish bad faith or intentional misconduct in order to recover an award of the defendant's profits under the Lanham Act.  *See, e.g., Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 753 (2d Cir. 1996); *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1540 (2d Cir. 1992).  Under that precedent – which remains good law, unchanged by the Second Circuit – willful infringement is a necessary, but not sufficient, prerequisite to an award of a defendant's profits.  *George Basch*, 968 F.2d at 1537, 1540.  Thus, the

33

jury's advisory profit award was properly rejected, and the Judgment denying

Romag an award of Fossil's profits should be affirmed.

### C. Under Section 1117(a)'s Equitable Principles, A Finding of Willful Infringement Remains a Prerequisite to Recovery of a Defendant's Profits

Seeking to avoid this long-standing rule, Romag argues that on *two prior*

*occasions* Congress by (at best) implication – noiselessly and without even a

whisper in the legislative history – overruled the decades-long, well-established,

equity-based willfulness prerequisite.  Relying on little more than a hunch, Romag

first posits Congress' unexpressed displeasure with the Second Circuit's

willfulness requirement.  That sentiment is voiced nowhere in any legislative

history, thus undermining Romag's major premise.  Continuing its logic, Romag

further surmises that Congress silently remedied the situation in 1996, *not by*

*amending section 1117(a)*, but by an oblique reference in a new section that

created a new type of remedy.  Romag further claims that when courts did not

catch on to that drift, three years later, in 1999, Congress once again acted to fix

that situation obliquely – and without ever saying so – by leaving *untouched* the

standard for recovery of defendant's profits for infringement and false designation,

the claims at issue here.  In truth, the requirement that an award be subject to

principles of equity remained unaltered, and Congress merely corrected a drafting

error from 1995 by adding new language to section 1117(a) regarding *trademark*

*dilution*, a claim not at issue here.  According to Romag, Congress ostensibly hoped this time the judiciary could crack the code and decipher its unexpressed "intent."

As the Supreme Court recently reiterated, "a major departure from the long history of equity practice should not be lightly implied," especially in the absence of statutory proof that "Congress intended such a departure." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  Lacking such statutory proof, Romag's argument falls flat.

### 1.    The Second Circuit Continues to Cite and Apply the Willfulness Requirement

Although the Second Circuit has had the opportunity, it has not overruled the willfulness requirement.[9]  *See Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*, 507 Fed. App'x 26, 31 (2d Cir. 2013) (declining to decide whether the 1999 dilution remedy amendment changed the common law rule).  As recently as 2014, in a precedential decision (unlike *Fendi's* summary order), the Second Circuit

---

[9] Romag argues that *Fendi* "calls into question" whether the willfulness requirement survived the 1999 dilution remedy amendment, and then carries that false notion forward to wrongly try to dismiss the significance of the Second Circuit's continued citation to that requirement in its precedential 2014 decision in *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 261-62 (2d Cir. 2014).  Romag Br. 42 and n.16.  This is simply not so.  In *Fendi*, the Second Circuit merely acknowledged that the plaintiff, Fendi, had asserted that position, but the court never endorsed it as presenting a real question.  *Fendi*, 507 Fed. App'x at 31.  Indeed, the court began its discussion by affirmatively stating that "Fendi's entitlement to…profits depends upon whether the infringement was willful." *Id.* at 30-31.

affirmed the law of the circuit that "[u]nder any theory, a finding of defendant's willful deceptiveness is a prerequisite for awarding profits," and "'[a] court may award a defendant's profits *solely* upon a finding that the defendant fraudulently used the plaintiff's mark.'" *Merck Eprova*, 760 F.3d at 261-62 (citing and quoting *George Basch*) (emphasis added by *Merck Eprova* Court).

Unpublished Second Circuit summary orders continue to apply the willfulness requirement. *See*, *e.g.*, *WE Media, Inc. v. Cablevision Systems Corp.*, 94 Fed. App'x 29 (2d Cir. 2004) (affirming dismissal of claims for monetary relief based on plaintiff's failure to establish actual consumer confusion or intentional deception); *Champagne v. Diblasi*, 36 Fed. App'x 15 at *17 (2d Cir. 2002) (citing "well settled" requirement of "actual consumer confusion or deception"). While summary orders (like *Fendi*) are not precedential under Second Circuit Local Rule 32.1.1, that "does not mean that the court considers itself free to rule differently in similar cases," *United States v. Payne*, 591 F.3d 46, 58 (2d Cir. 2010) (quoting Order dated June 26, 2007, adopting 2d Cir. Local R, 32.1.), and they "ha[ve] to be deemed some indication of how the Court of Appeals might rule were it to decide the issue in a binding opinion," *Mendez v. Starwood Hotels & Resorts Worldwide, Inc.*, 746 F. Supp. 2d 575, 595 (S.D.N.Y. 2010).

Other courts within the Second Circuit continue – as recently as this month – to require willful deception. *See*, *e.g.*, *C & L Int'l Trading Inc. v. Am. Tibetan*

*Health Inst., Inc.*, No. 13 Civ. 2638, 2015 WL 1849863, at \*5-6 (S.D.N.Y. Apr. 22, 2015); *Hilton v. UK Fragrances, Inc.*, No. 12-CV-6346, 2014 WL 794304, at \*5 (E.D.N.Y. Feb. 25, 2014); *Excell Consumer Prods. Ltd. v. Smart Candle LLC,* No. 11 C 7220, 2013 WL 4828581, at \*25–26 (S.D.N.Y. Sept.10, 2013); *Borghese Trademarks, Inc. v. Borghese*, No. 10 Civ 5552, 2013 WL 143807, at \*10 (S.D.N.Y. Jan. 14, 2013); *Gucci Am., Inc. v. Guess?, Inc.,* 868 F. Supp. 2d 207, 243 (S.D.N.Y. 2012); *Merck Eprova AG v. Gnosis S.p.A.,* 901 F. Supp. 2d 436, 457 (S.D.N.Y. 2012), *aff'd* 760 F.3d 247 (2d Cir. 2014); *Fendi Adele S.R.L. v. Filene's Basement, Inc.,* 696 F. Supp. 2d 368, 393 (S.D.N.Y. 2010); *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, No. 04 Civ. 7369, 2006 WL 2128785, at \*4 (S.D.N.Y. July 28, 2006); *Imig, Inc. v. Electrolux Home Care Prods., Ltd.,* 2008 WL 905898 \*19–20 (E.D.N.Y. 2008); *Merchant Media, LLC v. H.S.M. Int'l,* No. 05 Civ. 2817, 2006 WL 3479022, at \*11 (S.D.N.Y. Nov. 30, 2006); *Pfizer, Inc. v. Y2K Shipping & Trading, Inc.,* No.00 CV 5304, 2004 WL 896952, at \*9 (S.D.N.Y. March 26, 2004); *see also* cases cited in Argument Section I.B.2 below determining that willfulness requirement remains good law.

2. **The 1999 Dilution Remedy Amendment to the Lanham Act Did Not Affect the Willfulness Requirement at Issue Here**

   i. **The 1999 Dilution Remedy Amendment Did Not Alter the Language Governing the Monetary Remedies for the Claims at Issue Here or the Willfulness Requirement for an Award of Profits**

Romag's 1999 *sub silentio* abrogation argument fails first based on the plain language of section 1117(a). Congress made no change with respect to the operative language governing section 1117(a)'s remedies for infringement of registered trademarks or for false designation of origin. Only claims for trademark dilution under section 1125(c) were the subject of the 1999 amendment. The post-amendment language set forth in Section 1117(a) with respect to the remedies for the claims asserted by Romag here, trademark infringement and false designation of origin, is the same language that the Second Circuit interpreted, based on the principles of equity, to require a finding of willfulness before the equitable disgorgement of profits could be awarded. *Pedinol Pharmacal, Inc. v. Rising Pharm., Inc.*, 570 F. Supp. 2d 498, 502–503 (E.D.N.Y. 2008) ("First and most importantly, when Section 1117 was amended to provide for recovery of a defendant's profits for a willful violation under Section 1125(c), no changes were made regarding the recovery provisions of Section 1125(a) or (d)").

The pre-1999 language "[w]hen a violation of any right of the registrant of a mark [registered in the USPTO], [or] a violation under section 43(a) [15 U.S.C. §

1125(a)]…" remains in the statute essentially unchanged.  The amendment simply

added additional language, not relevant here, regarding trademark dilution (section

1125(c)) after the original section 1125(a) language to provide, as amended, as

follows:  "a violation under section 43(a), or a willful violation under section 43(c)

[15 U.S.C. §1125(c) for trademark dilution]."  15 U.S.C. §1117(a).  "On its face,

then, the amended statute restricts monetary awards in dilution cases to willful

violations, but leaves the appropriate remedy for other Lanham Act violations

'subject to the principles of equity,' 15 U.S.C. § 1117(a), just as it was prior to the

1999 amendments."  *Life Servs. Supplements, Inc. v. Natural Organics, Inc.*, No.

03 Civ. 6030, 2007 WL 4437168, at * 6 (S.D.N.Y. Dec. 17, 2007); *accord Pedinol*

*Pharmacal*, 570 F. Supp. 2d at 502–503 (holding "therefore, that the Second

Circuit's interpretation of 1117(a) in *Basch*, which construed the same statutory

language that existed prior to the 1999 amendment of the statute, remains good

law").  Thus, "[b]y their literal terms, the 1999 amendments modified the standard

of recovery in Lanham Act actions *only with respect to trademark dilution claims*

[and] did not directly alter any other aspect of the remedies provision of the

Lanham Act."  *Life Servs. Supplements*, 2007 WL 4437168, at *6 (citing 15 U.S.C.

§ 1117(a)) (emphasis added).

    Similarly, in *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, Southern

District Judge Scheindlin emphasized that "the 1999 Amendment []did not alter or

even address the language of section 1125(a) concerning infringement [as opposed

to the language of section 1125(c) concerning dilution], or the language of section

1117(a) concerning monetary remedies for infringement [as opposed to remedies

for dilution]." 500 F. Supp. 2d 276, 281 (S.D.N.Y. 2007). Instead – as the

legislative history, discussed below, provides – the 1999 dilution remedy

amendment to section 1117(a) brought the language of that section in line with

section 1125(c), which already "required the owner of a famous mark to prove a

defendant's willfulness in order to recover monetary relief on a dilution claim." *Id.*

at 282. Accordingly, Judge Scheindlin concluded that "the addition of 'willful

violation under section 1125(c),' does not indicate that it was Congress's intention

to simultaneously *sub silentio* overturn the weight of authority with respect to

section 1125(a)." *Id.* at 281.

Other Southern District judges have considered it "appropriate to assume

that Congress is aware of existing law when it passes or amends legislation," and

construed Congress's insertion of a willfulness requirement for section 1125(c)

violations – but not for section 1125(a) – as a *ratification* of prior circuit precedent

on willfulness, rather than an abrogation. *E.g., Mastercard Int'l, Inc. v. First Nat'l*

*Bank of Omaha, Inc.*, No. 02 Civ. 3691, 2004 WL 326708, at *10 (S.D.N.Y. Feb.

23, 2004). Thus, "[i]t may be presumed that Congress's inclusion, without

alteration, of the language concerning Section 1125(a) incorporates the existing

40

judicial interpretation of that language." *Id.* at *11. The *Mastercard* Court then determined that the 1999 dilution remedy amendment simply restricted the availability of any recovery – whether damages, profits or costs – in section 1125(c) trademark dilution actions only to cases where the violation was willful, but had no effect whatsoever on the available monetary remedies for other Lanham Act claims. Noting that "the Second Circuit permits the recovery of damages" – but not profits – "when a plaintiff is able to prove actual confusion but not intentional deception" the court explained that "the inclusion of the 'willful' modifier before 'section 1125(c)' in the 1999 amendment provides a more stringent standard for recovery than is available for a violation under Section 1125(a)." *Id.*

While not unanimous, the great weight of authority and reasoning of a supermajority of nine district judges (and now 10 including the District Court below) within the Second Circuit – some of which is discussed above – support the conclusion that the Second Circuit's willfulness requirement remains good law.[10]

---

[10] District Courts in the Second Circuit and several circuit courts that have found that the 1999 dilution amendment abrogated Second Circuit law infer that when Congress used the word "willfulness" in one class of Lanham Act violations, but not another, Congress intended for willfulness to apply only to one and not the other. *See Nike, Inc. v. Top Brand Co.*, No. 00 Civ.8179, 2005 WL 1654859, at *10-11 (S.D.N.Y. July 13, 2005) (Wood, J.); and *Cartier v. Aaron Faber, Inc.*, 512 F. Supp. 2d 165, 172-73 (S.D.N.Y. 2007) (Marrero, J); *see also Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 175 n. 13 (4th Cir. 2006) ; *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 174-75 (3d Cir. 2005); *Quick Techs. v. Sage Group Plc*,

*See Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 354, 365-67 (S.D.N.Y. 2014) (Engelmayer, J); *Guthrie Healthcare v. Contextmedia, Inc.*, No. 12 Civ. 7992, 2014 WL 185222, at *5–6 (S.D.N.Y. Jan. 16, 2014) (Forrest, J.); *GMA Accessories, Inc. v. BOP, LLC*, 765 F. Supp. 2d 457, 469–71 (S.D.N.Y. 2011) (Castel, J.), *aff'd sub nom. GMA Accessories, Inc. v. Electric Wonderland, Inc.*, 558 Fed. App'x 116 (2d Cir. 2014) (summary order); *Mr. Water Heater Enterprises, Inc. v. 1-800-Hot Water Heater, LLC*, 648 F. Supp. 2d 576, 589–90 (S.D.N.Y. 2009) (Pauley, J.); *Pedinol Pharmacal*, 570 F. Supp. 2d at 502–503 (Wexler, J.); *Life Servs. Supplements.*, 2007 WL 4437168, at *2–7 (Stein, J.); *Luis Vuitton Malletier*, 500 F. Supp. 2d at 278–82 (Scheindlin, J.); *Mastercard Int'l*, 2004 WL 326708, at *10–11 (Cote, J); and *De Venustas v. Venustas Int'l, LLC*, No. 07 Civ. 4530, 2008 WL 4735223, at *2 (S.D.N.Y. Oct. 24, 2008) (Swain, J.).

The circuits that have considered the issue of whether willfulness is required for an award of profits in light of the 1999 dilution remedy amendment are split. The Tenth Circuit has affirmatively maintained its prior willfulness requirement after the 1999 dilution remedy amendment. In *Western Diversified Servs., Inc. v. Hyundai Motor America, Inc.*, 427 F.3d 1269 (10th Cir. 2005), the court held that in light of section 1117(a)'s direction that an award of profits is "subject to the

---

313 F.3d 338, 349 (5th Cir. 2002) (maintaining Fifth Circuit law). But those cases fail to address the fact that the operative language previously relied on relating to Lanham Act claims other than dilution claims remained unchanged.

principles of equity" and in light of the punitive nature of such an award and the

increased risk of granting plaintiff a windfall, it was appropriate under the statute

to require "a showing that Defendant's actions were willful to support an award of

profits under 15 U.S.C. § 1117(a)." *Id.* at 1272–73. Additionally, the First Circuit,

while not speaking in terms of whether willfulness was a prerequisite for the

recovery of the defendant's profits, noted that a finding of willfulness is usually

required for disgorgement of profits. *Fishman Transducers, Inc. v. Paul*, 684 F.3d

187, 190-91 (1st Cir. 2012). The Eighth and Ninth Circuits have declined to

address the issue of abrogation directly but continue to apply it, with the latter

court expressing doubts that the 1999 dilution remedy amendment abrogated the

willfulness requirement. *M2 Software, Inc. v. Viacom, Inc.*, 223 Fed. App'x 653,

655–56 (9th Cir. 2007)[11] (characterizing abrogation based on the 1999 dilution

remedy amendment as a "shaky assumption"); *Masters v. UHS of Delaware, Inc.*,

---

[11] Without explanation or analysis, a panel of the Ninth Circuit recently noted in *dicta* that *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1405 (9th Cir.1993), which requires willful infringement for an award of profits, was in some unspecified way "superseded by statute on other grounds," by an unidentified part of the 1999 amendments. *Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1073 (9th Cir. 2015). The decision continues, however, citing *Lindy Pen* and *Bandag* for the proposition that "[a]warding profits is proper only where the defendant is attempting to gain the value of an established name of another," and that "[w]illful infringement carries a connotation of an intent to deceive," which requires deliberate, false, misleading or fraudulent conduct. *Id.* at 1073-74 (citations and internal quotations omitted). Thus, the *per se* willfulness requirement appears unaffected.

631 F.3d 464, 471 n.2 (8th Cir. 2011). The Third, Fourth and Fifth circuits are not in accord. *See* Fn. 10.

Ultimately it is only the Second Circuit's proper application of "equitable principles" that matters. But the First, Eighth and Ninth Circuits, joined by District of Columbia Circuit, *Alpo Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958 (D.C. Cir. 1992) ("an award based on a defendant's profits requires proof that the defendant acted willfully or in bad faith") (Thomas, Cir. J.), which has not addressed the issue, would all require willfulness under the circumstances here.

### ii.    The Legislative History to the 1999 Dilution Remedy Amendment Explains it Was Intended Merely to Remedy a Drafting Error Regarding Dilution

The legislative history of the 1999 dilution remedy amendment provides further support for the view that *"Congress intended only* to clarify the standard of recovery for a dilution claim (under 1125(c)), and was not considering claims under 1125(a)." *GMA Accessories*, 765 F. Supp. 2d at 470 (emphasis added); *see also Life Servs. Supplements,* 2007 WL 4437168, at *6. "At the most rudimentary level, the section of the bill containing the relevant amendment is entitled 'Remedies in Cases of *Dilution* of Famous Trademarks,' Trademark Amendments Act of 1999, Pub. L. No. 106–43, 113 Stat. 218 (emphasis added), which makes it plain that the focus of the legislation was trademark dilution, not infringement." *Life Servs. Supplements,* 2007 WL 4437168, at *6. The 1999 amendment

describes itself as "An act to amend the Trademark Act of 1946 *relating to dilution of famous marks*, and for other purposes." Pub. L. No. 106-43 (emphasis added). "The vast majority of the act focuses on dilution causes of action and its remedies." *GMA Accessories*, 765 F. Supp. at 470.

The House Judiciary Report explained that the damages section of the amendment "seeks to clarify that in passing the Dilution Act [in 1995], Congress did intend to allow for injunctive relief and/or damages against a defendant found to have wilfully [sic] intended to engage in commercial activity that would cause dilution of a famous mark." H.R. Rep. 106-250. While section 1125(c) of the 1995 Dilution Act provided that in cases of willful dilution the owner of a famous mark could obtain the remedies "set forth in section[] 35(a) [1117(a)]," as the House Report explained, the law mistakenly omitted the changes to section 35(a)/1117(a):

> The language of the Dilution Act [in 1995] presented to the President for signing did not include the necessary changes to sections 35(a) [1117(a)] and 36 of the Trademark (Lanham) Act of 1946 as referred to in the Dilution Act. Therefore, in an attempt to clarify Congress' intent and to avoid any confusion by courts trying to interpret the statute, section three makes the appropriate changes to sections 35(a) [1117(a)] and 36 to allow for injunctive relief and damages.

H.R. Rep. 106-250 (1999). On the other hand, nothing in the legislative record suggests that Congress intended to modify the standards for awarding profits for trademark infringement or false designation of origin – the claims at issue here –

45

through the 1999 dilution remedy amendment. *Life Servs. Supplements*, 2007 WL 4437168, at *6; *GMA Accessories*, 765 F. Supp. at 470.

Comments by Congressman Elijah E. Cummings in the Congressional Record confirm that the bill was intended to harmonize section 1117(a) with the 1995 Dilution Act:

> This legislation is a necessary follow-up to the Federal Trademark Dilution Act of 1995, which was enacted last Congress and which gave a Federal cause of action to holders of famous trademarks for dilution. The bill before us today *is necessary to clear up certain issues in the interpretation of the dilution act* which the Federal courts have grappled with since its enactment.

145 Cong. Rec. H6363-01 (1999), available at 1999 WL 533813 (emphasis added). Neither Congressman Cummings, nor any other legislator anywhere mentions the need or intent to change standards for recovery for non-dilution Lanham Act claims. This legislative silence confirms that the amendment was not intended to alter that law. *Petrusch v. Teamsters Local 317, Syracuse, NY*, 667 F.2d 297 (2d Cir. 1981) (refusing to find legislation *sub silentio* superseded or changed law when not mentioned in the legislative history); *see also eBay v. MercExchange*, 547 U.S. at 391.

One leading commentator has dubbed as "inaccurate" a reading of the 1999 dilution remedy amendment as reflecting Congressional intent to abrogate the willfulness requirement:

> In fact, the 1999 amendment of Lanham Act § 35(a) was not intended to change the law by removing willfulness as a requirement for an award of

> profits in a classic infringement case, but rather was meant *to correct a drafting error* when Congress intended to limit the recovery of damages in dilution cases (and only dilution cases) to instances of "willful violation."

J. Thomas McCarthy, *5 McCarthy on Trademarks and Unfair Competition* § 30:62 (4th ed. database updated March 2015) (emphasis added).

In short, the 1999 dilution remedy amendment was not intended to – and did not – alter the relevant statutory standard for recovery of profits for trademark infringement or false designation of origin underlying the willfulness requirement in the Second Circuit and elsewhere.

> **3.**    **The 1996 Amendment Adding Section 1117(c) to the Lanham Act Did Nothing to Change The Language or Standard of Recovery Under Sections 1117(a)**

Romag next contends that three years before the 1999 dilution amendment, in a 1996 amendment, Congress had already made "its intent plain" and showed its "understanding" – contrary to the then "dominant view" among the circuit courts (*see Banjo Buddies*, 399 F.3d at 174) – that willfulness was not a prerequisite to recovery of profits under section 1117(a) for trademark infringement or false designation claims.  Romag Br. 39-40.  Congress, however, as even Romag admits, did *not* do this by amending the section 1117(a) standard for recovery on which the Second Circuit's willfulness requirement rests.  Congress also did *not* verbalize this so-called plain intent in the legislative record – or anywhere else.  In light of the ethereal nature of Congress' supposed signal, it is unsurprising that when

Romag briefed the willfulness issue to the District Court, it had not yet noticed the "intent" it now calls "plain" (or gauged it too weak to mention).  It is also unsurprising that for nearly 20 years, not a single court or leading commentator recognized such "intent," let alone relied on it.  That should be the end of Romag's 1996 argument.

When Congress added subsection (c) to section 1117 in 1996 – and *left section 1117(a)  untouched* – it merely established the alternate remedy of statutory damages for trademark counterfeiting.  *See* Anticounterfeiting Consumer Protection Act of 1996, Pub. L. 104-153, 110 Stat 1386, § 7 (1996).  Section 1117(c) does not define or alter when an award of defendant's profits is appropriate under section 1117(a), which remains unchanged and "subject to principles of equity," as it has since 1946.  Section 1117(c) simply identifies the two (of several) remedies under subsection (a) – actual damages and profits – that a plaintiff must forego if it elects an award of statutory damages, leaving available other remedies under section 1117(a), including, for example, recovery of attorneys' fees.  *See Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 109 (2d Cir. 2012) (1996 amendment left available possible remedy of attorneys' fees under section 1117(a)).

Ironically, the availability of substantially higher statutory damages *for willful infringement* under section 1117 (c) – a bright line test Congress uses

48

throughout the Lanham Act and elsewhere in the law – reflects Congress' view that the nature of the Lanham Act wrongdoing bears directly on the nature and the quality of the remedy:  culpable willful infringement warrants substantially higher damages than unknowing or unintentional infringement.  *See* 15 U.S.C. §1117(c)  And this Court is no stranger to a bright line willfulness test.   For example, its Patent Act section 284 precedents hold that proof of willfulness – which, notably, is not expressly in the statute – *is necessary for, but does not compel, enhanced damages*, which a court may or may not thereafter award based on additional considerations.  *In re Seagate Technology, LLC*, 497 F.3d 1360, 1368 (2007).

> **D.    This Court Should Not Overrule Decades of Second Circuit Case Law Conditioning an Award of Defendant's Profits on a Willfulness Finding Under Long-Standing Principles of Equity**

This Court should decline – on jurisprudential and substantive grounds – Romag's bold invitation to gut the Second Circuit's decades-long equitable willfulness requirement because the word "willful" does not appear expressly in the pre-1999 version of section 1117(a).  Romag Br. 33

Initially, Romag's claim – essentially, that before 1999 the entire federal judiciary wrongly read willfulness into section 1117(a) – is inconsistent with its recognition (and the authority it cites) that willfulness is at least *an important factor* inherent in section 1117(a)'s principles of equity.  Even those courts that

claim it is not a prerequisite, agree it is *an important* concept *inherent within*

*section 1117(a)'s "principles of equity,"* though not spelled out in so many words.

The willfulness requirement – like laches, acquiescence, estoppel and

unclean hands[12] – applies to an award of profits under section 1117(a) based on its

express language conditioning an award of profits upon proof not merely of

infringement, but "subject to the principles of equity." 15 U.S.C. § 1117(a).  The

legislative history explains that the Committee Print of the Lanham Act did not

expressly contain the phrase "subject to the principles of equity," and it was

included to make clear that the normal principles of equity with respect to granting

and defending claims for an accounting of profits remained unaffected:

> Section 36 of the committee print [which became Section 35 of the
> Lanham Act] has to do with the recovery of damages, profits, and costs.  In
> view of the language of section 35 [authorizing injunctive relief] and the fact
> that sections 35 and 36 are derived in the main from the present act, it seems
> clear that *the normal principles of equity in respect of allowance of and
> defenses to an accounting of profits* and the recovery of damages are not
> affected by this bill.
>
> In order to effectuate the intentions of the draftsmen and in the
> interests of clarity, it is *recommended* that the words "according to the
> principles of equity be inserted…

Hearings on HR 102, HR 5461, and S 895 Before the Subcommittee on Trade-

Marks of the House Comm. On Patents, 77th Cong, 1st Sess. 39, 228 (1941)

---

[12] Romag's reading renders the phrase "subject to principles of equity" a nullity; by
its logic, these equitable concepts are inapposite to determining a profits award
because they are not specifically mentioned, unlike, for example, section
1115(a)(9), where they are spelled out.

(emphasis added).  Thus, the pre-Lanham Act principle of equity requiring willfulness in the allowance of and defenses to an accounting is unequivocally incorporated.

By 1946, the willfulness requirement for an accounting of profits was among the well-established common law equitable principles.  Even before passage of the first comprehensive federal trademark legislation in 1905, the Supreme Court applied federal common law equitable principles in *McLean v. Fleming*, 96 U.S. 245 (1878), to hold that, absent fraudulent intent, "an account of gains and profits [for trademark infringement] … is constantly refused even where the right of the party to an injunction is acknowledged because of an infringement," or when "the facts proved render it proper to grant an injunction to prevent future infringement." *Id*. at 257 (citation to numerous equitable cases omitted).  Likewise, in *Saxlehner v. Siegel-Cooper Co.*, 179 U.S. 42, 43 (1900), the Supreme Court held under federal common law an "innocent[]" or "good faith" trademark infringer may be enjoined from further infringement, but "not be required to account for gains and profits." *Id*. at 42-43; *see also*, *e.g.*, *N.K. Fairbank Co. v. Windsor*, 124 F.200, 202 (2d Cir. 1903) (stating that "in all cases where there has been recovery [of profits], intentional fraud has been found").

Like the Lanham Act, the Trademark Act of 1905 did not expressly specify the intent required to obtain an award of actual damages or profits for

infringement. *See* Section 19 of the 1905 Trademark Act, 15 U.S.C. § 99. But the Court continued to adhere to the common law rule denying profits where injunctive relief satisfies the equities of the case where "there has been no showing of fraud or palming off." *Champion Spark Plug*, 331 U.S. at 130 (decided under 1905 Act); *see also Horlick's Malted Milk Corp. v Horluck's, Inc.*, 51 F.2d 357, 359 (W.D. Wash. 1931) (denying award of defendant's profits absent showing of "willful fraud"), *aff'd in part on other grounds*, 59 F.2d 13 (9th Cir. 1932); *Rubber & Celluloid Harness Trimming Co. v. F.W. DeVoe & C.T. Reynolds Co.*, 233 F.150, 160 (D.N.J. 1916) (denying accounting of profits where conduct was not "willful and fraudulent"); *P.E. Sharpless Co. v. Lawrence*, 213 F. 423, 428 (3d Cir. 1914) (profits awarded on ground that the unfair competition was "willful and fraudulent"); *Liberty Oil Corp. v. Crowley, Milner & Co.*, 270 Mich. 187 (1935) (citing *Nims on Unfair Competition and Trade-Marks* (p. 1078) ("An accounting will not be awarded when the infringing party acted innocently and in ignorance of the plaintiff's rights….")).

The pre-Lanham Act legislative attempts to amend the 1905 Act, which Romag wrongly touts (Romag Br. 51-52), confirm that the pre-Lanham Act common law "principles of equity" incorporated into the Lanham Act by Congress' shorthand reference included a willfulness requirement before an accounting of defendants profits would be considered. As Romag states, those

drafts – many years, one Great Depression and one world war before the Lanham Act – provide that an infringer's good faith would be an absolute defense to an award of profits. Romag Br. at 52, citing legislative drafts at 52 n.20. As Congress stated in the draft statutory text, those proposed acts – including the defense to a profit award based on good faith and unknowing infringement (*see*, *e.g.*, Sec. 18(c) of 1928 draft H.R. 13109) –were "declaratory of the common law of trade-marks, trade names, and devices and applies such law, so far as concerns registered trade-marks, trade names, and devices to commerce within the control of Congress." *See*, *e.g.*, HR 13109, 70th Cong, 1st Sess § 30, 1928 Cong. Rec. 9357, 9362 (1928) and legislation cited by Romag, Romag Br. 52 n.20. The 1938 Restatement further confirms the well-settled nature of the willfulness requirement, as it authorized an award of profits "if, but only if, (a) [a defendant] engaged in his conduct *with the purpose of securing the benefit of the reputation* in the market of the other." Restatement (First) of Torts § 747 Profits (1938) (emphasis added).

So, the Lanham Act did not, as Romag contends, jettison the willfulness requirement in the earlier drafts. It took another approach, making the profit award subject broadly to all the equitable principles at common law, including the firmly entrenched (as earlier draft legislation itself confirms) common law willfulness requirement.

If, as Romag contends, the Second Circuit completely misread the willfulness requirement into section 1117(a), then it was not alone, as many sister circuits had found that requirement within the "principles of equity" in section 1117(a). The willfulness requirement remained the "dominant view" among the circuit courts before the 1999 dilution remedy amendment. *Banjo Buddies*, 399 F.3d at 174. The wide-spread acceptance of the willfulness pre-requisite to an award of profits is further shown by section 37(1)(a) of the Restatement, containing a bright line, *per se* rule making a trademark infringer liable for its profits "only if (a) [it] engaged in the conduct with the intention of causing confusion or deception" (and thereafter also subject to a "comparative appraisal" of the additional equitable factors). *Restatement (Third) of Unfair Competition* § 37(1)(a) and (2)(1995); *see also id.* comment c. (profits award ordinarily "reserved for cases of intentional misconduct"); comment e , Bad Faith (accounting requires intentional misconduct). The Second Circuit expressly adopted the Restatement's view in *George Basch*. 968 F.2d at 1540 (agreeing with section 37 of the *Restatement* and holding that "under § 35 of the Lanham Act, a plaintiff must prove that an infringer acted with willful deception before the infringer's profits are recoverable by way of an accounting.").

Ultimately, the *willfulness requirement* is a well-recognized "principle of equity" expressly relevant to an award of profits under section 1117(a).[13]  Romag provides no basis for this Court to overrule the Second Circuit's holdings to that effect.

### E.    Remand is Unnecessary Even if Equitable Balancing is Required, As this Court Can and Should Affirm the Judgment Based on the Jury's and District Court's Unchallenged Findings

This Court should affirm the Judgment denying Romag an award of Fossil's profits because willful infringement remains a prerequisite to such an award under Second Circuit law.

But even if the jury's no willful infringement finding is *only an important factor* weighing against a profit award here – the position of Romag and the authority it cites[14] – balancing that factor with the jury's and District Court's unchallenged findings on the other equitable factors, factors that also weigh against such an award, leaves no question that this Court should affirm the Judgment denying Romag Fossil's profits.  *See Seattle Box Co. v. Indus. Crating & Packing*

---

[13] For this same reason, Romag's citation of Lanham Act provisions using the word "willful," Romag Br. 50, is unavailing; section 1117(a) used a shorthand when drafted to incorporate the willfulness requirement and other "principles of equity."

[14] *See, e.g., Nike, Inc.*, 2005 WL 1654859, at *10 (willfulness must be taken into consideration); *Banjo Buddies*, 399 F.3d at 175 (whether defendant had an intent to confuse or palmed off are factors); *Quick Techs.*, 313 F.3d at 349, 350 (concluding "[i]t is obvious from our cases that willful infringement is an important factor which must be considered" and affirming denial of profits award).

*Inc.*, 756 F.2d 1574, 1578 (Fed. Cir. 1985) (quoting reference omitted) (holding that normal practice of remand is not inflexible and may be departed from where the record leaves no question as to the decision that must result from a remand). Because *the District Court's and jury's unchallenged factual findings* on the relevant equitable considerations entirely favor the Judgment denying Romag an award of profits, this Court can and should affirm it without remand.[15] *See Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1156-57 (Fed. Cir. 2011) (*reversing* denial of injunction without remand *after balancing equitable considerations* based on trial court's factual record). Remand "for the purely ministerial task of entering a necessary and foreordained finding serves no useful purpose and merely wastes judicial resources." *Kloster Speedsteel AB v. Crucible Inc.*, No. 85-2174, 1986 WL 721181, at *13 (Fed. Cir. June 11, 1986).

"Having stated that a finding of willful deceptiveness is necessary in order to warrant an accounting for profits, we note that it may not be sufficient." *George Basch*, 968 F.2d at 1540; *see also* 15 U.S.C. §1117(a) (profits awarded subject to "principles of equity" and "for such sum as the court shall find to be just,

---

[15] The Second Circuit reviews a district court's decision to allow recovery of defendant's profits for abuse of discretion. *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 752 (2d Cir. 1996) (citing *George Basch,* 968 F.2d at 1537). Because the jury's and the District Court's unchallenged findings all support the Judgment denying an award of profits, an award of profits on remand would be an abuse of the District Court's discretion, requiring reversal by this Court.

according to the circumstances of the case.  Such sum … shall constitute

compensation and not a penalty").  The Second Circuit identified the following

additional equitable principles from the Restatement that, in cases *unlike* here

where the prerequisite of willful infringement is found, must be balanced:

> (1) the degree of certainty that the defendant benefited from the unlawful conduct; (2) [the] availability and adequacy of other remedies; (3) the role of a particular defendant in effectuating the infringement; (4) plaintiff's laches; and (5) plaintiff's unclean hands.

*George Basch,* 968 F.2d at 1540, *citing Restatement,* § 37(2) at cmt. f & cases

cited in the reporter's notes.  In addition to the jury's *important* finding of no

willful infringement, the unchallenged findings below on each of these factors

unequivocally support the District Court's Judgment denying Romag Fossil's

profits.

**Fossil Did Not Benefit from the Infringement.**  The jury's findings that

Fossil's profits were 99% attributable to factors other than the Romag mark,

leaving only a *de minimis* 1% attributable to Romag's mark, JA2410, make "the

degree of certainty that the defendant benefited from the unlawful conduct"

absolute – there was virtually no benefit to the defendant.  Similarly, before

reducing for attribution, the jury's $90,000 advisory unjust enrichment profits

award reflected roughly just 1.3% of Fossil's total profits.  JA2409  Finally, Fossil

did not benefit monetarily, because it paid full price for the unauthorized snaps

Superior used.  JA58-59 (Ruling), citing JA2577

**Other Remedies are Available and Adequate and an Award of Fossil's Profits Would be an Inequitable Windfall.**  As the Supreme Court recognized in *Champion Spark Plug*, an infringement finding does not automatically entitle a plaintiff to an award of defendant's profits, as an injunction often sufficiently satisfies the equities of the case, particularly where there is no showing of fraud or palming off.  331 U.S. at 131.  Fossil, a non-willful infringer, has been enjoined from the inception of the case.  Further, the jury's 9 cents-per-snap reasonable royalty patent award to Romag nearly doubled the 5 cent royalty it receives under the license of *both its trademark and patent rights* to Wing Yip.  The injunction and more than $50,000 royalty payment is a more than sufficient remedy for Fossil's non-willful and non-beneficial infringement.  To award Romag Fossil's profits of nearly $7 million – *more than 130 times Romag's actual damages*, JA1586 – would be a windfall contrary to equity.  *See George Basch*, 968 F.2d at 1540 (recognizing the "conceivably draconian impact" of profits remedy that "may overcompensate for a plaintiff's actual injury and create a windfall judgment at the defendant's expense).

**Fossil Played No Role in Effectuating the Infringement**.  Fossil indisputably played no role in effectuating the infringement.  Romag presented no evidence to the contrary, and that conclusion necessarily follows from the findings of both the jury and the District Court that Fossil did not know about, turn a blind

eye to or recklessly avoid any infringement. Superior, a third party factory neither

owned nor operated by Fossil, selected where to purchase the snaps at issue

without ever informing Fossil. *See* Statement of the Facts Section A.3 above; *see*

*also* JA6 (Findings), citing JA985-86; *compare Monsanto Chem. Co. v. Perfect Fit*

*Prods. Mfg. Co.*, 349 F.2d 389, 395-97 (2d Cir. 1965) (manufacturer owned and

controlled by the defendant).

**Romag's Inequitable, Unclean Hands Also Strongly Supports Denying**

**Romag an Award of Defendants' Profits**. In sanctioning Romag, the District

Court found clear and convincing evidence that Romag acted without a colorable

claim and in bad faith, motivated by an improper purpose. This included

submitting the fraudulent and misleading Reiter Declaration falsely expressing

"surprise" and "shock" and concealing Romag's knowledge of Fossil's

unauthorized use before November 2010; and "acting in bad faith by delaying its

TRO filing until the beginning of the holidays" and "intentionally [sitting] on its

rights" to orchestrate a strategic advantage. JA30-31 (Conclusions) Such bad faith

and unclean hands militates strongly in favor of affirming the Judgment denying

Romag an award of Fossil's profits.[16] One who seeks equity must do equity.

---

[16] While the District Court found that Romag's unclean hands was not a complete
defense to this lawsuit, under the Restatement as adopted by *George Basch*, its
"related misconduct" is relevant to equitable balancing. *Restatement (Third) of*
*Unfair Competition* § 37(2)(f) (1995).

**Romag's Laches in Delaying Strongly Supports Denying Romag an Award of Fossil's Profits**.  In an unchallenged finding, the District Court "conclude[d] that Defendants have sustained their burden with respect to their trademark laches defense."  JA26 (Conclusions).  The millions of dollars in harm to Fossil in lost inventory alone, *see* JA13 and JA26 (Conclusions) and cited references, speaks loudly in favor of denying Romag a windfall award of millions of dollars in Fossil's profits.

Thus, the jury's *critical* non-willful infringement finding and each of the *George Basch* factors overwhelmingly support affirming the Judgment denying Romag any of Fossil's profits without remand.  *See Quick Techs. Inc.  v. Sage Group Plc*, 313 F.3d 338 (5th Cir. 2002) (applying equitable factors on appeal to affirm denial of profits).

## II. The District Court Properly Reduced Romag's Patent Damages Due to Romag's Laches

The District Court found Romag unreasonably sat on its rights and committed laches because it knew of Fossil's use in May 2010, intentionally timed suing Fossil until the eve of Black Friday, and harmed Fossil, which could have readily switched to generic snaps and profitably sold its handbags during the busy holiday season but instead was left holding over $4 million in unsellable inventory. Relying on *Aukerman*, the District Court reduced the jury's patent damages award to proportionately eliminate damages accrued during the laches period.

Unable to challenge the District Court's findings of unreasonable delay,

prejudice and laches,[17] Romag instead challenges this Court's *en banc Aukerman*

decision, arguing that it should be overruled and laches eliminated as a defense to

patent damages in view of *Petrella*. *Aukerman*, however, remains good law

because the statutory distinctions between the Copyright Act analyzed in *Petrella*

and the Patent Act analyzed by this Court in *Aukerman* reflect Congress' intention

to retain laches as a bar where patent holders unjustifiably sit on their rights and

harm defendants.

A.    **The Patent Act Has No Statute of Limitations, and Laches Performs the Gap-Filling Role Recognized in *Petrella***

Romag's argument hinges on the erroneous premise that the Patent Act

contains a "statute of limitations," and, therefore, that *Petrella* overrules

*Aukerman*. Romag Br. at 53-56. *Petrella* was decided based on the Court's

finding that Copyright Act section 507(b) is a "time-to-*sue* prescription" reflecting

"Congress' judgment on the timeliness of *suit*"; "*bar[ring] relief of any kind*"; that

expressly occupied the timeliness field and "[left] 'little place' for a doctrine

[laches] that would further limit the timeliness of a copyright owner's suit." ___

U.S. at __, 134 S. Ct. at 1967 (emphasis added). But the *Petrella* Court recognized

---

[17] Romag challenges only what it terms the District Court's "mistake of law" in applying *Aukerman*, Romag Br. 54, a legal question subject to this Court's *de novo* review, which this Court is undertaking *en banc*. Other standards of review it cites on issues not before this Court are simply irrelevant.

the "gap-filling" role and vitality of laches where no statute of limitations has been enacted. *Petrella*, ___ U.S. at ___, 134 S. Ct. at 1974.

The Patent Act lacks a comprehensive "statute of limitations" defining the timeliness of all patent claims. Instead it merely provides that "*no recovery shall be had* for any infringement committed more than six years prior to the filing" of an infringement claim. 35 U.S.C. § 286 (emphasis added). This Court has defined a "statute of limitations" as "[a] statute prescribing limitations to the right of action on certain described causes of action; that is, declaring that *no suit shall be maintained* on such causes of action unless brought within a specified period after the right accrued." *Standard Oil, Co. v. Nippon Shokubai Kagaku Kogyo Co.*, 754 F.2d 345, 347 (Fed. Cir. 1985) (quoting *Black's* Law Dictionary (4th ed. 1968)). Section 286 "merely limits the time frame for which damages can be incurred," and "[r]eading § 286 in light of this definition shows that this statute is not a statute of limitations barring suit in the usual meaning of the term. It does not say that 'no suit shall be maintained.'" *Standard Oil, Co.*, 754 F.2d at 347; *see also Bradford Co. v. Jefferson Smurfit Corp.*, Nos. 00-1511, 00-1546, 2001 WL 35738792, at *9 (Fed. Cir. Oct. 31, 2001) ("section 286 is not a statute of limitations") (non-precedential). This Court acknowledged as much in a December 30, 2014 order directing *en banc* rehearing on this issue in a pending appeal, stating that "there is no statute of limitations for claims of patent infringement." *SCA Hygiene Prods.*

62

*Aktiebolag v. First Quality Baby Prods., LLC*, No. 2013-1564, 2014 WL 7460970, at *1 (Fed. Cir. Dec. 30, 2014). Because the Patent Act contains no statute of limitations, *Petrella* confirms (rather than undermines) the availability of laches for the "gap-filling role" under the patent laws.

### B.    Legislative History and Practice Demonstrate Congress' Intent that Laches Remain Available to Bar Patent Damage Claims

Patent Act section 282 and its commentary are relevant to maintaining the laches defense. *See Petrella*, ___ U.S. at ___, 134 S. Ct. at 1974 n.15 ("Based in part on § 282 and commentary thereon, legislative history, and historical practice, the Federal Circuit has held that laches can bar damages incurred prior to the commencement of [a] suit."). Section 282(b)(1), states "defenses to a suit for infringement [] *in general terms*," H.R. Rep. No. 82-1923, at 10 (1952) (emphasis added), providing that the following are defenses to patent infringement: "(1) Noninfringement, absence of liability for infringement or unenforceability." 35 U.S.C §282(b)(1). Commentary of one of the drafters of the Patent Act, P.J. Federico, whose commentary this Court deems to be "an invaluable insight into the intentions of the drafters of the act," *Symbol Techs., Inc. v. Lemelson Med.*, 277 F.3d 1361, 1366 (Fed. Cir. 2002), explains that under section 282(b)(1) laches continues to be a defense to patent infringement:

> this would include the defenses such as that the patented invention has not been made, used, or sold by the defendant; license; and equitable defenses such as laches, estoppel and unclean hands.

P.J. Federico, *Commentary on the New Patent Act*, reprinted in 75 *J. Pat. & Trademark Off. Soc'y* 161, 215 (1993).

And panels of this Court, *both before and after Aukerman*, have consistently concluded that section 282 includes "equitable defenses such as laches, estoppel and unclean hands." *See, e.g., J.P. Stevens & Co. v. Lex Tex, Ltd.*, 747 F.2d 1553, 1561 (Fed. Cir. 1984) (citing *Federico* Commentary); *Symbol Techs.*, 277 F.3d at 1366 (Fed. Cir. 2002).

Both section 286 and section 282 distinguish the Patent Act from the Copyright Act, and thus, *Petrella* confirms and does not require overruling *Aukerman*'s holding that laches is available as a defense in suits for patent infringement.

Courts of equity will "not assist one who ha[d] slept upon his rights, and show[ed] no excuse for his laches in asserting them." *Lane & Bodley Co. v. Locke*, 150 U.S. 193, 201 (1893). The economic prejudice *Aukerman* recognized that may arise from that delay, 960 F.2d at 1033, is not eliminated by the six-year recovery bar. Romag should not be allowed to "intentionally lie silently in wait watching damages escalate, particularly where [Fossil], if [it] had had notice, could have switched to a noninfringing product." *Aukerman*, 960 F.2d at 1033 (citation omitted). Whereas a prompt suit could have led to fair and equitable damages, Romag's delay caused Fossil substantial losses that could have been avoided.

**CROSS-APPELLANT'S PRINCIPAL BRIEF**

### If the Case is Remanded, The Jury's Flawed Advisory Award of Deterrence-based Profits Should be Vacated

As discussed above, the Judgment should be affirmed. If, however, remand is directed, and if the District Court decides – notwithstanding its findings to the contrary – that equities compel awarding Romag some amount of Fossil's profits, the advisory jury award of profits under the deterrence rationale of $6,704,046.00 should be vacated.[18]

Fossil's cross-appeal, although conditional, properly seeks to "'lessen the rights of [Romag] under the judgment,' rather than simply asserting additional grounds in support." *Power Mosfet Technologies, L.L.C. v. Siemens AG*, 378 F.3d 1396, 1414 n.3 (Fed. Cir. 2004) (quoting in part *Bailey v. Dart Container Corp. of Michigan*, 292 F.3d 1360, 1362 (Fed. Cir. 2002). The fact that the cross-appeal is conditional does not alone render it improper, *see Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1376 (Fed. Cir. 2003), and Fossil's cross-appeal does not implicate the concerns raised by this Court because the arguments contained in the cross-

---

[18] As to the jury's $90,759 "unjust enrichment" advisory award, putting aside the balance of equities in Fossil's favor should there be remand, at best for Romag its recovery would be limited to 1% or $907.59 under *Mishawaka* and the jury's finding of 1% attribution. JA 2409-10; *Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co.*, 316 U.S. 203, 206 (1942); *see also* JA2128-31. That potential award of less than $1000 is not the subject of this cross-appeal, although, as set forth in opposition to Romag's appeal, the Judgment denying Romag even $907.59 should be affirmed.

appeal could not have been made by Fossil as appellee. *Power Mosfet*, 378 F.3d at 1414 n.3; *see also* Fed. Cir. R. 28.1, Practice Notes. Fossil's cross-appeal is consistent with that authority and in line with leading commentary advising that, aside from the risk of waiver by failing to cross-appeal, "prudence dictates" that an appellee seek guidance from the court of appeals in the event of a remand; although the court of appeals may decline to reach the evidentiary issues, "the interests of judicial economy will often lead the court to discuss them," and "the opportunity for clarification should not be lost." *See* Eric J. Magnuson and David F. Herr, *Fed Appeals Jurisdiction and Practice* § 6.9 (2015 ed.). That need is particularly great here, because Fossil argues on cross-appeal that even if the willfulness prerequisite for an award of profits generally is abrogated, willfulness nevertheless remains a prerequisite to an award of a defendant's profits *based on a deterrence rationale*, because the need to deter a *willful infringer* is inherent in the underlying rationale. The District Judge's Ruling suggests that, absent guidance from this Court, it will misapply a ruling on Romag's appeal to the deterrence-rationale specifically. *See* JA67 (Ruling)

**A.    The District Court Failed to Instruct the Jury that Deterrence-based Profits Could Only be Awarded Against a Willfully Deceptive Defendant**

"[W]illfulness expressly defines the third rationale (deterrence)" for an award of a defendant's profits under the Lanham Act. *George Basch*, 968 F.2d at 1537.

Contrary to Second Circuit law, the District Court refused to instruct the jury that a Lanham Act award of a defendant's profits *under a deterrence rationale* is proper only if the defendant acted with *willful deception*. *See* JA2384-86 Compounding this error, the District Court provided a broad instruction that boundlessly invited the jury to consider – and disregard – whatever information it saw fit. Specifically, the instruction allowed an award of deterrence profits if Fossil had acted in "callous disregard" of Romag's trademark. But the District Court nowhere defined "callous disregard"; and, moreover, while it noted that "turning a blind eye" to the infringement (that is, essentially willful blindness) could be considered, that was not necessary or sufficient, as the jury was invited without direction to speculate and consider or reject *anything* in the case:

> In considering whether [Fossil] engaged in such callous disregard of Romag's rights, you should consider all the circumstances presented in this case, including whether [Fossil] turned a blind eye to the use of counterfeit snap fasteners.

JA2384-86  Based on this erroneous instruction, which Fossil objected to, *see* JA2099 – the jury made an advisory award of the full amount of Fossil's handbag

profits[19] despite its finding that Fossil did not willfully infringe and that Fossil did

not act with a reckless indifference to Romag's rights or commit an intentional or

wanton violation of Romag's rights such as to support an award of punitive

damages under other claims.

Under Second Circuit law applicable here, *see Eli Lilly and Co. v. Aradigm*

*Corp.,* 376 F.3d 1352, 1359 (Fed. Cir. 2004), a jury instruction challenged below is

reviewed *de novo* and erroneous if it "misleads the jury as to the correct legal

standard or where it fails to adequately inform the jury on the law." *Gordon v.*

*New York City Bd. of Educ.,* 232 F.3d 111, 115-16 (2d Cir.2000).

As recognized in *George Basch*, in *Monsanto* and  *W.E. Bassett Co. v.*

*Revlon, Inc.*, 435 F.2d 656, 664 (2d Cir. 1970), the Second Circuit found that

profits may be awarded if justified by the need "to deter a *willful infringer* from

doing so again." *See George Basch Co.*, 968 F.2d at 1537 (emphasis added); *see*

*also id*. at 1538-40.

The conduct in *Bassett* and *Revlon* that gave rise to a need to deter was not

mere infringement or even negligence, but rather years of highly egregious, bad

faith, fraudulent and willfully deceptive conduct.  To illustrate, in *Monsanto*, the

defendant "acted 'wilfully [sic] with full knowledge of plaintiff's rights and as part

---

[19] Ostensibly the jury did not really calculate how much the award of profits
needed to be deter, but it just used Fossil's total profits as calculated by Fossil's
expert.  JA1585, JA2409

of a pre-conceived plan to trade upon plaintiff's goodwill'"; had "taken up

trademark infringement as its principal line of business" and "carried out" similar

"schemes" at least three times, in violation of an injunction such that the court

described it as a "commercial racketeer" 349 F.2d at 390, 91, 396-97. Similarly,

in *Revlon* the defendant had been held in contempt; acted with "bad faith,"

"wrongful intent," "deliberately and fraudulently," with a "smug willingness" to

determine unilaterally to treat plaintiff's goodwill as a nullity, all reflecting a

"callous disregard" of the "rights of a competitor and for the mandates of the

federal courts." 435 F.2d at 662, 664. Informed by the conduct in those cases,

*George Basch* recognized a willful deception requirement for a deterrence-based

award of an infringer's profits.

Under a proper instruction, the jury's no willful infringement finding could

have only resulted in an award of no profits.

**B.    The District Court Erroneously Instructed the Jury that Attribution Could Not Reduce a Deterrence-based Profit Award Under the Facts of this Case**

Next, the District Court erred in instructing the jury that attribution

under *Mishawaka* did not apply to reduce an award of deterrence-based profits

under the facts here. In the unlikely event that this appeal results in remand and

some award of deterrence-based profits, under this erroneous view of the law,

Fossil will not be allowed to reduce those profits based on the minimal attribution (1%) Fossil proved. That would be error.

*Mishawaka* provides that a trademark plaintiff "of course, is not entitled to profits demonstrably not attributable to the unlawful use of his mark," 316 U.S. at 206, and that rule should apply to Fossil's non-willful and unknowing infringement here. While the District Court concluded that under *Revlon* and *Monsanto* attribution does not apply to deterrence-based profits, the rationale underlying those decisions has no application here. Viewed most broadly, those decisions can be read as refusing, on policy grounds, to apply attribution to reduce the profits of *willfully deceptive infringers*, like the infringers in *Revlon* and *Monsanto*, *who engaged in egregious, bad faith and knowing conduct.* But those considerations do not apply to a non-willful, unknowing infringer like Fossil. Unlike in those cases, there is no justification for denying Fossil the statutory reduction of profits based on attribution. Indeed, an award of all of Fossil's profits would be punitive and contrary to the Lanham Act. *Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 113 (2d Cir. 1988) So, alternately, in the event of remand on deterrence-based profits, *the ceiling on Romag's recovery* lies at 1% of $6,704,046.00, or $67,040.

**CONCLUSION AND STATEMENT OF RELIEF SOUGHT**

This Court should affirm the Judgment denying Romag an award of Fossil's profits, either by refusing Romag's request to overrule and change Second Circuit law or, alternately, by performing the equitable balancing Romag seeks based on the unchallenged findings by the District Court, which overwhelmingly balance in favor affirming the Judgment.

Next, this Court should hold that laches remains available as a defense to a patent infringement claim and affirm the District Court's Judgment reducing Romag's patent damages.

On Fossil's Cross-Appeal, if the matter is remanded, the District Court should be instructed that the jury's advisory award of profits under a deterrence rationale (1) should be reversed; and (2) at most, should be limited to 1% of the profits based on the jury's attribution finding.

Dated: May 1, 2015

Of Counsel:

Lauren S. Albert
Lawrence Brocchini
Nicholas A. Geiger

Respectfully submitted,

/s/ Jeffrey E. Dupler
Jeffrey E. Dupler
GIBNEY, ANTHONY & FLAHERTY LLP
665 Fifth Avenue
New York, NY 10022
Telephone: (212) 688-5151

*Counsel for Defendants-Cross-Appellants*

# ADDENDUM

Ruling on Post-Trial Motions ................................................................Addendum 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROMAG FASTENERS, INC.,<br>*Plaintiff*,<br>*v.*<br>FOSSIL, INC., *et al.*,<br>*Defendants*. | Civil No. 3:10cv1827 (JBA)<br><br>August 8, 2014 |

**RULING ON POST-TRIAL MOTIONS**

On April 3, 2014, after a seven-day trial, a jury returned a verdict finding Defendants Fossil, Inc. and Fossil Stores I, Inc. ("Fossil") liable for trademark infringement, false designation of origin, state common law unfair competition, and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"). (*See* Jury Verdict [Doc. # 417].) The jury also found Fossil and Macy's, Inc. and Macy's Retail, Inc. ("Macy's") liable for patent infringement. (*Id.*) The jury returned a verdict of no liability for the remaining defendants, and found that neither Fossil nor Macy's had willfully infringed Plaintiff Romag Fasteners, Inc.'s ("Romag") patent or trademark. (*Id.*) The jury made an advisory award of $90,759.36 of Fossil's profits for trademark infringement under an unjust enrichment theory and $6,704,046.00 of Fossil's profits for trademark infringement under a deterrence theory and determined that 99% of Fossil's profits were attributable to factors other than its infringement of the ROMAG mark. (*Id.*) Finally, the jury awarded a reasonable royalty of $51,052.14 against Fossil and $15,320.61 against Macy's for patent infringement. (*Id.*)

The Court then held a two-day bench trial on April 8 and 9, 2014 to address "the equitable defenses of estoppel, acquiescence, unclean hands, and laches; the equitable adjustment of the amount of profits awarded by the jury; the calculation of punitive

damages; treble damages; attorneys' fees; and the amount of statutory damages to be awarded," (Ruling Granting Mot. to Bifurcate [Doc. # 360] ¶ 15), as well as Romag's claim for a permanent injunction. Defendants also asserted that Romag failed to mitigate its damages and sought sanctions as a result of Romag's conduct in procuring a temporary restraining order ("TRO") at the outset of this case. (*See* Defs.' Prop. Findings of Fact and Conclusions of Law [Doc. # 419] at 42–45.) The Court ultimately concluded that Defendants had failed to establish their equitable defenses of unclean hands or breach of the duty to mitigate, but that they had sustained their burden with respect to the equitable defense of laches, and reduced the jury's award of a reasonable royalty by 18% to an award of $41,862.75 against Fossil and an award of $12,562.90 against Macy's. (*See* Findings of Fact and Conclusions of Law [Doc. # 471] at 40–41.) The Court also imposed sanctions on Plaintiff for its conduct in seeking a Temporary Restraining Order ("TRO") in this case, holding that Plaintiff may not recover its attorney's fees in connection with the TRO proceedings. (*Id.* at 40.) Finally, the Court held as a matter of law that because the jury found that Fossil's trademark infringement was not willful, Romag was not entitled to an award of Fossil's profits. (*Id.* at 40–41.)

Plaintiff now moves [Doc. # 472] pursuant to Rules 50(b) and 59 of the Federal Rules of Civil Procedure for judgment as a matter of law and for a new trial. Romag argues that it is entitled to judgment as a matter of law with respect to the issue of trademark infringement by the Retailer Defendants—Macy's, Belk, Inc., The Bon-Ton Stores, Inc., The Bon-Ton Department Stores, Inc., Dillard's, Inc., Nordstrom, Inc., Zappos.com, Inc., and Zappos Retail, Inc. Romag further argues that it is entitled to a new trial on the issue of willful trademark infringement and the attribution of Fossil's profits. Defendants have also filed a "conditional" motion [Doc. # 475] for judgment as a

2

matter of law and a new trial on the issue of an award of profits if this Court's ruling with respect to the willfulness requirement is overturned on appeal and this Court determines in its analysis of the equitable factors governing an award of profits that Plaintiff is entitled to such an award.[1]  For the following reasons, Plaintiff's motion will be granted in part and denied in part, and Defendants' motion will be denied without prejudice to renewal.

## I.      Legal Standard

A court may enter judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1).  The standard for judgment as a matter of law under Rule 50 "mirrors" the summary judgment standard "such that the inquiry under each is the same." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (internal citations and quotation marks omitted).  However, where a jury has deliberated and returned a verdict, the Court "may set aside the verdict pursuant to Rule 50 only where there is 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against him [or her].'" *AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 456 (2d Cir. 2009) (quoting *Cross v. New York City Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005)).

---

[1] Also pending before the Court in this case are Plaintiff's Motions for Supplemental Relief [Doc. # 378], Attorney Fees and Costs [Doc. # 450], and to Compel Compliance with Plaintiff's Subpoenas [Doc. # 466], which will be addressed in a separate opinion.

3

"The court may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. Moreover, a trial judge is free to weigh the evidence [her]self, and need not view it in the light most favorable to the verdict winner." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998). "A new trial must be granted if the court determines that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Santa Maria v. Metro–North Commuter R.R.*, 81 F.3d 265, 273 (2d Cir. 1996). The grant of a new trial is also appropriate when, "in the opinion of the district court, the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice." *DLC Mgmt. Corp.*, 163 F.3d at 133.

## II.    Romag's Motion for Judgment as a Matter of Law and for a New Trial

Romag moves for judgment as a matter of law with respect to the issue of the Retailer Defendant's trademark infringement, and for a new trial on the issues of willful trademark infringement and the attribution of Fossil's profits.

### A.    Trademark Infringement as to the Retailer Defendants

Romag moves this Court to enter judgment as a matter of law against the Retailer Defendants finding that they infringed the ROMAG mark, arguing that the jury's verdict with respect to Fossil's trademark infringement cannot be reconciled with the jury's finding of no liability with respect to the remaining defendants in the action. The gravamen of Plaintiff's argument is that because the jury found that the accused snaps were counterfeits and because every retailer in the chain of sale is strictly liable for

4

**Addendum  4**

trademark infringement, *see El Greco Leather Products Co., Inc. v. Shoe World, Inc.*, 806 F.2d 392, 396 (2d Cir. 1986) ("[The defendant's] sale of the shoes was sufficient 'use' for it to be liable for the results of such infringement and its claimed lack of knowledge of its supplier's infringement, even if true, provides no defense."), the Retailer Defendant's sale of Fossil bags containing those counterfeit snaps rendered them liable for trademark infringement as a matter of law.  (*See* Pl.'s Mem. Supp. [Doc. # 473] at 5–6.)   Romag further argues that by finding against Fossil with respect to counterfeiting and trademark infringement, the jury necessarily rejected Fossil's defense to infringement—i.e., that the snaps were genuine—and thus the Retailer Defendants cannot rely on such a defense with respect to their own infringement.

"When confronted with a potentially inconsistent verdict, the court must adopt a view of the case, if there is one, that resolves any seeming inconsistency.'" *Turley v. Police Dep't of City of New York*, 167 F.3d 757, 760 (2d Cir. 1999) (internal citations and quotation marks omitted); *see also Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 497 (2d Cir. 1995) ("A court's role is to reconcile and preserve whenever possible a seemingly inconsistent jury verdict.").  Defendants contend that the jury's disparate verdicts with respect to trademark infringement can be reconciled because Romag's argument ignores its own burden to establish that the Retailer Defendants actually sold Fossil handbags containing the infringing snaps.  Thus, Defendants argue, rather than interpreting the jury's split verdict as a rejection of the strict liability standard on which it was instructed (*see* Jury Instructions [Doc. # 410] at 10–11), the Court can reconcile any discrepancy by concluding that the jury found that Plaintiff failed to prove by a preponderance of the evidence that any of the Fossil handbags sold by the Retailer Defendants actually contained the counterfeit snaps.

5

**Addendum 5**

In its briefing, Plaintiff argues that "[i]t cannot be disputed that the very same counterfeit Romag magnetic snap fasteners used in Fossil handbags imported and sold by Fossil to the Retail Defendants necessarily were sold by the Retail Defendants to the public." (Pl.'s Mem. Supp. at 5.) In support of this proposition, Plaintiff cites the Retailer Defendants' interrogatory responses and their sales records, indicating that they sold Fossil handbags. (*See* Exs. 126–130, 131A, 263–269, 596.) However, in their responses to Plaintiff's interrogatories, each defendant included a disclaimer that nothing in the responses should be construed as an admission that the accused handbags actually contained the infringing snaps. (*See* Exs. 126–30, 264–69.) Thus, in the interrogatories, Defendants did no more than provide the sales data for the requested SKU numbers, and did not admit that the accused handbags contained the infringing snaps.

The jury heard testimony from Doug Dyment that Superior was only one of the three largest manufacturers of women's handbags for Fossil and that it only manufactured approximately forty to fifty percent of Fossil's handbags. (Trial Tr. Vol. II [Doc. # 434] at 363–64.) There was no evidence presented at trial regarding the exact sales chain between Superior, Fossil, and the Retailer Defendants with respect to any specific handbags containing counterfeit snaps. Based on this testimony, the jury could have reasonably concluded that the Fossil handbags to which the Retailer Defendants admitted selling were manufactured by a different manufacturer, and that because there was no evidence presented at trial that Fossil's other manufacturers had used counterfeit snaps, it could have further concluded that those bags did not contain counterfeits. The jury also heard testimony that Fossil sold handbags through department stores, specialty stores, and through its own stores and website (Trial Tr. Vol. II at 349–51), and thus the

6

jury could have reasonably concluded that the snaps it found to be infringing were sold through sales channels other than the Retailer Defendants.[2]

With respect to the actual handbags and snaps presented to the jury at trial, Howard Reiter testified that he had purchased handbags at Macy's, at a Fossil outlet store, and online at Zappos.com to confirm his suspicions of counterfeiting (Trial Tr. Vol. I [Doc. # 433] at 202), but he did not testify as to any purchases from any of the other Retailer Defendants.  Mr. Reiter did testify that a Fossil bag of the same style that he had determined contained counterfeit snaps was shown in online advertising for Zappos.com. (*Id.* at 204.)  However, Mr. Reiter never testified that he inspected any of the bags purchased from Zappos.com, and stated only that he "checked quite a few bags." (*Id.* at 205.)  Thus, Mr. Reiter's testimony did not establish that any of the bags purchased from the Retailer Defendants were manufactured at Superior or were found to contain counterfeit snaps.  Based on a review of the evidence presented at trial, the Court concludes that the jury could have found that Plaintiff failed to carry its burden to prove that the Retailer Defendants other than Macy's sold Fossil handbags containing counterfeit ROMAG snaps, which would resolve any potential inconsistency in their verdict.

However, with respect to Macy's, the jury did hear testimony that Fossil bags purchased from Macy's contained counterfeit snaps.  Mr. Reiter testified that it was the Fossil bags his wife and sister-in-law purchased at Macy's that initially raised his suspicion of counterfeiting.  (*Id.* at 174–180.)  Mr. Reiter also testified that he personally inspected the snaps taken from a Fossil bag purchased at Macy's, and had his factory in

---

[2] A review of Romag's exhibit list [Doc. # 415] indicates that some of the Fossil handbags entered into evidence were indeed purchased from non-party retailers, such as "SavyFashions." (*Id.* at 3.)

7

China inspect those snaps, and that based on the analysis of those snaps he reached the conclusion that Fossil was selling handbags containing counterfeit snap fasteners.  (*Id.* at 176–80.)  Additionally, the jury's verdict against Macy's contains an inconsistency that is not present in its verdict against the other Retailer Defendants.  The jury returned a verdict against Macy's with respect to patent infringement.  The only way the Court could reconcile this verdict with its verdict finding for Macy's with respect to trademark infringement would be if the jury concluded that Fossil handbags containing Romag snaps manufactured by Superior were sold to Macy's, but that these snaps did not bear the ROMAG mark.  There was no evidence at trial to support such a conclusion.  Therefore, Plaintiff's motion for judgment as a matter of law with respect to trademark infringement is granted as to Macy's and denied as to the remaining Retailer Defendants.

### B.    Willful Trademark Infringement

Plaintiff moves for a new trial on the issue of willful trademark infringement, arguing that the Court's instructions on willful trademark infringement were erroneous and that the jury's verdict with respect to willful trademark infringement represents a miscarriage of justice that substantially prejudiced Romag.  "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Cameron v. City of New York,* 598 F.3d 50, 68 (2d Cir. 2010). "A jury instruction is proper so long as the charge correctly and sufficiently covers the case to allow the jury intelligently to decide the questions presented to it." *Bruneau v. South Kortright Cent. Sch. Dist.,* 163 F.3d 749, 761 (2d Cir. 1998), *abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm.,* 555 U.S. 246 (2009).  When determining whether jury instructions were erroneous, the Court must ask "whether considered as a whole, the instructions adequately communicated the essential ideas to the jury." *United*

*States v. Schultz,* 333 F.3d 393, 414 (2d Cir. 2003) (internal citations and quotation marks omitted).  If an instruction is erroneous, a new trial must be granted, unless the error was harmless.  *See United States v. Bah,* 574 F.3d 106, 114 (2d Cir. 2009).  "An error is harmless only if the court is convinced that the error did not influence the jury's verdict." *Gordon v. N.Y. City Bd. of Educ.,* 232 F.3d 111, 116 (2d Cir. 2000).

The Court instructed the jury as follows with respect to willful trademark infringement:

> Plaintiff also alleges that Defendants willfully infringed its trademark.  If you find that Defendants infringed Romag's trademark, you must also determine if Defendants used the trademark willfully, as I now define that term for you.   This is a separate claim from Plaintiff's claim that Defendant's infringed Romag's trademark, which I described earlier.   To prove willfulness, Plaintiff must show (1) that Defendants were actually aware of the infringing activity, or (2) that Defendants' actions were the result of willful blindness.  Willful blindness means that Defendants knew they might be selling infringing goods but nevertheless intentionally shielded themselves from discovering the truth.

(Jury Instructions at 14.)  Romag argues that this instruction was erroneous because it did not inform the jury that it could find that Defendants' willfully infringed the ROMAG mark if they acted with reckless disregard.  In support of this proposition Romag cites *Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.,* 507 F. App'x 26 (2d Cir. 2013), a non-precedential summary order, which held that:  "[t]o prove willfulness, a plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of reckless disregard or willful blindness."  *Id.* at 30 (internal quotation marks omitted) (quoting *Island Software & Computer Serv., Inc. v. Microsoft Corp.,* 413 F.3d 257, 263 (2d Cir. 2005)).

However, the Court notes that the portion of the *Island Software* opinion that the *Fendi* court quoted in defining trademark willfulness was actually a definition of

9

"willfulness" under the Copyright Act. *See Island Software*, 413 F.3d at 263 ("To prove 'willfulness' under the Copyright Act, the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of reckless disregard for, or willful blindness to, the copyright holder's rights." (internal citations and quotation marks omitted)). The *Fendi* court went on to define willful blindness as follows: "In the context of a trademark infringement action, willful blindness means that a defendant knew it might be selling infringing goods but nevertheless 'intentionally shielded itself from discovering' the truth." *Fendi*, F. App'x at 31 (quoting *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 109–10 (2d Cir. 2010)). The Court's instruction is nearly identical to this language and thus is not clearly erroneous.

Furthermore, Romag did not object to this instruction, and actually requested the charge given by the Court. The Court's original proposed instruction on willful trademark infringement included the phrase "reckless disregard" (*see* Court's Prop. Instructions, Ex. A to Geiger Decl. [Doc. # 478] at 15), but Romag itself requested that the Court strike this language from its final charge (*see* Romag's Response to Court's Prop. Instructions, Ex. B to Geiger Decl. at 14). The charge the Court gave is *identical* to the charge Romag requested in response to the Court's proposed instructions. (*Compare id. with* Jury Instructions at 14.) "Where, as here, the party fails to object to the instruction before the jury begins deliberations, a subsequent challenge based on that charge should be entertained only if the alleged errors are fundamental. An error is fundamental under this standard only if it is so serious and flagrant that it goes to the very integrity of the trial." *Shade v. Housing Authority of City of New Haven*, 251 F.3d 307, 312–13 (2d Cir. 2001). The Second Circuit has previously noted that it "[cannot] see how holding [a party] to a jury verdict that faithfully followed an instruction . . . that [the party itself]

10

urged upon the  court could give rise to a miscarriage of justice." *Id.* at 313.  Thus, the Court's failure to include "reckless disregard" in its initial instruction does not warrant the granting of a new trial in this case.

After the Court gave its final instructions, the jury requested a definition of the term "intentionally shielded" as it appeared in the Court's instruction on willful trademark infringement.  After colloquy with counsel, the Court instructed the jury that

> "Intentionally shielded'" is more than reckless or negligent conduct.  It means when a defendant knew that there was a high probability that components which infringed Plaintiff's mark were used on its handbags, but took deliberate actions, such as purposefully looking the other way, to avoid learning of the infringement.

(Suppl. Jury Instructions [Doc. # 411] at 1.)  Plaintiff initially objected to a proposal very similar to the language the Court ultimately used, but withdrew its objection when the Court agreed to omit the words "for the purpose of."  (Trial. Tr. Vol. VIII [Doc. # 441] at 1594–95 ("Then that would be fine your honor.").)  When the Court re-read the above-quoted language without the previously objected-to phrase, Plaintiff failed to object to the instruction in its final form.  (*Id.* at 1596.)

Plaintiff now argues that the instruction was erroneous because it improperly incorporated language from *Global-Tech Appliances, Inc. v. SEB SA*, 131 S. Ct. 2060 (2011), a patent case, in contravention of the Second Circuit's trademark precedent on willful infringement as articulated in *Fendi*.  However, in its proposed jury instructions, Plaintiff proposed an instruction on willfulness in the context of trademark infringement and unfair competition that included language similar to that used in the Court's clarifying instruction and that cited *Global-Tech* as the primary authority in support of the charge:

11

> In addition, you may determine that Defendants' conduct was willful if
> Defendants remained willfully blind to the infringement. Defendants
> remained willfully blind to the infringement if they subjectively believed
> there was a high probability that they were infringing Romag's trademark,
> and took deliberate action to avoid confirming this infringement.

(Pl.'s Prop. Jury Instructions [Doc. # 303-13] at 48 (citing *Global-Tech*, 131 S. Ct. at 2070–

72).) In light of this proposed instruction, Romag cannot now be heard to argue that

*Global-Tech* is not a proper authority for the Court's jury instructions.

In *Global-Tech*, the Supreme Court conducted a review of the precedents of the

Courts of Appeals with respect to "willful blindness," drawing on examples from the

criminal context, and synthesized that precedent to arrive at what it concluded was an

appropriate general definition of the term "willful blindness." The Court noted that all of

the appellate courts appeared to agree on two basic requirements: "(1) the defendant

must subjectively believe that there is a high probability that a fact exists and (2) the

defendant must take deliberate actions to avoid learning of that fact." 131 S. Ct. at 270.

The Court concluded that "these requirements give willful blindness an appropriately

limited scope that surpasses recklessness and negligence. Under this formulation, a

willfully blind defendant is one who takes deliberate actions to avoid confirming a high

probability of wrongdoing and who can almost be said to have actually known the critical

facts." *Id.* at 270–71. The Second Circuit recognized a similar proposition in *Tiffany (NJ)*

*Inc. v. eBay Inc.*, 600 F.3d 93 (2d Cir. 2010): "[W]illful blindness is equivalent to actual

knowledge for purposes of the Lanham Act." *Id.* at 110 (internal citation and quotation

marks omitted). This Court's supplemental instruction on "intentionally shielded"

closely tracked the Supreme Court's language defining the general concept of willful

blindness, which is not, as Plaintiff argues, in conflict with existing Second Circuit

precedent. Therefore, this Court's instructions, adequately conveyed the concepts of

12

willfulness, were not erroneous and did not represent a fundamental error going to the very integrity of the trial.

Even if this Court's instructions with respect to willful trademark infringement had been erroneous, Plaintiff would not be entitled to a new trial because the evidence at trial at most could have supported a finding that Fossil[3] was negligent, not that it acted in reckless disregard, with willful blindness, or with actual knowledge of Superior's purchases of counterfeit snaps.  Romag argues that the jury's verdict resulted in a miscarriage of justice, barring it from recovering any award of profits, because there was insufficient evidence based on which a jury could have concluded that Fossil's actions were not willful.  Plaintiff cites evidence that Mr. Dyment knew of the only authorized sales channel for Romag snap fasteners, and that Fossil had had difficulties with Superior in the past, to argue that Romag's failure to inspect Superior's sales records or to visually inspect the snap fasteners on the bags produced by Superior[4] constituted willful infringement.

However, a defendant "has no affirmative duty to take precautions against the sale of counterfeits . . . [and is not required] to seek out and prevent violations."  *Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1149 (7th Cir. 1992).  Thus,

---

[3] Plaintiff presented almost no evidence at trial with respect to the conduct of the Retailer Defendants, willful or otherwise, and cites no evidence in its briefing in support of a finding of willful infringement on the part of the Retailer Defendants.

[4] With respect to the evidence that Fossil failed to perform visual inspection of the snap fasteners on its handbags to determine whether or not they contained counterfeits, Mr. Reiter himself testified that when he first looked at the counterfeit snaps on the handbags his wife had purchased from Macy's he did not believe that they were counterfeits.  (Trial Tr. Vol. II at 309.)  If the inventor of the snaps himself cannot always distinguish a counterfeit snap from an authentic snap via visual inspection, it cannot be the case that a Fossil acted recklessly or with willful blindness by failing to visually inspect the snaps in its handbags.

unless Fossil had a specific reason to suspect that there was a risk that Superior was using counterfeit snaps, any lapses in its oversight of Superior would rise no higher than mere negligence. The evidence that Fossil knew generally that counterfeiting was a serious problem in China, or that it had an issue with the use of counterfeit zippers by a different vendor does not establish that Fossil suspected Superior of using counterfeit snaps. Furthermore, when Fossil discovered the use of counterfeit YKK zippers in its products by a vendor, rather than turning a blind eye, it quickly set up a quality control program in an attempt to avoid future issues. (Ex. 119.)

Plaintiff points to several instances where Fossil and Superior had a dispute regarding materials as evidence that Fossil suspected there was a risk that Superior was using counterfeit snaps. However, Mr. Dyment testified that he believed Superior's use of PVC instead of genuine leather in some products was an honest mistake, made without any intent to mislead Fossil. (Trial Tr. Vol. II at 461.) He further testified that although Fossil suspected that Superior was charging Fossil for YKK zippers while using generic zippers (*see* Ex. 118), this led to the concern that Superior was inflating its prices, rather than to a concern that Superior was using counterfeits (*see* Trial Tr. Vol. II at 462–63). Neither of these instances would have alerted Fossil to the risk that Superior was using counterfeit snap fasteners. Plaintiff cites only one instance in which Fossil had an issue with respect to the snap fasteners used by Superior. There, Fossil raised questions as to the reimbursement amount requested by Superior and indicated that Superior should be using generic rather than branded snaps. (Exs. 92–93.) Ultimately, Fossil agreed to reimburse Superior for the branded price. (Ex. 93.) Romag argues that Fossil should have checked Superior's purchase orders when reviewing its request for reimbursement and that it would have discovered the counterfeiting if it had done so. However, the

14

dispute over the reimbursement amount does not indicate that Fossil suspected Superior of using counterfeits.  Rather, the fact that Fossil paid Superior the full amount requested indicates that Fossil believed the snaps were genuine.  A company would be highly unlikely to pay full price for a counterfeit, and then to continue to ignore that counterfeiting, opening itself up to liability.

Thus, the evidence at trial established that Fossil paid full price for the snaps used by Superior, that it had never been informed of any specific instances of Superior using counterfeit snaps, and that it "[d]idn't believe that counterfeits were being used."  (Trial Tr. Vol. III [Doc. # 435] at 579.)  There was no other evidence to support a finding that Fossil knew or suspected there was a risk that Superior was using counterfeit snaps.  If it had such suspicions, Fossil's failure to investigate those suspicions would have constituted willful infringement.  However, absent evidence of such suspicions, Fossil's failure to investigate Superior more generally amounts to no more than negligence by Fossil.  Therefore, the jury's verdict with respect to willful infringement did not constitute a miscarriage of justice because there was no evidence that Fossil acted recklessly, with willful blindness, or with actual knowledge of a risk of counterfeit snaps, and Romag is not entitled to a new trial on this issue.

### C.    Attribution of Profits

Romag argues that it is entitled to a full award of Fossil's profits under an unjust enrichment theory, without attribution, and that it is entitled to a new trial on the issue of attribution of Defendants' profits.  Romag bases these arguments on perceived errors in the jury instructions and verdict form.  Specifically, Romag believes that the jury improperly applied its attribution finding to its award of unjust enrichment profits, and that therefore the Court should multiply the jury's finding by 100 to correct this error.

15

Romag further asserts that the Court's instructions with respect to the jury's determination of the portion of Fossil's profits attributable to the use of the ROMAG mark were erroneous and that they are therefore entitled to a new trial on this issue.

The Court instructed the jury with respect to an award of profits and attribution of profits as follows:

> Profits may only be awarded if you find a Defendant has been unjustly enriched by a use of Plaintiff's trademark or there is a need to deter an infringer from doing so again.  It is not necessary for you to make a finding of both unjust enrichment and deterrence in order for you to make an award of profits.  You may award Romag Defendants' profits if you make either a finding of unjust enrichment or deterrence, or both. . . . Profit is determined by deducting all expenses from gross revenue.  Gross revenue is all of Defendants' receipts from using the infringing mark in the sale of its product.  Plaintiff has the burden of proving a Defendant's gross receipts by a preponderance of the evidence.  Expenses are all costs incurred in producing the gross revenue.  Defendant has the burden of proving expenses.  Defendant also bears the burden of proving that any portion of the profit is attributable to factors other than the infringement.  Defendant must prove each of these by a preponderance of the evidence. Unless you find that a portion of the profit from the sale of the products using the trademark is attributable to factors other than use of the trademark, you should find that the total profit is attributable to the infringement.  If you determine that Plaintiff is entitled to an award of profits under the deterrence rationale, you may decide to award Defendants' profits even if the profits were not acquired due to the use of Romag's mark.

(Jury Instructions at 22–24.)  Romag objected to this instruction on the grounds that it invited improper speculation by the jury as to the attribution of the profits, in contravention of the Supreme Court's decision in *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203 (1942).

The Court's initial proposed verdict form simply asked the jury to calculate the amount of profits they found proved with respect to each Defendant, reserving the issue of what specific amount to award for the Court's consideration of the equitable factors

16

after trial.  At the charge conference, Plaintiff objected to this formulation, and requested that the jury be asked to indicate separately the amount of profits it found should be awarded under an unjust enrichment theory and under a deterrence theory.  (*See* Charge Conf. Tr. [Doc. # 439] at 5–8.)  The Court acceded to this request.  The verdict form given to the jury read as follows:

> B.1.     What amount of profits do you find that Romag proved by a preponderance of the evidence that each Defendant made on the sale of the accused handbags which should be awarded to Plaintiff to prevent unjust enrichment to Defendants?  *Proceed to Question B.2.*

> B.2.     What amount of profits do you find that Romag proved by a preponderance of the evidence that each Defendant made on the sale of the accused handbags which should be awarded to deter future trademark infringement?  *Proceed to Question B.3.*

> B.3.     Have Defendants proved by a preponderance of the evidence that any portion of the profits earned from the sale of the accused handbags was attributable to factors other than the use of the ROMAG mark?  If your answer to Question B.3. is "Yes," what percentage of Defendants' profits earned from the sale of the accused handbags was attributable to factors other than the use of the ROMAG mark?

(Jury Verdict at 4–5.)  Romag preserved an objection to the verdict form on the grounds that the order of Questions B.2 and B.3 should have been reversed, arguing that the order might confuse the jury as to whether attribution applied to deterrence profits in addition to unjust enrichment profits.  (Trial Tr. Vol. VII [Doc. # 440] at 1572.)

During deliberations, the jury asked the following question:  "How does the percentage in "B3" page 5 impact or relate in any way to the totals in "B2" page 4 in any way?"  (Court Ex. 5.)  In response to this question, the Court suggested to the parties that the current verdict form be exchanged for the original verdict form, which asked only for total profits proved and the percentage of profits attributable to factors other than the use

17

of the mark. (Trial Tr. Vol. VIII at 1598, 1600.) The Court also specifically raised the issue of potential confusion between the unjust enrichment award and the attribution finding:

| | |
|---|---|
| The Court: | They haven't asked how attribution applies to unjust enrichment. |
| Mr. Schaeffer: | Right, but they've read the jury charge. Okay? So they—I think they're just very closely following the jury charge . . . |
| The Court: | I'm accepting that your earlier view that it shouldn't be there is probably correct. It has been proved to be correct. But if the next question is, if the next question were to be, does it apply to B1, what's the answer? . . . If their award of unjust enrichment profits— |
| Mr. Schaeffer: | Right. |
| The Court: | —is less than 100 percent— |
| Mr. Schaeffer: | Right. |
| The Court: | —how then is the allocation applied? . . . All I want to know is we only have this jury once. Do we want to know what the total amount of profits is as well as unjust enrichment and deterrence profits? . . . |
| Mr. Schaeffer: | Your Honor, our thinking hasn't changed. We think it's— to start redoing their whole process would not be wise . . . |
| The Court: | Well, that's—does the answer to B3 apply to B1? |
| Mr. Schaeffer: | It would apply to B1, but we want to keep that separate because we may have questions on the charge on attribution and allocation, so we want those separate amounts. |
| The Court: | So it will be for the Court to apply that percentage to their unjust enrichment. |
| Mr. Schaeffer: | Correct. |

(*Id.* at 1603–06.) Based on this colloquy, the Court instructed the jury that the percentage in Question B3 did not apply to the award in Question B2. (*Id.* at 1607.) Ultimately, the jury awarded $90,759.36 of Fossil's profits under an unjust enrichment theory and $6,704,046.00 of Fossil's profits under a deterrence theory and determined that 1% of Fossil's profits were attributable to its infringement of the ROMAG mark. (*See* Jury Verdict at 4–5.)

18

Plaintiff now argues that the jury must have applied its finding in Question B.3 to Question B.1 based on the confusing verdict form and jury instructions and that therefore the court should multiply the unjust enrichment award by 100 and amend the judgment to reflect that the jury awarded $9,0759,360.00 of Fossil's profits under an unjust enrichment theory. Plaintiff bases this argument on the fact that there was no evidence regarding an amount of $90,000 in profits, and on the fact that $9 million is an amount somewhere between Defendants' expert's calculation of profits as $6,704,046.00 and Plaintiff's expert's calculation of profits as either $16,192,555.00 or $13,540,338.00. However, Plaintiff's arguments are completely speculative. Romag vehemently rejected the possibility of such confusion by the jury when this specific issue was raised by the Court and refused the Court's offer to provide clarifying instructions or a revised verdict form that could have resolved any doubt on the matter. Furthermore, the jury adopted Defendants' expert's calculation of profits wholesale with respect to the deterrence rationale, which would undercut the argument that it believed that the total amount of profits was closer to $9 million. If the jury had applied its attribution finding to its award of unjust enrichment profits it would have been more likely to award 1% of the $6,704,046.00 amount in its deterrence award.

The verdict form's wording permitted the jury to award less than the full amount of profits, before considering attribution, on both the unjust enrichment theory and the deterrence theory. (*See* Verdict Form at 4 ("What amount of profits do you find . . . *should* be awarded . . . ).) The Court has a duty to adopt a view of the verdict that would resolve any inconsistencies, *Turley*, 167 F.3d at 760, and it is possible that the jury concluded that Fossil was not unjustly enriched by the full amount of its profits. Additionally, the Supreme Court has recognized "the almost invariable assumption of the

19

law that jurors follow their instructions." *Shannon v. United States*, 512 U.S. 573, 585 (1994).    Here, the instructions on the verdict form clearly direct the jury to first determine the amount of profits that should be awarded under each rationale, and only then to determine the attribution of profits.    There is no instruction in either the jury charge or the verdict form to apply the attribution amount to the award of unjust enrichment profits.    Therefore, the Court may assume that the jury followed the directions in the verdict form to calculate their award of unjust enrichment profits before making any determination on the issue of attribution, and the Court declines to award a new trial or amend the judgment on this issue.

Romag also argues that Court should either amend the judgment to reflect an attribution of 0% or grant it a new trial because the jury's finding of 99% attribution was unsupported by the evidence at trial and based on erroneous jury instructions.    In *Mishawaka*, the Supreme Court set forth the standard for attribution of profits under the Lanham Act:

> If it can be shown that the infringement had no relation to profits made by the defendant, that some purchasers bought goods bearing the infringing mark because of the defendant's recommendation or his reputation or for any reason other than a response to the diffused appeal of the plaintiff's symbol, the burden of showing this is upon the poacher.  The plaintiff of course is not entitled to profits demonstrably not attributable to the unlawful use of his mark.  The burden is the infringer's to prove that his infringement had no cash value in sales made by him.  If he does not do so, the profits made on sales of goods bearing the infringing mark properly belong to the owner of the mark.  There may well be a windfall to the trade-mark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer.  In the absence of his proving the contrary, it promotes honesty and comports with experience to assume that the wrongdoer who makes profits from the sales of goods bearing a mark belonging to another was enabled to do so because he was drawing upon the good will generated by that mark.  And one who makes profits

20

> derived from the unlawful appropriation of a mark belonging to another
> cannot relieve himself of his obligation to restore the profits to their
> rightful owner merely by showing that the latter did not choose to use the
> mark in the particular manner employed by the wrongdoer.

316 U.S. at 206–07 (internal citation omitted); *see also Hamilton-Brown Shoe Co. v. Wolf
Bros. & Co.*, 240 U.S. 251, 261–62 (1916) (holding that where attribution of profits is
"inherently impossible" the plaintiff is entitled to the full amount of the defendant's
profits).

Plaintiff asserts that these cases stand for the proposition that unless a defendant
offers a "reasoned methodology" for the attribution of profits, the plaintiff must recover
100% of the profits proved. Based on this proposition, Romag argues that the Court's
instructions and verdict form were erroneous because they provided for an open-ended
calculation of attribution, rather than instructing the jury that unless Fossil proved that
*none* of its profits were derived from its use of the ROMAG mark, Romag was entitled to
recover the full amount of profits proved. However, *Mishawaka* and *Hamilton-Brown
Shoe* do not speak in terms of a "reasoned methodology." Rather, they instruct that where
it is *impossible* to attribute profits the windfall should go to the plaintiff, rather than the
infringer. In *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390 (1940), a copyright
case that relied on *Hamilton-Brown Shoe* and was cited with approval in *Mishawaka*, the
Supreme Court explained that "mathematical exactness" was not required for the
attribution of profits. "What [i]s required [i]s only reasonable approximation which
usually may be attained through the testimony of experts and persons informed by
observation and experience. . . . The result to be accomplished is a rational separation of
the net profits so that neither party may have what rightfully belongs to the other." *Id.* at
404 (internal citations and quotation marks omitted). The Court's instructions and

21

verdict form accurately reflected these concepts and thus were not erroneous and do not merit the granting of a new trial.

Furthermore, contrary to Plaintiff's arguments, the evidence at trial did not mandate an all-or-nothing attribution calculation.  Although Fossil's expert Dr. Jay testified that the ROMAG mark played "no role in the purchase of handbags with magnetic snaps," (Trial Tr. Vol. VI [Doc. # 438] at 1269), the jury was "free to accept or reject the expert's opinions in whole or in part and to draw its own conclusions from it," *In re MTBE Products Liability Litigation*, 739 F. Supp. 2d 576, 604 (S.D.N.Y. 2010).  Dr. Jay's survey results indicated that 6% of respondents stated that whether there was a brand name printed on the magnetic snap was a reason for purchasing one particular handbag instead of another, and that 2% of respondents stated that the appearance of the brand name on the magnetic snap was the only reason for purchasing one particular handbag instead of another.  (Ex. 648 at 8–9.)   The jury also saw evidence that Fossil purchased its snaps for approximately $0.24, which represents approximately 1% of the total landed cost of $30.00 for its handbags.  (*See* Ex. 93, 234).  Based on this evidence, the jury could have reasonably concluded that the use of the ROMAG mark accounted for approximately 1% of Fossil's profits on the accused handbags.  The jury's verdict on attribution was not contrary to the evidence at trial so as to constitute a miscarriage of justice and is not in contravention of the governing legal standards.  Therefore, Romag is not entitled to a new trial on this issue or to an amendment of the judgment to reflect an attribution of 0%.

### III.    Defendants' Motion for Judgment as a Matter of Law and for a New Trial

Defendants have filed what they refer to as a "conditional" motion for judgment as a matter of law and for a new trial.  They argue that, in the event the Court's ruling

22

with respect to the willfulness requirement is overturned on appeal, and the Court determines after conducting an analysis of the equitable factors that Plaintiff is entitled to an award of profits, the Court should find as a matter of law that their conduct was not "willfully deceptive" or "unjust" such that Plaintiff cannot recover an award of profits, and that the Court's failure to include these terms in its instructions with respect to an award of profits entitles them to a new trial on this issue. As Plaintiff correctly argues, Defendants essentially seek an advisory opinion with respect to the issue of an award of profits, and as such, Defendants' motion is unripe. In order for the Court to reach the issues raised in Defendants' motion, its prior ruling must first be overturned on appeal, and it must find after an analysis of the equitable factors governing an award of profits that Plaintiff is entitled to such an award. There are thus two different opinions that need to be decided in Plaintiff's favor before Defendants' arguments become ripe. Furthermore, in their motion, Defendants rely on the standard set forth in *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532 (2d Cir. 1992), which would likely have to be abrogated in order for an appellate court to overturn the Court's prior ruling on the issue of the willfulness requirement for an award of profits. Therefore, the Court is unable at this time to determine what standard to apply to Defendants' prospective, conditional arguments. In light of these considerations, Defendants' "conditional" motion for judgment as a matter of law and for a new trial is denied without prejudice to renewal in the event that the conditions precedent for such a renewed motion are met.

III.   **Conclusion**

For the foregoing reasons, Plaintiff's Motion [Doc. # 472] for Judgment as a Matter of Law and for a New Trial is GRANTED, in that judgment will be entered against Defendants Macy's, Inc. and Macy's Retail, Inc. with respect to trademark infringement,

and DENIED in all other respects.  Defendants' "Conditional" Motion [Doc. # 475] for Judgment as a Matter of Law and for a New Trial is DENIED without prejudice to renewal if the Court's ruling with respect to the willfulness requirement is overturned on appeal and the Court subsequently determines based on the equitable factors that Plaintiff is entitled to an award of Fossil's profits for trademark infringement.  The Clerk is directed to enter judgment[5] as follows:  (1) judgment shall enter against Fossil, Inc. and Fossil Stores I, Inc. with respect to trademark infringement, false designation of origin, state common law unfair competition, violation of CUTPA, and patent infringement in the amount of $41,862.75;[6] (2) judgment shall enter against Macy's, Inc. and Macy's Retail, Inc. with respect to trademark infringement and patent infringement in the amount of $12,562.90;[7] and (3) judgment shall enter for Defendants with respect to Plaintiff's remaining claims.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 8th day of August, 2014.

---

[5] The Court will delay the entry of this final judgment until five days after this opinion is issued in order to give Romag the opportunity to elect statutory damages against Fossil and Macy's for trademark infringement.

[6] This figure reflects the jury's award of a reasonably royalty for patent infringement, as reduced by the Court in light of its finding with respect to Plaintiff's laches.  The jury's award of Fossil's profits for trademark infringement is vacated by the Court's ruling with respect to the willfulness requirement. The jury awarded no damages on Plaintiff's state-law claims because Plaintiff sought only punitive damages with respect to those claims, and the jury found that Plaintiff was not entitled to such damages.

[7] This figure reflects the jury's award of a reasonably royalty for patent infringement, as reduced by the Court in light of its finding with respect to Plaintiff's laches.

## <u>CERTIFICATE OF SERVICE</u>

I, Jeffrey E. Dupler, hereby certify that on May 1, 2015, the foregoing

Principal and Response Brief for Defendants-Cross-Appellants, with attached

Addendum, was filed with the Court and served on the following counsel

electronically through the Court's CM/ECF System.

Parties may access this filing through the Court's CM/ECF System.

Jonathan M. Freiman
Wiggin and Dana LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832

Norman H. Zivin
Tonia A. Sayour
Cooper & Dunham, LLP
30 Rockefeller Plaza
New York, New York 10122

Dated: May 1, 2015

/s/ Jeffrey E. Dupler
Jeffrey E. Dupler

*Counsel for Defendants-Cross Appellants*

**Federal Rules of Appellate Procedure Form 6.  Certificate of Compliance with Rule 32(a)**

**Certificate of Compliance with Type-Volume Limitation, Typeface Requirements and Type Style Requirements**

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(A)(7)(B) and 28.1(e)(2)(B)(i) because

☒     This brief contains 16,447 words, excluding the parts of the brief exempted by Fed. R. App. 32(a)(7)(B)(iii), **or**

☐     This brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☒     This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point font and Times New Roman type style, **or**

☐     This brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: May 1, 2015

/s/ Jeffrey E. Dupler
Jeffrey E. Dupler

*Counsel for Defendants-Cross Appellants*